U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA

FILED

DEC 2 6 2001

ROBERT H. SHEMWELL, CLERK

BY _____
                    DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION

|  |  |
|---|---|
| ALBERT RONNIE BURRELL and<br>MICHAEL RAY GRAHAM, JR. | ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) ) ) |
| TOMMY ADKINS, DAN J. GRADY, III,<br>KENNETH LARRY AVERITT, DONALD<br>HOLDMAN, MONTY FORBESS, ELMER<br>HEARRON, JIM HOOD, ROBERT LEVY,<br>BOB BUCKLEY and JOHN AND JANE<br>DOES 1-40. | ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

Case No. 3:01CV2679

**COMPLAINT**

**JURY TRIAL DEMANDED**

**JUDGE JAMES**
**MAGISTRATE JUDGE KIRK**

For their Complaint against Defendants above-named, Plaintiffs Albert Ronnie

Burrell and Michael Ray Graham, Jr. state as follows:

## INTRODUCTION

1.  Plaintiffs Albert Ronnie Burrell and Michael Ray Graham, Jr. each spent more

than thirteen years on Death Row at the Louisiana State Penitentiary at Angola for a

crime they did not commit.  Burrell and Graham consistently maintained and professed

their innocence and, in 2000, the Louisiana Attorney General dismissed all charges

against them, citing a complete lack of evidence linking them to the crime.  Burrell and

Graham's arrest, prosecution, indictment, conviction, death sentence, and imprisonment

were the result of police and prosecutorial misconduct of the most extreme order.  This

case is brought pursuant to federal civil rights laws and Louisiana State law to obtain just



1

Doc# 1458562\3

and fair compensation for the damages Burrell and Graham suffered as a result of the prosecutorial and police misconduct.

2.   In 1987, Burrell and Graham were separately convicted of two counts of first-degree murder for killing William Delton Frost and Callie Maude Frost over Labor Day weekend in 1986.  Following their convictions, both Burrell and Graham were sentenced to die.

3.   On March 3, 2000, the Union Parish District Court – Honorable Cynthia T. Woodard presiding – ruled that Graham was entitled to a new trial because "in this case, it is obvious that the jury was not given all the facts; and, that the jury was misled about other important facts" due to actions by members of the Union Parish Sheriff's Department and Union Parish District Attorney's Office that violated Graham's constitutional, statutory, and common law rights.  (**Exhibit A** attached hereto.)

4.   On December 28, 2000, the Louisiana Attorney General filed a dismissal of all charges against Graham and Burrell for the Frost killings because of the "total lack of credible evidence" linking either man to the crime.  (**Exhibit B** attached hereto.)

5.   On January 2, 2001, the Union Parish District Court, again with Judge Woodard presiding, granted a joint motion for new trial brought by Burrell and the State of Louisiana.  (**Exhibit C** attached hereto.)  In granting the motion, the Court held that many of the same acts of constitutional misconduct that had occurred in the investigation and prosecution of  Graham's case also had occurred in Burrell's case.  The Court also held that additional evidence of misconduct relating to the State's failure to disclose information relating to Burrell's  mental incompetence further warranted the setting aside of Burrell's conviction and death sentence.

Doc# 1458562\3

6. After more than 13 years of imprisonment on death row at the Louisiana State Penitentiary at Angola, Graham was released from prison on December 28, 2000.

7. After more than 13 years of imprisonment on death row at the Louisiana State Penitentiary at Angola, Burrell was released from prison on January 2, 2001.

8. The wrongful arrest, indictment, prosecution, conviction, sentencing and imprisonment of Graham and Burrell would not have occurred, but for the malicious, intentional, reckless, and deliberate illegal and unconstitutional acts of the Union Parish Sheriff, his deputies, the Lincoln and Union Parish District Attorney, his assistant district attorneys, and other Union Parish or state agents, employees and policymakers.

9. Acting under color of state law, the Defendants, acting individually and in concert, maliciously, intentionally and with reckless disregard for and deliberate indifference to Plaintiffs' rights, employed wrongful, illegal and unconstitutional means and methods to achieve and secure the arrest, indictment, prosecution, conviction, death sentence, and imprisonment of Graham and Burrell.

10. Acting under color of state law, the Defendants, acting individually and in concert, intentionally, maliciously, and with reckless disregard for and deliberate indifference to Plaintiffs' rights, conducted a constitutionally deficient investigation into the Frost killings; arrested, indicted, prosecuted and imprisoned Graham and Burrell without probable cause or legal justification solely to avoid embarrassment and discovery of the Defendants' own illegal and improper acts; illegally coerced and threatened witnesses into giving false statements to investigators which were later the subject of perjured testimony at the grand jury hearing, trial, and post-trial hearings; fabricated falsely inculpatory evidence against Burrell and Graham; gave and elicited perjured

Doc# 1458562\3

testimony before the grand jury, at trial and at post-trial hearings; upon information and belief (with respect to Union Parish Sheriff's Department Defendants and Defendant Hood) failed to disclose exculpatory evidence to the District Attorney; and failed to disclose exculpatory evidence to Burrell and Graham's counsel.

11. The Defendants' actions, jointly and severally, deprived Burrell and Graham of their rights to due process, a fair trail, to be secure in their person and effects, to effective assistance of counsel, and to be free from cruel and unusual punishment, in violation of the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article I, sections 2, 3, 5, 15, 16, 20 and 24 of the Louisiana State Constitution.

12. The Defendants, acting jointly and severally, engaged in intentional, malicious, reckless, and deliberate acts that resulted in the false arrest, malicious prosecution, wrongful conviction, wrongful imprisonment and intentional and reckless infliction of emotional distress on Graham and Burrell.

13. The Defendants' acts caused injury to Graham and Burrell for which Graham and Burrell are entitled to, and now seek, damages.

## JURISIDICTION

14. This action is brought pursuant to 42 U.S.C. §§ 1983, 1985, 1986, and 1988, the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, Article I, §§ 2, 3, 5, 15, 16, 20 and 24 of the Louisiana State Constitution, and the statutory and common laws of the State of Louisiana. Jurisdiction over Plaintiffs' federal law claims is founded on 28 U.S.C. §§ 1331, 1343, and 2202. Jurisdiction over Plaintiffs' pendent state law claims is founded on 28 U.S.C. § 1367.

15. Venue is proper in this district under 28 U.S.C. § 1391(b)

## PARTIES

### Plaintiffs

16. Plaintiff Albert Ronnie Burrell was, at all times material to this Complaint, a citizen of the State of Louisiana. He is currently a citizen of the State of Texas.

17. Plaintiff Michael Graham was, at all times material to this Complaint, a citizen of the State of Louisiana and/or the State of Virginia. He is currently a citizen of the State of Ohio.

### District Attorney Defendants

18. Defendant Tommy Adkins was, at all times relevant to this Complaint, the duly elected District Attorney of Lincoln and Union Parishes, Louisiana, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs and usage of Lincoln and Union Parishes and the State of Louisiana. He is sued in his individual and official capacities.

19. Defendant Robert Levy is currently the duly elected District Attorney of Lincoln and Union Parishes, Louisiana, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs and usage of Lincoln and Union Parishes and the State of Louisiana. Levy is sued in his official capacity as the successor in office and liability to District Attorney Adkins.

20. Defendant Dan J. Grady, III, was, at all times relevant to this Complaint, an assistant district attorney with the District Attorney's Office, working primarily in Union Parish, Louisiana, acting under color of law pursuant to the statutes, ordinances,

5

regulations, policies, customs and usage of Union Parish and the State of Louisiana. He is sued in his individual capacity.

21. Defendants John and Jane Does 1-10 are persons who, at all times relevant to this Complaint, were assistant district attorneys, supervisors, agents, employees and/or policy makers of the Lincoln and Union Parish District Attorney's Office, acting under color of law pursuant to the statutes, ordinances, regulations, customs and usage of Union Parish and the State of Louisiana. Each is sued in his or her individual capacity.

**Sheriff's Department Defendants**

22. Defendant Kenneth Larry Averitt was, at all times relevant to this Complaint, the duly elected Sheriff of Union Parish, Louisiana, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs and usage of Union Parish and the State of Louisiana. He is sued in his individual and official capacities.

23. Defendant Bob Buckley is currently the duly elected Sheriff of Union Parish, Louisiana, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs and usage of Union Parish and the State of Louisiana. He is sued in his official capacity as the successor in office and liability to Sheriff Averitt.

24. Defendant Donald Holdman was, at all times relevant to this Complaint, a deputy sheriff for the Union Parish Sheriff's Department, Union Parish, Louisiana, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs and usage of Union Parish and the State of Louisiana. Together with Monty Forbess, Holdman was in charge of the Union Parish Sheriff's Department's investigation of the Frost killings. He is sued in his individual capacity.

6

25. Defendant Monty Forbess was, at all times relevant to this Complaint, a deputy sheriff for the Union Parish Sheriff's Department, Union Parish, Louisiana, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs and usage of Union Parish and the State of Louisiana. Together with Donald Holdman, Forbess was in charge of the Union Parish Sheriff's Department's investigation of the Frost killings. He is sued in his individual capacity.

26. Defendant Elmer Hearron was, at all times relevant to this Complaint, a deputy sheriff for the Union Parish Sheriff's Department, Union Parish, Louisiana, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs and usage of Union Parish and the State of Louisiana. He is sued in his individual capacity.

27. Defendants John and Jane Does 11-20 are persons who, at all times relevant to this Complaint, were deputy sheriffs, supervisors, agents, employees and/or policymakers for the Union Parish Sheriff's Department, Union Parish, Louisiana, acting under color of law, pursuant to the statutes, ordinances, regulations, customs and usage of Union Parish and the State of Louisiana. Each is sued in his or her individual capacity.

**Other Defendants**

28. Defendant Jim Hood was, at all times relevant to this Complaint, an investigator for the North Louisiana Criminalistics Laboratory, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Union Parish and the State of Louisiana. He is sued in his individual capacity.

29. Defendants John and Jane Does 21-30 are person who, at all times relevant to this Complaint, were employees, agents, supervisory officials and/or policy makers with the North Louisiana Criminalistics Laboratory, acting under color of law, pursuant to the

Doc# 1458562\3

statutes, ordinances, regulations, customs and usage of Union Parish and the State of Louisiana. Each is sued in his or her individual capacity.

30. Defendants John and Jane Does 31-40 are the various insurance companies that, upon information and belief, have issued to one or more of the above named Defendants and/or their employer(s), a policy of insurance under which the insurer is obligated to pay any sums that one or more of the Defendants may be obligated to pay Plaintiffs or to indemnify one or more of the Defendants for any sums they may be obligated to pay Plaintiffs.

## FACTUAL BACKGROUND

31. On Sunday, August 31, 1986, William Delton Frost and Callie Maude Frost were killed in Union Parish, Louisiana, each by a single gunshot wound to the head.

32. The Frost killings were investigated by the Union Parish Sheriff's Department. Sheriff Kenneth Larry Averitt oversaw and supervised the deputy sheriffs who worked on the Frost investigation. Sheriff Averitt specifically turned down the FBI's offer for assistance in investigating the crime.

33. Deputy Sheriffs Monty Forbess and Donald Holdman were in charge of the investigation of the Frost killings. Deputy Sheriff Elmer Hearron, along with Forbess, Holdman and Does 11-20 investigated the Frost killings.

34. The early investigation of the Frost killings proved fruitless. There was minimal physical evidence at the scene to indicate the identity of the Frosts' killers. The investigators' primary lead was a witness who stated that he had seen Michael Rogers, the Frosts' nephew, at the Frosts' house with another man. The Sheriff's Department Defendants – Averitt, Holdman, Forbess, Hearron, and Does 11-20 – investigated that

Doc# 1458562\3

lead, but did not arrest Rogers in connection with the murders. Rogers claimed, and

apparently the Sheriff's Department Defendants believed, that the Frosts were alive when

he left their house. He also claimed, and apparently the Sheriff's Department Defendants

believed, that the person he was with at the Frosts' home was not a man but was in fact

his girlfriend at the time, Ruth Toney.

35. Having absolved Rogers of any involvement in the murders, the Sheriff's

Department Defendants had few other suspects. Within a few days after the Frost

killings, Sheriff's Deputies questioned Kenneth St. Clair about the killings, but again,

made no arrests.

36. Nearly six weeks passed, and the Sheriff's Department Defendants still had

made no arrests in connection with the crime.

**Coerced False Statements of Janet Burrell**

37. On October 12, 1986, six weeks after the Frost killings and after extensive

media coverage of the killings in the local papers, Janet Burrell ("Janet"), the ex-wife of

Plaintiff Albert Burrell, telephoned Sheriff Averitt at home and volunteered

"information" to the Sheriff. She told Averitt that she had met with Burrell at 11:30 p.m.

on the night of the Frost killings, that, at that meeting, she saw a billfold containing

Delton Frost's driver's license and social security card in Burrell's car, and that Burrell

showed her approximately $2700 in cash that he said he got from Delton Frost.

38. In the following days, Janet was interviewed several times by Sheriff Averitt,

Deputy Forbess and Does 11-20. Upon information and belief, Janet was also

interviewed on at least one occasion by Assistant District Attorney Dan Grady.

39. Janet gave a recorded statement to Averitt and Forbess on October 14, 2001. According to the transcript, the statement commenced at 12:25 p.m. and ended at 12:40 a.m.

40. During this interrogation, Janet stated that, on the night of the Frost killings, she met with Burrell at 11:30. She said that Burrell told her that he had earlier gone to the Frost's house to ask Delton Frost for money but Frost had refused. She said that in Burrell's car, she saw a brown billfold containing Delton Frost's driver's license, social security card, and some other papers. She told Averitt and Forbess that the wallet contained no money, but that Burrell showed her twenty-seven one-hundred dollar bills and said he had taken the money from Delton Frost. She said also said that Burrell had blood on his boots and a .22-caliber rifle in the back of his car. According to Janet, Burrell admitted to her that he had shot into the Frost's house. She said that Burrell told her he then "busted" into the Frosts' house by forcing open the door and found Frost lying in front of the door. Janet also said that several days later, Burrell told her he had put the money in a bank account in his name.

41. Janet did not mention or implicate Plaintiff Michael Ray Graham, Jr., in any way during her statement.

42. Upon information and belief – according to an affidavit prepared for Assistant District Attorney Dan Grady's signature (**Exhibit D** attached hereto) – prior to October 15, 1986, Janet repeated essentially the same story in an interview conducted by Averitt and Grady.

Doc# 1458562\3

43. At the time they first heard Janet's story, the Sheriff's Department Defendants and Grady knew that the statements given by Janet were false and/or relied on them with deliberate disregard for their truth.

44. At the time she made her initial statement, Janet was engaged in a vicious battle with Burrell for custody of their minor son. Despite being illiterate, schizophrenic, and retarded, Burrell had been adjudged to be the better parent and had been awarded custody of the child following the couple's divorce. Janet wanted custody and thus had every incentive to attempt to discredit or publicly impugn Burrell's character. Moreover, Janet had a long reputation for being untruthful. The investigating Defendants knew, or with minimal investigation would have known, of Janet's motive to lie and her reputation for being untruthful.

45. In addition to the circumstantial evidence undermining the credibility of Janet's story, the Sheriff's Department Defendants and Grady had physical evidence confirming that her account was false. During their investigation of the Frost residence following the discovery of the two bodies, the Sheriff's Department Defendants found a wallet containing Delton Frost's driver's license, social security card, some papers (including the very recent receipt for the final payment of a .22-caliber handgun that Delton had purchased on layaway and that has never been located following the killings). This wallet was black – not brown as Janet had told the investigators – and was found on the Frosts' bed, under the contents of three paper grocery bags that had been dumped out on the bed. It also contained money – six one dollar bills – a fact Janet denied when she gave her statement. Additionally, contrary to Janet's statement that Burrell shot into the house then broke open the front door and found Delton Frost lying in front of it, Deputy

Elmer Hearron's investigative report describing the crime scene showed that broken glass from the front door was found under Delton Frost's body, indicating that he had been pulled down to the floor <u>after</u> the break-in occurred.

46. This physical evidence directly contradicted key elements of Janet's story. The investigative report outlining this critical exculpatory evidence, however, was never disclosed by Defendants to either Burrell or Graham prior to or during their capital murder trials and, upon information and belief, was never turned over to Grady by the Sheriff Department Defendants.

47. Despite this knowledge, the Sheriff's Department Defendants and Grady intentionally, maliciously and with reckless disregard for and deliberate indifference to Graham and Burrell's rights, failed to investigate or confirm the truth of Janet's story. Although they knew that Janet's story conflicted with much of the physical evidence they had already gathered, there is nothing in the criminal trial record to indicate that the Sheriff's Department Defendants or Grady even attempted to confirm many essential elements of Janet's claims – including her allegations regarding Burrell's bank account; the amount of money she had seen Burrell holding; or the presence of blood on Burrell's boots – that, if investigated, could have exonerated Burrell, and subsequently Graham, of the crime. The "investigation" of the killings by the Sheriff's Department Defendants and Grady was constitutionally deficient.

48. The Sheriff's Department Defendants not only failed to investigate or question the credibility of Janet's story, they actively coerced her into giving a false statement and perjured testimony.

Doc# 1458562\3

49. Almost immediately after she first gave her statement to Sheriff Averitt, Janet told Sheriff's Deputies that the story she told Averitt, Forbess and Grady was a lie. Janet made up the story of Burrell's confession to get back at Burrell and to get him in trouble with the police so that she could get custody of the couple's son.

50. In response to Janet's disavowing her earlier version of the events, Sheriff's Deputies – including, upon information and belief, deputies Forbess, Holdman and Does 11-20 – threatened Janet into returning to her initial false tale of Burrell's involvement in the Frost killings by telling her that if she provided false information initially and now changed her story, they would take her son away from her forever and put her in jail. According to an affidavit signed by Janet Burrell, these threats increased as the trials of Burrell and Graham got closer.   (**Exhibit E** attached hereto.)

51. The deputies' threats to Janet were part of a well-established practice among Union Parish Sheriff's investigators.. Deputies Holdman and Forbess routinely used the very threat reported by Janet – *i.e.,* the potential loss of children – as a way of intimidating witnesses and controlling their statements and testimony.

**Albert Burrell's Wrongful Arrest and Detention**

52. Despite the obvious inconsistencies and inaccuracies in Janet's statements and despite her immediate attempts to retract those statements, the Sheriff's Department Defendants coerced and threatened Janet into sticking with her false statement implicating Burrell. Relying almost exclusively on those false statements to establish probable cause, on October 12, 1986, the Sheriff's Department Defendants arrested Burrell.

Doc# 1458562\3

53. At the time of Burrell's arrest the investigators – including the Sheriff's Department Defendants and Grady – knew or should have known that Janet's story implicating Burrell in the Frost killings was false and, therefore, could not constitute probable cause or legal justification to arrest Burrell.

54. At the time of Burrell's arrest, neither the Sheriff's Department Defendants nor Grady had any other evidence linking Burrell to the Frost killings sufficient to constitute probable cause to arrest or detain Burrell.  Indeed, a .22-caliber rifle that had been seized from Burrell's home was positively excluded as the murder weapon and investigators were unable to locate any blood on any of Burrell's shoes or boots.

55. The arrest and ongoing seizure and detention of Burrell were without reasonable cause, probable cause or any other legal justification.

56. Burrell was booked and arraigned on two counts of murder in connection with the Frost killings.  Because he was held without bail, Burrell remained incarcerated pending trial.

**False Statements of the St. Clairs and Amy Opal**

57. In connection with the Frost killings, the Sheriff's Department Defendants also interviewed Kenneth St. Clair and members of his family.

58. Kenneth St. Clair was first interviewed only days after the Frost killings, and weeks before either Burrell or Graham were arrested or charged with the crime.  Upon information and belief, Kenneth St. Clair did not implicate, in any way, either Graham or Burrell in the Frost killings in his initial statements.  No record of this interview was ever made available to Graham or Burrell's defense counsel.  In fact, although Kenneth St. Clair and various members of his family were interviewed multiple times by the Sheriff's

Department Defendants, none of the contents of these interviews were ever disclosed to Graham or Burrell's defense counsel. Upon information and belief, the Sheriff's Department Defendants intentionally, maliciously and with reckless disregard for and deliberate indifference to Graham and Burrell's rights, failed to disclose the contents of these interviews to the District Attorney's Office.

59. On October 13, 1986 – after the publication of media accounts of Burrell's arrest in connection with the Frost killings – Deputy Monty Forbess took the recorded statement of Kenneth St. Clair. During that statement, St. Clair implicated Graham and Burrell in the Frost killings. He said that on the night of the killings, August 31, 1986, Graham and Burrell had left his house at about 9:00, that Graham said they had some business to do in Downsville (the town where the Frosts resided), and that there was a .22-caliber pistol in their vehicle. He said that Graham returned early the next morning – dropped off by someone other than Burrell – and that Graham had blood on him. He also said he saw Burrell that day and that Burrell had a lot of money with him. St. Clair stated that he subsequently heard Burrell and Graham whispering during a television account of the Frost killings and that Graham turned the TV off and said "that was simple." Immediately thereafter, however, Kenneth St. Clair stated to Deputy Forbess that he did not believe Graham and Burrell had anything to do with the Frost killings.

60. On October 16, 2001, Deputy Forbess interviewed Glenda St. Clair, Jackie St. Clair, and Nicki St. Clair – respectively the mother, sister and brother of Kenneth St. Clair – and Jackie's friend, Amy Opal. Forbess interviewed these persons together, in the St. Clairs' home.

     a.     Glenda St. Clair stated that Michael Graham had left her house at about 8:30 one night and, when she saw him the next day, he had blood on him.

Glenda St. Clair, however, admitted that she was confused about what night these events occurred and would "probably stay that way."

b.　Fifteen-year-old Jackie St. Clair was interviewed several times by the Sheriff's Department Defendants. Jackie's statement on October 16 (the only recorded statement that has yet been discovered) was similar to Glenda's, only Jackie said that Graham had left the St. Clair residence on Saturday, August 30, 1986 (the day before the Frost Killings and the day before Kenneth St. Clair had said that Graham left). Jackie did not recall seeing Graham with any large amounts of money and said that, on Monday, September 1, 1986, she saw Burrell with one one-hundred dollar bill that he used to purchase a motor part.

c.　In her recorded statement, fourteen-year-old Amy Opal also said that Graham left the St. Clair residence on Saturday night, not Sunday. When initially asked, Opal said that she did not see any blood on Graham. Only after both Jackie and Glenda St. Clair said they saw blood on Graham and "reminded" Opal that she too had seen this blood did Opal say that she had seen some "red stuff" and eventually said that she recalled seeing blood.

d.　Thirteen-year-old Nicki St. Clair said that he had seen Burrell with three one-hundred dollar bills and had seen Graham with one one-hundred dollar bill. He could not recall the date of her supposed observation.

61. The statements of the St. Clairs and Opal were false. Kenneth St. Clair lied to protect himself and Glenda and Jackie lied to protect Kenneth. Amy Opal, in fact, had seen blood on Kenneth St. Clair, not Michael Graham, and did not see Burrell at all on the day of the killings. To protect their brother, Jackie and Glenda St. Clair influenced Opal's testimony and told her not to say anything about the blood on Kenneth St. Clair. Opal has since stated that she believed then, and still believes, that Kenneth St. Clair killed the Frosts but that she testified otherwise because she was afraid of the St. Clairs. (**Exhibit F** attached hereto.)

62. At the time they first heard the stories of the St. Clairs and Opal, or shortly thereafter, the Sheriff's Department Defendants knew that the statements of Opal and the

16

Doc# 1458562\3

St. Clairs were false and/or and relied on them with deliberate disregard for their truth or falsity.

63. The veracity of the St. Clairs' testimony was immediately suspect. Shortly after the Frost killings – and before Janet Burrell had come forward with her statement – the police had considered Kenneth St. Clair to be a suspect in the killings. At the time of his October 13, 1986 recorded interview, Kenneth St. Clair was in the Union Parish Jail on charges of multiple counts of forgery. The person he implicated in the Frost killings – Michael Graham – had been arrested as his accomplice.

64. Upon information and belief, the multiple statements Kenneth St. Clair gave to the Sheriff's Department Defendants were inconsistent and, contrary to his October 13th statement, St. Clair did not implicate Graham or Burrell in his initial statements to investigators. Deputy Forbess testified at trial that the first indication he received that Burrell and Graham might be involved in the killings was the October 12th statement of Janet Burrell. Only after Janet Burrell came forward and Burrell was arrested, did St. Clair gave a new statement implicating Graham and Burrell in the Frost killings.

65. Jackie and Glenda St. Clair, respectively the sister and mother of Kenneth St. Clair, had obvious motive to lie to protect Kenneth St. Clair. Their statements clearly indicate that they were unable to tie the events they were telling of to the night of the killings. Contrary to Kenneth St. Clair's October 13th statement that Graham and Burrell left the St. Clair house on Sunday, August 31st – the night of the Frost killings – the statements of Jackie St. Clair and Amy Opal indicate that Graham left on Saturday night, August 30th. Neither Nicki nor Glenda St. Clair could recall the dates of the events they observed. Moreover, their statements conflicted with each other and with Kenneth St.

Clair's statements regarding the amount of money, if any, that Graham and Burrell possessed following the killings.

66. For the same reasons, the testimony of Amy Opal was also immediately suspect. Like Jackie St. Clair, Opal's story of the date on which the events occurred differed from the account of Kenneth St. Clair. Opal also made no reference to Burrell or Graham having any money. Opal was also very young and impressionable. In her statement she offered incriminating details, such as the supposed presence of blood on Graham, only after she was encouraged by Jackie St. Clair. It should have been obvious that Opal was coerced by the St. Clairs into giving a statement consistent with theirs which seemingly absolved Kenneth St. Clair of any involvement in the murders.

67. Despite knowledge of the abundant evidence undermining the veracity and credibility of the St. Clairs' and Opal's statements, the Investigators – including the Sheriff's Department Defendants and Grady – intentionally, maliciously and with reckless disregard for and deliberate indifference to Graham and Burrell's rights failed to conduct any investigation to confirm those statements. The investigation that was conducted was constitutionally deficient.

**Michael Graham's Wrongful Arrest and Detention**

68. Despite the obvious lack of credibility of Kenneth St. Clair's statement, the Sheriff's Department Defendants, relying almost exclusively on that statement, charged Michael Graham – who was already in jail charged with being Kenneth St. Clair's accomplice in the theft of some checks – with the Frost killings.

69. At the time they charged Graham, the Sheriff's Department Defendants and Grady, knew or should have known that the statements implicating Graham and Burrell

18

in the Frost killings were false and could not constitute probable cause or legal justification to detain and imprison Graham.

70. At the time Graham was charged and continually detained for the Frost killings, neither the Union Parish Sheriff's Department nor Grady had any other evidence linking Graham to the Frost killings sufficient to constitute probable cause to continue to detain or imprison Graham.

71. The continuing seizure and detention of Graham were without probable cause or legal justification.

72. Graham was booked and arraigned on two counts of murder in connection with the Frost killings. Held without bail on the murder charges, Graham remained incarcerated in the Union Parish Jail pending trial.

**Involvement of Union Parish District Attorney and Conspiracy to Maliciously Prosecute Graham and Burrell**

73. The cases against Burrell and Graham were assigned by District Attorney Tommy Adkins to assistant District Attorney Dan Grady, III.

74. Upon information and belief, prior to Burrell or Graham's arrest and/or indictment, Grady participated in the Sheriff's Department's investigation of Burrell and Graham by, among other things, participating in an interview with Janet Burrell in which Janet reiterated her false story implicating Burrell, and through him Graham, in the Frost killings. Like the Sheriff's Department Defendants, Grady knew or should have known that Janet's statements and the other testimonial evidence against Graham and Burrell was false. Indeed, in a written memorandum to Adkins, Grady recommended against prosecution of the cases against Graham and Burrell, acknowledging that the principal witnesses against Graham and Burrell lacked credibility.

Doc# 1458562\3

75. The Frost case was not Grady's first encounter with Albert Burrell. In 1976, Burrell had been charged in Lincoln Parish, Louisiana with arson, but was adjudged to be mentally incompetent to stand trial and was committed to a mental hospital. In his report to the court, the evaluating doctor questioned whether Burrell, given his "extremely limited intelligence and limited comprehension," could ever have the ability to assist in his defense. Grady knew of this adjudication and these conclusions because in 1982 Grady filed papers with the Lincoln Parish District Court officially dismissing any further prosecution of Burrell.

76. Based on his examination of the evidence the Sheriff's Department Defendant's had presented to him concerning their investigation of the Frost killings, and on his own participation in the investigation, Grady recommended against presenting the cases against Burrell and Graham to a grand jury. In a 1995 affidavit, Grady stated that "[t]he evidence at that time, in my opinion, was too weak and too dependent upon witnesses of questionable credibility to support a prosecution." (**Exhibit G** attached hereto.) Grady presented this opinion in a written assessment of the case which he presented to Adkins.

77. Rather than heed the conclusions or follow the advice of Grady, Adkins demanded that Grady continue to investigate Graham and Burrell, secure an indictment, and try the case. Adkins' demand was not based on any independent evaluation of the evidence of the case or any legitimate prosecutorial concern. Adkins' motivation was purely political and well outside his authority. Without concern or consideration for the strength of the evidence or the existence of probable cause, Adkins told Grady that the

cases against Burrell and Graham needed to be prosecuted simply "to avoid embarrassment to the sheriff."

78. According to Grady's affidavit testimony, "the Union Parish Sheriff [Defendant Averitt] was under substantial pressure at the time the charging decision against Graham and Burrell was being made, in part because he [Averitt] had refused FBI assistance for the investigation of the case, and in part because the local press and public were anxious for action on a double homicide which occurred six weeks before any arrests."

79. There proved to be good reason for Sheriff Averitt and the other Defendants to want to wrap up the case quickly and prevent the FBI from snooping around. Upon information and belief, at the time of the Frost killing investigation, Averitt, with assistance from, or the with the knowledge of other Defendants, was misappropriating funds from Union Parish, a crime for which Averitt was later indicted and pled guilty.

80. Averitt and the other Sheriff's Department Defendants, in cooperation with Adkins and the District Attorney's Office, proceeded with the arrest and prosecution of Graham and Burrell, despite knowing that no probable cause existed to support such prosecution and despite having been specifically advised by Grady that the evidence was insufficient to support such prosecution. Upon information and belief, the Defendants' decision to arrest and prosecute Burrell and Graham was made to protect the public image of the Sheriff, to protect Averitt's career and reputation, and to avoid discovery of the Defendants' own illegal conduct.

81. Despite having reached his own conclusion that probable cause and legal justification to prosecute Burrell and Graham did not exist, Grady followed Adkins'

Doc# 1458562\3

demands and continued to investigate Graham and Burrell and to prosecute the cases against Burrell and Graham before the grand jury.

**Grady's False Affidavit Testimony**

82. Upon information and belief, prior to October 15, 1986, Grady submitted an "Affidavit for Presentation to Grand Jury" to the Union Parish District Court for purposes of establishing probable cause to submit the case to the grand jury.

83. In that sworn statement, Grady stated that he was privy to the investigative reports of the Sheriff's Department and had personally interviewed the investigating officers.  To establish probable cause against Burrell and Graham, Grady recounted the statement Janet had given to him and Averitt in which she essentially reiterated the false story recorded in her October 14, 1986 statement to investigators.  Grady also relied on the statement of Kenneth St. Clair.

84. Grady has admitted in his written recommendation to Adkins that he did not find Janet Burrell or Kenneth St. Clair to be credible. Grady knew or should have known those statements were false.  Grady nevertheless intentionally, maliciously and with reckless disregard for and complete indifference to Graham or Burrell's rights, presented testimony which recounted these false statements without disclosing that these statements were false and without disclosing the numerous facts that undermined the credibility of those statements.

85. Based on Grady's false affidavit, the court convened the grand jury.

**Grand Jury Hearing**

86. On October 24, 1986, Grady presented the State's cases against Burrell and Graham to the grand jury.  During the course of that presentation, Grady intentionally,

maliciously, and with reckless disregard for and deliberate indifference to Graham and Burrell's rights elicited false and materially misleading testimony, including the false stories of Janet Burrell, Kenneth St. Clair, Jackie St. Clair, Nicki St. Clair, Glenda St. Clair, and Amy Opal.

87. Based on the incomplete record and perjured testimony placed before it, on October 24, 1986, the grand jury returned indictments for both Burrell and Graham.

**Coerced False Statements of Olan Wayne Brantley Regarding Graham**

88. On October 27, 1986, Olan Wayne Brantley, an inmate at Sheriff Averitt's Union Parish Jail, reported to Deputy Forbess that Graham had confessed to be involved in killing the Frosts.

89. According to Brantley, Graham said that he and Burrell had gone to the Frosts' home and shot the Frosts through their window.  Brantley provided little details about the murder, and said nothing that he could not have learned from reading newspaper accounts of the crimes.

90. Brantley's statements regarding Graham's supposed confession were false and were the product of Brantley's mental illness and, upon information and belief, coercion by the Sheriff's Department and District Attorney Defendants.

91. At the time Brantley reported Graham's supposed confession, the Union Parish Sheriff's Department Defendants and District Attorney Defendants knew that Brantley's statements were false and/or recorded and relied on them with deliberate disregard for their truth or falsity.

92. At the time he reported Graham's supposed confession to law enforcement officials, Brantley had an extensive reputation for dishonesty and a well documented

criminal history in Louisiana for writing bad checks.  Former Union Parish Deputy

Sheriff Ralph Reppond – who had known Brantley for many years – has testified by

affidavit that Brantley had a reputation for not being truthful.  In fact, Brantley's

proclivities toward dishonesty were so well known that he was called "Lyin' Wayne

Brantley."  Current Union Parish Sheriff Bob Buckley has been quoted as saying

"Everybody around here knows him as that."  Sheriff Buckley went on to say "I would

hate to base a case on his testimony."  Retired Union Parish jailer Joe Buck Albritton,

who also knew Brantley, has stated about Brantley that "[i]f his lips moved he was

lying."  Even Defendant Grady, who, in a sworn affidavit stated that Brantley's testimony

was the decisive evidence in proceeding with the prosecution of Graham and Burrell, has

been quoted as admitting that he knew Brantley to be a "con man" and a "wacko" and

that "[e]verybody involved in this case knew what Olan Wayne Brantley was about."

93.  At the time he reported Graham's supposed confession, Brantley also had a

well-documented mental illness.  In 1981 in a criminal case in Ouachita Parish District

Court, Brantley was adjudged not guilty of passing bad checks by reason of insanity.  In

1982, a Ouachita Parish District Court adjudged Brantley to be without the mental

capacity to proceed to trial on another bad check charge.  Court records from Ouachita

Parish and Morehouse Parish also showed that during Brantley's episodes of manic

behavior, Brantley was prone to fabricate fantastic stories.

94.  The Union Parish Sheriff's Department and District Attorney's Office knew

these facts at the time of Graham and Burrell's trial or, at the very least, would have

known them had they performed even a minimal investigation.  Instead, the Defendants

intentionally, maliciously and with reckless disregard for and complete indifference to the

rights of Graham and Burrell, failed to conduct further investigation to confirm or verify Brantley's statements. The "investigation" performed by Defendants was constitutionally deficient.

95. Upon information and belief, the Defendants not only failed to investigate Brantley's statements, they intentionally, maliciously and with reckless disregard for and complete indifference to the rights of Graham and Burrell, coerced Brantley into making the false statements.

96. At the time he reported the false Graham confession, Brantley had a favorable relationship with Sheriff Averitt and had received numerous favors from Sheriff Averitt. During his incarceration in the Union Parish Jail, Brantley had contacts with Sheriff Averitt "every day" and performed numerous services for Sheriff Averitt. In return, Sheriff Averitt let Brantley go home for visits.

97. Brantley also received favorable treatment for his testimony against Graham and Burrell. At the time he reported the false Graham confession, Brantley had been indicted for two forgery counts which carried a penalty of up to 10 years in prison. On January 9, 1987, the Union Parish District Attorney's Office reduced the charges against Brantley to two counts of issuing worthless checks, which carried a maximum sentence of not more than two years. On these charges, Brantley received two, two-year sentences, which, while they ran consecutively to one another, ran concurrently with a six-year, no-parole sentence Bradley had received in Morehouse Parish and concurrently with sentences Brantley received on different convictions in Ouachita Parish and Franklin Parish. Thus, Brantley received no additional jail time for his Union Parish crimes.

98. The Sheriff's Department Defendants and District Attorney Defendants knew these facts at the time of Graham and Burrell's trial. These facts were exculpatory towards Graham and Burrell in that they tended to call into question Brantley's credibility and motives. These facts were not disclosed to Graham or Burrell's counsel prior to or at trial.

99. Upon information and belief – based upon the incredible "coincidence" that an inmate in Sheriff Averitt's jail would come forth with a supposed confession by Graham just days after Grady had opined that the case against Burrell and Graham were too weak to prosecute; Brantley's long history of mental illness and his propensity for reporting false jailhouse confessions; the desperate need of Averitt to secure a conviction in the Frost killing case; the documented propensity of Union Parish Deputy Sheriff's to coerce and threaten witnesses to elicit false statements; the close and corrupt relationship between Brantley and Sheriff Averitt, and the plea agreement entered into between Brantley and the Union Parish District Attorney's Office – the Sheriff's Department and District Attorney's Defendants, acting in concert, coerced Brantley into fabricating the false Graham confession.

**Graham's Trial**

100.    Graham's trial began in May 1987. Assistant District Attorney Grady was the prosecutor for the case.

*Presentation of Brantley's False and Coerced Testimony*

101.    The state's principal witness against Graham was Brantley who testified as to Graham's supposed jailhouse confession.

102.   At the time he elicited Brantley's testimony at trial, Grady, and the other

District Attorney and Sheriff's Department Defendants knew that the testimony was

false.  Nevertheless Grady intentionally, maliciously and with reckless disregard for and

complete indifference to Graham and Burrell's rights, elicited and presented Brantley's

false testimony at trial and never informed either the court or Graham's defense counsel

that it was false.  Upon information and belief, the Sheriff's Department Defendants

and/or the District Attorney Defendants illegally induced, coerced or threatened Brantley

into giving the false testimony.

103.   At the time of Graham's trial, Grady and the other District Attorney and

Sheriff's Department Defendants also knew of substantial evidence concerning Brantley

– including his past criminal history, his history of mental illness, the fact that he had

twice before been found mentally incompetent to stand trial, his documented propensity

for telling false stories, his relationship with Sheriff Brantley, and the plea agreement that

had been entered into between Brantley and the Union Parish District Attorney's Office –

that undermined the credibility of Brantley's testimony and therefore was exculpatory

evidence with respect to Graham.   This evidence was not turned over to Graham's

defense counsel prior to or at trial.

104.   Upon information and belief, the Union Parish Sheriff's Department

Defendants acted in concert and cooperation with the district attorney Defendants in

keeping this exculpatory evidence from Graham's defense counsel in violation of

Graham's constitutional rights.

Doc# 1458562\3

105.   To make Brantley appear credible to jurors, the Defendants also knowingly and maliciously presented and elicited additional false testimony regarding Brantley.

106.   At Graham's trial, Grady intentionally, maliciously, and with reckless disregard for and deliberate indifference to Graham and Burrell's rights, elicited false testimony from Brantley that Brantley could not have received favors in exchange for his testimony against Graham because he had "maxed out" on the Union Parish charges that were pending when he came forward with Graham's alleged confession.  In fact, after Brantley came forward, the charges against him were reduced in a plea agreement with the Union Parish District Attorney's Office.

107.   At Graham's trial, Grady intentionally, maliciously, and with reckless disregard for and complete indifference to Graham and Burrell's rights, elicited false testimony from Deputy Forbess that Brantley had not been convicted or sentenced on his pending charges in Union Parish.

108.   At Graham's trial, Grady intentionally, maliciously, and with reckless disregard for and complete indifference to Graham and Burrell's rights, elicited false testimony from Brantley regarding the issue of Brantley's mental illness.  At Grady's urging, Brantley falsely testified that he had never been found mentally incompetent or legally insane.  Grady also elicited testimony from Brantley stating that he had not been taking his lithium carbonate medication for his bipolar disorder when he committed his past offenses of writing false checks.  In truth, Brantley was on his medication when he committed those crimes.

28

109.    Grady also intentionally, maliciously, and with reckless disregard for and complete indifference to the rights of Graham and Burrell, elicited false testimony from Brantley that Brantley had seen only television accounts of the Frost killings which he did not pay too much attention to.  In fact, Brantley had collected newspaper clippings about the case.

*Failure to Disclose Exculpatory Statement of Janet Burrell*

110.    Another key witness against Graham was Janet Burrell who, at trial, repeated her false account of Burrell's alleged confession.

111.    The state did not, prior to or at trial, disclose to Graham's defense counsel the transcript of Janet's October 14, 1986 statement to Sheriff Averitt and Deputy Forbess.  That statement contained information that was exculpatory with respect to Graham, including:

   a.    Janet had said that Burrell had admitted to being the trigger man and had made no mention of Graham.

   b.    Janet also said that Burrell told her on the Wednesday following the Frost Murders that he had deposited the Frosts' money in a bank in his name.  There was no evidence that Burrell had deposited any money in a bank account in his name.

   c.    Janet also said that two friends of Burrell had attempted to obtain a .22-caliber pistol owned or possessed by Burrell in order to prevent Burrell's conviction.  This testimony was inconsistent with the findings of the North Louisiana Criminalistics Laboratory, which had concluded that that probable murder weapon in the Frost killings was a rifle and not a pistol.

112.    Upon information and belief, the Sheriff's Department Defendants acted in concert and cooperation with the District Attorney Defendants in keeping this exculpatory evidence from Graham's defense counsel in violation of Graham's constitutional rights.

29

*Presentation of False, Coerced Testimony of Janet Burrell*

113.    Janet's testimony at Graham's trial regarding Burrell's supposed confession was false. Prior to Graham's trial, Janet had told Sheriff's Deputies that her original account of Burrell's involvement in the Frost killings was a lie. Rather than disclose this exculpatory information to the District Attorney's Office or Graham's defense counsel – the deputies, including, upon information and belief, Deputies Forbess and Holdman, intentionally, maliciously, and in reckless disregard for and indifference to Graham and Burrell's rights, threatened and coerced Janet into repeating the false testimony at Graham's trial.

114.    Upon information and belief – based on Sheriff Averitt's desperate need to secure a conviction and the known propensity of Holdman and Forbess to elicit false testimony – in coercing false testimony from Janet, the deputies were acting under the direct supervision and instruction or within the knowledge and acquiescence of Sheriff Averitt.

115.    At the very least, given the well-known propensity of Holdman and Forbess to improperly coerce false witness testimony, the damage caused to Graham by Janet's false testimony was the direct result of Sheriff Averitt's intentional, malicious, and reckless disregard for and deliberate indifference to the need to exercise greater supervision over the tactics and practices of the deputy sheriffs.

116.    Additionally, at the time he elicited Janet's testimony at trial, Grady had concluded that she was not trustworthy and that her story was false. Nevertheless, he intentionally, maliciously, and in reckless disregard for and deliberate indifference to Graham and Burrell's rights, elicited that false testimony at trial.

Doc# 1458562\3

*James Burrell's False Coerced Testimony*

117.    At Graham's trial, the state also presented and elicited testimony from James Burrell, Albert Burrell's brother and Janet Burrell's second husband. James Burrell corroborated the supposed meeting between Janet and Albert on the night of the Frost killings.

118.    James trial testimony was false. In truth, Janet had been with James all evening and did not meet with Albert Burrell on the night of the Frost killings. James lied at trial because of the threats Janet had received from the Union Parish Sheriff's Deputies. (**Exhibit H** attached hereto.)

119.    At the time he elicited Janet's testimony at trial, Grady had concluded that Janet was not trustworthy and that her story was false. Nevertheless, he intentionally, maliciously, and in reckless disregard for and indifference to Graham and Burrell's rights, elicited the false testimony of James in an effort to add credibility to Janet's story.

*False Argument with Respect to St. Clair*

120.    In his closing argument to the jury, Grady asserted that the police did not contact or interview the St. Clairs until after Burrell and Graham were already arrested for the Frost killings. Grady knew this statement of fact was false. Sheriff's Deputy Monty Forbess had testified at Graham's pretrial bail hearing that Graham was arrested because Kenneth St. Clair had implicated him in the killings.

121.    In granting Graham's motion for a new trial, the Union Parish District Court ruled that Grady's argument was misleading and may have influenced the jury's assessment as to how much weight to give the St. Clairs' testimony.

31

122. Grady intentionally, maliciously, and in reckless disregard for and deliberate indifference to the rights of Graham and Burrell presented this fabricated false argument to the jury.

*Exculpatory Crime Lab Reports*

123. As part of their investigation of the Frost killings, the Sheriff's Department Defendants contacted the North Louisiana Criminalistics Laboratory which found a partial palm print on the door knobs of the Frost residence.

124. Crime lab examiner Jim Hood examined the print and stated in his report that he was awaiting prints to compare it to, indicating that he believed that the partial print was sufficient such that it could be compared to reference prints for matches.

125. The Sheriff's Department forwarded palm prints from Graham and Burrell to Hood who then compared them to the partial print.

126. Hood's report indicated that the partial print contained at least two or more areas of friction ridges that differed from Graham and Burrell's prints and that there was not enough identifying characteristics in the partial print to make a positive identification.

127. At Graham's trial, Deputy Forbess intentionally, maliciously and with reckless disregard for and deliberate indifference to Graham and Burrell's rights, falsely testified that the crime lab had not compared the partial print to Graham and Burrell's prints because there were not enough points for identification.

128. Hood's exculpatory report was not disclosed to Graham or Burrell's defense counsel prior to or at trial.

129. Upon information and belief, Jim Hood, Does 21-30, and the Sheriff's Department Defendants, acting separately or in concert, intentionally, maliciously, and in

32

reckless disregard for and indifference to Graham and Burrell's rights, failed to turn over

Hood's report to the District Attorney or Graham or Burrell's defense counsel.

*Other Brady Violations*

130.    The prosecution failed to disclose additional exculpatory evidence prior to

or at Graham's trial, including:

    a.    The state failed to disclose reports from the North Louisiana
        Crimminalistics Laboratory that contradicted the trial testimony of Deputy
        Forbes and the statements of Grady regarding the source of blood found at
        the murder scene.

    b.    The state failed to disclose Amy Opal's October 16, 1986 recorded
        statement to Deputy Forbess in which she stated that she had gone with
        Graham and Burrell to a truck stop on August 30, 1986 (the day before the
        Frost killings) and that, after the killings, she did not see any blood on
        Michael Graham. In this statement Opal never mentions that she saw
        Graham and Burrell counting money. This statement contradicted Opal's
        trial testimony in which she said she saw Graham and Burrell counting
        money on the evening of August 31 and that this was the same night she
        went to the truck stop with them.

    c.    The state failed to disclose Jackie St. Clair's October 16, 1986 statement
        in which she said that she had seen Burrell with one one-hundred dollar
        bill and did not see Graham with any money. At trial, Jackie testified that
        "[t]hey had, well, mostly Ronnie had large sums of money" and that
        Burrell had "a whole lot" of money, "big bills like fifties."

    d.    The state failed to disclose Glenda St. Clair's October 16, 1986 statement
        to Deputy Forbess in which she said that she was confused and could not
        recall the date on which she saw blood on Graham's arm and probably
        never would be able to do so. This statement contradicted her trial
        testimony that she was positive she saw Graham with blood on his arm on
        the early morning of September 1, 1986 (the morning after the Frost
        killings).

    e.    The state failed to disclose that investigators had discovered that Callie
        Frost's wedding ring was missing when her body was discovered, which
        information was not publicly known and could have been used to impeach
        Brantley's testimony.

Doc# 1458562\3

f.      The state failed to disclose Kenneth St. Clair's October 13, 1986 statement
        to Deputy Forbes in which St. Clair stated that he did not feel that Graham
        and Burrell were involved in the Frost killings.

g.      The state failed to disclose the investigative report of Deputy Elmer
        Hearron which stated that Delton Frost's wallet had been found at the
        crime scene under the contents of three paper bags that had been dumped
        out on the bed and that the wallet contained six $1 bills.  This report
        contradicts Janet Burrell's trial testimony in which she says that that she
        saw Burrell with Delton Frost's wallet on the night of the killings and that
        it contained no money.  It also contradicts the testimony of Deputy
        Forbess who testified that Burrell or Graham likely returned to the crime
        scene and threw the wallet on the bed and that the wallet was found lying
        on top of the bed.

h.      The state failed to disclose that, prior to Graham's trial, Farmerville Police
        Chief George Cothran had turned over to the Union Parish Sheriff's
        Department a .22-caliber rifle that had been found in a dumpster about 8
        miles from the crime scene within a week after the Frost killings.  This
        evidence contradicted Deputy Forbess' testimony that the only two guns
        found and tested as potential murder weapons were Kenneth St. Clair's
        and Burrell's (neither of which matched).  This evidence also supports
        Graham's theory that the police had failed to investigate other potential
        suspects and leads.

i.      The state failed to disclose evidence regarding the prior criminal
        convictions of Michael Rogers, a witness against Graham, whom
        Graham's defense counsel suggested was the Frost's murderer.

j.      The state failed to disclose a statement given to Union Parish Sheriff's
        Deputies by James Beardon and E.C. ("Dorsie") Smith that they had seen
        Michael Rogers at the Frosts' residence at the night of the killings with a
        young man.  This statement contradicted the Rodger's trial testimony that
        he had gone to the Frost's residence with his girlfriend on the night of the
        killings.

k.      The state failed to disclose the contents of Kenneth St. Clair's initial
        interview with police, taken, upon information and belief, shortly after the
        Frost killings, in which St. Clair did not implicate either Burrell or
        Graham in the killings.

131.    Upon information and belief, the Sheriff's Department Defendants,

intentionally, maliciously, and in reckless disregard for and deliberate indifference to

Graham and Burrell's rights, failed to turn over the above exculpatory evidence to the District Attorney or Graham or Burrell's defense counsel prior to or at Graham's trial.

*Effect of Defendant's Wrongful, Illegal and Unconstitutional Acts*

132. Based on the coerced false testimony of Janet Burrell, James Burrell and Olan Brantley, the false testimony of Kenneth St. Clair, Jackie St. Clair, Glenda St. Clair and Amy Opal, Defendant's constitutionally deficient investigation of the Frost killings, the fabricated inculpatory evidence manufactured by the Defendants, and the failure of the Defendants to disclose critical exculpatory evidence, Graham was convicted by a jury of two counts of first degree murder for the killing of Delton and Claire Frost and was sentenced to death.

133. Following sentencing, Graham was transferred to the Louisiana State Penitentiary at Angola where he spent over 13 years on death row before his exoneration.

## Coerced False Statements of Olan Brantley Regarding Burrell

134. In late July of 1987, after Graham had been convicted and sentenced to death, Brantley came forward with another supposed confession. This time, Brantley reported that Burrell had confessed involvement in the Frost killings to him and asked Brantley to assist him in making a deal with the State. Brantley also reported that two weeks prior to this alleged confession, Brantley overheard Burrell talking with Burrell's brother Jessie and Burrell's mother Gladys during a visit with Burrell in jail. During this conversation, according to Brantley, Burrell asked Jessie to get rid of something for him. The following week – one week prior to Burrell's alleged confession to Brantley – Brantley overheard a conversation between Burrell and his brother Jessie during a visit with Burrell in jail. During this conversation, Brantley claims that he overheard Jessie

35

telling Burrell not to worry, Jessie had gotten rid of the item where no one would ever find it. When Burrell supposedly confessed to Brantley, Brantley asked what had happened to the murder weapon. Burrell supposedly replied that his brother Jessie had gotten rid of it for him.

135. Brantley's statements regarding Burrell's supposed confession were false. Upon information and belief, Grady personally investigated Brantley's story by questioning Union Parish Jailers. Grady's notes reflect a conversation between, on information and belief, Grady and John Day, the then jailer at the Union Parish jail. The notes specifically detail Jessie Burrell's visits to the jail to see his brother. Those notes show that Burrell's brother did not visit Burrell at the Union Parish jail on consecutive weeks in July of 1987 as Brantley claimed in his tale to authorities. In fact, Jessie had not visited Burrell on consecutive weeks at any time for a period of months prior to the alleged confession. Jessie's one visit in late July (only a day or so before Brantely came forward) was his first visit to his brother since February, according to the State's notes.

136. By reason of his own investigation Grady knew that Brantley's statement regarding Burrell's confession was false and/or relied on it with deliberate disregard for its truth.

137. Upon information and belief – again based upon the incredible "coincidence" that Brantley would hear a second jailhouse confession in the same case; Brantley's long history of mental illness and his propensity for reporting false jailhouse confessions; the desperate need of Averitt to secure a conviction in the Frost killing case; and the documented propensity of Union Parish deputy sheriff's to coerce and threaten witnesses to elicit false statements; the close relationship and history of mutual favors

between Sheriff Averitt and Brantley – the Sheriff's Department Defendants, acting

separately or in cooperation with the District Attorney Defendants, wrongfully and

illegally coerced or induced Brantley into reporting the false Burrell confession.

## Burrell's Trial

138.    Burrell's trial began on August 13, 1987.  Assistant District Attorney

Grady was the prosecutor for the case.

### Janet Burrell's Coerced False Testimony

139.    The linchpin of Union Parish's case against Burrell was Janet's testimony

of Burrell's supposed confession.  Janet gave this testimony both at trial and at a post-

trial hearing on Burrell's motion for a new trial.

140.    Janet's testimony regarding Burrell's supposed confession was false.

Prior to Burrell's trial, Janet had told the Sheriff's Deputies that her initial statement

implicating Burrell in the killings was a lie.  Rather than disclose this exculpatory

information to the District Attorney's Office or Burrell's defense counsel the deputies,

including, upon information and belief, Deputies Holdman and Forbess and Does 11-20,

intentionally, maliciously, and with reckless disregard for and deliberate indifference to

Graham and Burrell's rights, threatened and coerced Janet into repeating the false

testimony at Burrell's trial and post-trial hearing.

141.    Upon information and belief – based on Sheriff Averitt's desperate need to

secure Burrell's conviction and the known propensity of Holdman and Forbess to elicit

false testimony – in coercing false testimony from Janet, Deputies Holdman and Forbess,

and Does 11-20 were acting under the direct supervision and instruction or within the

knowledge and acquiescence of Averitt.

142.    At the very least, given the well-known propensity of Holdman and Forbess to improperly coerce false witness testimony, the damage caused to Burrell by Janet's false testimony was the direct result of Sheriff Averitt's intentional, malicious and deliberate disregard for the need to exercise greater supervision over the tactics and practices of the deputy sheriffs.

143.    Additionally, at the time he elicited Janet's testimony at trial, Grady had concluded that she was not trustworthy and that her story was false. Nevertheless, he intentionally, maliciously, and in reckless disregard for and deliberate indifference to Graham and Burrell's rights, elicited that false testimony at trial.

*James Burrell's False Coerced Testimony*

144.    At Burrell's trial, the state also presented and elicited testimony from James Burrell, Albert Burrell's brother and Janet Burrell's second husband.  James Burrell corroborated the supposed meeting between Janet and Albert Burrell on the night of the Frost killings.

145.    James' trial testimony was false.  In truth, Janet had been with James all evening and did not meet with Albert Burrell on the night of the Frost killings.  James lied at his brother's trial because of the threats Janet had received from the Union Parish Sheriff's Deputies.

146.    At the time he elicited Janet's testimony at trial, Grady had concluded that Janet was not trustworthy and that her story was false.  Nevertheless, he intentionally, maliciously, and with reckless disregard for and indifference to Graham and Burrell's rights, elicited the false testimony of James in an effort to add credibility to Janet's story.

Doc# 1458562\3

*Failure to Disclose Exculpatory Police Report*

147.    At Burrell's trial, the state tried to reconcile the testimony of Janet Burrell – who said that she had seen Burrell with a wallet containing Delton Frost's driver's license and social security card – with the fact that the police had recovered a wallet containing Delton Frost's driver's license and social security card at the crime scene.  To do so, Grady – through argument and through testimony elicited from Monty Forbess – presented to the jury the theory that Burrell had returned to the Frosts' home after meeting with Janet and tossed the wallet on the bed.

148.    Forbess testified that the wallet was found on the bed, but denied that he knew where exactly on the bed the wallet was found.

149.    Contrary to Forbess' testimony, an investigation report prepared by Union Parish Sheriff's Deputy Elmer Hearron revealed that the actual location of the wallet was on the Frosts' bed under the contents of three paper bags which had been dumped out on the bed.

150.    Because it tended to discount Janet's statement of having seen Burrell with the wallet and Forbess' testimony of how the wallet had gotten back into the Frosts' residence after Janet had supposedly seen it in Burrell's possession, the Hearron investigative report was exculpatory evidence with respect to Burrell.

151.    Upon information and belief, the Sheriff's Department Defendants, intentionally, maliciously, and with reckless disregard for and deliberate indifference to Graham and Burrell's rights, failed to turn over the above exculpatory evidence to the District Attorney or Graham or Burrell's defense counsel.

*Failure to Disclose Exculpatory Evidence Regarding Brantley*

152.    At Burrell's trial, Grady also presented the false testimony of Olan Wayne Brantley about Graham and Burrell's supposed jailhouse confessions.  Just as Brantley had done in Graham's trial, Brantley testified during Burrell's trial that he had received no deal for coming forward with information about Graham and Burrell.  This was false.

153.    Moreover, at the time of Burrell's trial, Grady knew, from his own investigation, that Brantley's story of Burrell's confession was false.  Nevertheless, Grady intentionally, maliciously, and in reckless disregard for and deliberate indifference to Graham and Burrell's rights, elicited and presented the perjured testimony of Brantley. Upon information and belief, the Sheriff's Department Defendants and/or the District Attorney Defendants illegally induced, coerced or threatened Brantley into giving false testimony.

154.    At the time of Burrell's trial, Grady and the other District Attorney and Sheriff's Department Defendants also knew of substantial evidence concerning Brantley – including his past criminal history, his history of mental illness, the fact that he had twice before been found mentally incompetent to stand trial, his documented propensity for telling false stories, his relationship with Sheriff Brantley, and the plea agreement that had been entered into between Brantley and the Union Parish District Attorney's Office – that would tend to undermine the credibility of Brantley's testimony and therefore was exculpatory evidence with respect to Burrell.   This evidence was not turned over to Burrell's defense counsel prior to or at trial.

155.    Upon information and belief, the Sheriff's Department Defendants acted in concert and cooperation with the district attorney Defendants in keeping this

40

exculpatory evidence from Burrell's defense counsel in violation of Burrell's constitutional rights.

*Failure to Disclose Perjured Testimony*

156.    At the time of Burrell's trial, Grady knew that several of the state's key witnesses, including Brantley, and Deputy Forbess, Janet Burrell, James Burrell, the St. Clairs, and Amy Opal, had presented perjured testimony at Graham's trial.  Since it undermined the credibility of these witnesses, this information was exculpatory with respect to Burrell.

157.    Grady and the other District Attorney Defendants intentionally, maliciously, and with reckless disregard for and indifference to Graham and Burrell's rights, failed to turn over the above exculpatory evidence Burrell's defense counsel.

*Failure to Disclose Exculpatory Evidence:*

158.    At Burrell's trial, the state again failed to disclose much of the exculpatory evidence it had withheld at Graham's trial.  This included:

a.    Kenneth St. Clair's October 13, 1986 statement to Deputy Forbess in which he said he did not feel that Graham and Burrell had anything to do with the Frost killings;

b.    Jackie St. Clair's October 16, 1986 statement to Deputy Forbess in which she said that Burrell had only one $100 bill;

c.    Amy Opal's October 16, 1986 statement to Deputy Forbess in which she denied seeing blood on Graham, said nothing about Graham and Burrell possessing large amounts of money, and stated that she was with Burrell and Graham at the truck stop on August 30, 1986 rather than the night of the killings;

d.    The fact that Callie Frost's wedding ring was missing;

e.    The report from the North Louisiana Criminalistics Laboratory regarding the results of the blood tests;

Doc# 1458562\3

f.   Jim Hood's report from the North Louisiana Criminalistics Laboratory regarding the results of the palm print analysis;

g.   The finding of a .22-caliber rifle in a dumpster near the crime scene within days of the Frost killings; and

h.   The contents of Kenneth St. Clair's initial statement to the Sheriff's deputies, taken shortly after the Frost killings, in which St. Clair did not implicate either Graham or Burrell in the killings.

159.   Upon information and belief, the Sheriff's Department Defendants, and with respect to the palm print report, Jim Hood and Does 21-30, intentionally, maliciously, and in reckless disregard for and deliberate indifference to Graham and Burrell's rights, failed to turn over the above exculpatory evidence to the District Attorney or Graham or Burrell's defense counsel.

*Failure to Disclose Exculpatory Evidence Concerning Burrell's Mental Capacity*

160.   Prior to trial, Assistant District Attorney Grady knew – from his past experience with Burrell and from records he had received from Lincoln Parish District Court – that Burrell has severe mental limitations and, in the past, had been adjudged mentally unfit to participate in his own defense and stand trial.

161.   The information concerning Burrell's mental incapacity was exculpatory with respect to Burrell. In violation of Burrell's constitutional rights and Louisiana law, Grady intentionally, maliciously, and with reckless disregard for and deliberate indifference to Burrell's rights, failed to provide this exculpatory information to Burrell's defense counsel prior to or at Burrell's trial or Burrell's post-trial sentencing hearing.

162.   In violation of Burrell's constitutional rights, at Burrell's sentencing hearing, Grady also intentionally, maliciously, and with reckless disregard for and deliberate indifference to Burrell's rights, falsely argued to the jury that he had seen no

42

evidence that Burrell had any mental impairment or disease or any evidence of any mitigating factors.

*Effect of Defendants' Acts*

163.    Based on the coerced false testimony of Janet, James Burrell, and Brantley, the false testimony of the St. Clairs and Amy Opal, the Defendants' constitutionally deficient investigation of the Frost killings, the fabricated inculpatory evidence manufactured by the Defendants, the failure of the Defendants to disclose critical exculpatory evidence, and Defendants' presentation of false evidence and argument, Burrell was convicted by a jury of two counts of first degree murder for the killing of Delton and Claire Frost.

164.    Based in substantial part on Grady's failure to disclose the mitigating factor of Burrell's mental impairments and Grady's false claim that there were no mitigating factors, Burrell was sentenced to death.

165.    Following sentencing, Burrell was transferred to the Louisiana State Penitentiary at Angola where he spent more than 13 years on death row before his exoneration.

166.    In June 1996, a warrant for the execution of Burrell was issued by the district court. The execution was scheduled to take place in August. A stay of execution was issued by the district court only 17 days prior to Burrell's scheduled execution.

Doc# 1458562\3

## COUNT ONE
**Claim Under 42 U.S.C. § 1983 for Insufficient Investigation, Illegal and Unconstitutional Coercion of Witnesses, Fabrication of Evidence, False Testimony, Failure to Disclose Exculpatory Evidence, Wrongful Conviction and Wrongful Sentence Against the Named and Unnamed Union Parish Sheriff's Department Individual Defendants.**

167.   All of the foregoing paragraphs are incorporated by reference and realleged as though fully set forth herein.

168.   In violation of Plaintiff Albert Ronnie Burrell and Michael Ray Graham, Jr.'s rights under the United States Constitution, Defendants Averitt, Holdman, Forbess, Hearron and John and Jane Does 11-20, acting individually and in concert, intentionally, maliciously, and with reckless disregard for and deliberate indifference to Graham and Burrell's rights:

     a.     conducted a constitutionally deficient investigation of the Frost killings by utilizing unreliable, incompetent, and illegal investigative techniques and practices to investigate the credibility of the testimonial evidence against Plaintiffs;

     b.     conducted a constitutionally deficient investigation of the Frost killings by ignoring evidence tending to exonerate Plaintiffs and failing to pursue leads contrary to Defendants' joint effort to manufacture a case against Plaintiffs;

     c.     illegally coerced and threatened witnesses – including, without limit, Janet Burrell, James Burrell and Olan Brantley – into giving false statements and false testimony against Plaintiffs;

     d.     fabricated false evidence against Plaintiffs;

     e.     gave false and materially misleading testimony to the jury at Plaintiffs' trials;  and

     f.     failed to turn over exculpatory evidence to the District Attorney or to Plaintiffs' criminal defense counsels prior to or during Plaintiffs' criminal trials.

Doc# 1458562\3

169.   In conducting these joint and individual acts, Defendants Averitt, Forbess, Holdman, Hearron, and Does 11-20 were acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs and usage of Union Parish and the State of Louisiana.

170.   At the time they engaged in the above acts, Defendants Averitt, Forbess, Holdman, Hearron and Does 11-20 knew or should have known that their conduct, jointly and individually, violated Plaintiffs' clearly established constitutional and statutory rights.   Nevertheless, Defendants engaged in that conduct intentionally, maliciously, and with reckless disregard for and deliberate indifference to Plaintiffs' rights.

171.   The acts of Defendants Averitt, Forbess, Holdman, Hearron and Does 11-30, jointly and severally, caused the deprivation of Plaintiffs' liberty without due process of law, in violation of the Fifth and Fourteenth Amendment of the United States Constitution.

172.   The acts of Defendants Averitt, Forbess, Holdman , Hearron and Does 11-20, jointly and severally, caused the cruel and unusual punishment of Plaintiffs in violation of the Eighth Amendment to the United States Constitution.

173.   The acts of Defendants Averitt, Forbess, Holdman , Hearron and Does 11-20, jointly and severally, violated Plaintiffs' right to a fair trial and deprived them of effective assistance of counsel in violation of the Sixth Amendment to the United States Constitution.

174.   The acts of Defendants Averitt, Forbess, Holdman, Hearron and Does 11-20, jointly and severally, proximately and directly caused Plaintiffs grievous permanent

Doc# 1458562\3

injury, including, great distress, physical pain, anguish, fear, suffering, loss of companionship and monetary damages.

## COUNT TWO
**Claim Under 42 U.S.C. § 1983 for False Arrest, Malicious Prosecution, and Wrongful Imprisonment Against the Named and Unnamed Union Parish Sheriff's Department Individual Defendants.**

175.    All of the foregoing paragraphs are incorporated by reference and realleged as though fully set forth herein.

176.    In violation of Plaintiffs' rights under the United States Constitution, Defendants Averitt, Holdman, Forbess, Hearron and John and Jane Does 11-20, acting individually and in concert, intentionally, maliciously, and with reckless disregard for and deliberate indifference to Graham and Burrell's rights:

   a.    arrested, imprisoned and continually detained Plaintiffs without reasonable cause, probable cause or other legal justification and on the basis of evidence they knew was false;

   b.    fabricated false evidence, withheld exculpatory evidence, coerced witnesses into giving false testimony, and gave false testimony to preclude judicial and prosecutorial authorities from discovering the lack of probable cause for the arrest and on-going detention of Plaintiffs' and to ensure the conviction of Plaintiffs;

   c.    commenced and continued, on an ongoing basis, prosecution of Plaintiffs without probable cause or other legal justification and for improper purposes including, without limit, political gain and concealment of their own wrongdoings;

177.    In conducting these joint and individual acts, Defendants Averitt, Forbess, Holdman, Hearron, and Does 11-20 were acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs and usage of Union Parish and the State of Louisiana.

Doc# 1458562\3

178.    At the time they engaged in the above acts, Defendants Averitt, Forbess, Holdman, Hearron and Does 11-20 knew, or should have known, that their conduct, jointly and individually, violated Plaintiffs' clearly established constitutional and statutory rights.   Nevertheless, Defendants engaged in that conduct intentionally, maliciously, and with reckless disregard for and deliberate indifference to Graham and Burrell's rights.

179.    The acts of Defendants Averitt, Forbess, Holdman, Hearron and Does 11-20, jointly and severally, caused the unlawful arrest, detention, and on-going and continuing seizure of Plaintiffs in deprivation of Plaintiffs' right to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures guaranteed by the Fourth Amendment of the United States Constitution.

180.    The acts of Defendants Averitt, Forbess, Holdman, Hearron and Does 11-20, jointly and severally, caused the malicious prosecution of plaintiffs without probable cause in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

181.    The acts of Defendants Averitt, Forbess, Holdman, Hearron and Does 11-20, jointly and severally, proximately and directly caused Plaintiffs grievous permanent injury, including, great distress, physical pain, anguish, fear, suffering, loss of companionship and monetary damages.

Doc# 1458562\3

## COUNT THREE
**Claim Under 42 U.S.C. § 1983 for Insufficient Investigation, Illegal and
Unconstitutional Coercion of Witnesses, Fabrication of Evidence,
False Testimony, Failure to Disclose Exculpatory Evidence,
Wrongful Conviction and Wrongful Sentence Against the
Named and Unnamed Union Parish District Attorney
Individual Defendants.**

182.    All of the foregoing paragraphs are incorporated by reference and
realleged as though fully set forth herein.

183.    In violation of Plaintiff Albert Ronnie Burrell and Michael Ray Graham,
Jr.'s rights under the United States Constitution, Defendants Adkins, Grady and John and
Jane Does 1-10, acting individually and in concert, intentionally, maliciously, and with
reckless disregard for and deliberate indifference to Plaintiffs' rights:

a.    conducted a constitutionally deficient investigation of the Frost killings by
      utilizing unreliable, incompetent, and illegal investigative techniques and
      practices to investigate the credibility of the testimonial evidence against
      Plaintiffs;

b.    conducted a constitutionally deficient investigation of the Frost killings by
      ignoring evidence tending to exonerate Plaintiffs and failing to pursue
      leads contrary to Defendants' joint effort to manufacture a case against
      Plaintiffs;

c.    illegally coerced and threatened witnesses – including, without limit, Olan
      Brantley – into giving false statements and false testimony against
      Plaintiffs;

d.    fabricated false evidence against Plaintiffs;

e.    gave false or materially misleading affidavit testimony to the Court in
      connection with Defendant Grady's "Affidavit for Presentation to Grand
      Jury."

f.    presented false evidence and elicited false and materially misleading
      testimony before the grand jury;

g.    presented false evidence and elicited false and materially misleading
      testimony before the jury at Plaintiffs' trials;

Doc# 1458562\3

h.  failed to turn over exculpatory evidence to Plaintiffs' criminal defense counsels prior to or during Plaintiffs' criminal trials; and

i.  presented false and materially misleading argument to the jury in connection with Plaintiff Burrell's sentencing hearing.

184.  In conducting these joint and individual acts, Defendants Adkins, Grady, and Does 1-10 were acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs and usage of Union Parish and the State of Louisiana.

185.  At the time they engaged in the above acts, Adkins, Grady, and Does 1-10 knew, or should have known, that their conduct, jointly and severally, violated Plaintiffs' clearly established constitutional and statutory rights.  Nevertheless, Defendants engaged in that conduct intentionally, maliciously, and with reckless disregard for and deliberate indifference to Graham and Burrell's rights.

186.  The acts of Defendants Adkins, Grady, and Does 1-10, jointly and severally, caused the deprivation of Plaintiffs' liberty without due process of law, in violation of the Fifth and Fourteenth Amendment of the United States Constitution.

187.  The acts of Defendants Adkins, Grady, and Does 1-10, jointly and severally, caused the cruel and unusual punishment of Plaintiffs in violation of the Eighth Amendment to the United States Constitution.

188.  The actions of Defendants Adkins, Grady, and Does 1-10, jointly and severally, violated Plaintiffs' right to a fair trial and deprived Plaintiffs of effective assistance of counsel in violation of the Sixth Amendment to the United States Constitution.

189.  The actions of Defendants Adkins, Grady, and Does 1-10, jointly and severally, proximately and directly caused Plaintiffs grievous permanent injury,

Doc# 145856213

including, great distress, physical pain, anguish, fear, suffering, loss of companionship

and monetary damages.

## COUNT FOUR
### Claim Under 42 U.S.C. § 1983 for False Arrest, Malicious Prosecution, and Wrongful Imprisonment Against the Named and Unnamed Union Parish District Attorney's Office Individual Defendants.

190.    All of the foregoing paragraphs are incorporated by reference and

realleged as though fully set forth herein.

191.    In violation of Plaintiffs' rights under the United States Constitution,

Defendants Adkins, Grady, and Does 1-10, acting individually and in concert,

intentionally, maliciously, and with reckless disregard for and deliberate indifference to

Plaintiffs' rights:

     a.     imprisoned and continually detained Plaintiffs without reasonable cause, probable cause or other legal justification and on the basis of evidence they knew was false;

     b.     fabricated and presented false evidence, withheld exculpatory evidence, coerced witnesses into giving false testimony, and made false argument to preclude judicial authorities from discovering the lack of probable cause for the arrest and on-going detention of Plaintiffs and to ensure the conviction of Plaintiffs;

     c.     commenced and continued, on an ongoing basis, the prosecution of Plaintiffs without probable cause or other legal justification and for improper purposes including, without limit, political gain and concealment of their own wrongdoings;

192.    In conducting these joint and individual acts, Defendants Adkins, Grady,

and Does 1-10 were acting under color of law pursuant to the statutes, ordinances,

regulations, policies, customs and usage of Union Parish and the State of Louisiana.

193.    At the time they engaged in the above acts, Defendants Adkins, Grady,

and Does 1-10 knew, or should have known, that their conduct, jointly and individually,

Doc# 1458562\3

violated Plaintiffs' clearly established constitutional and statutory rights.  Nevertheless,

Defendants engaged in this conduct intentionally, maliciously, and with reckless

disregard for and deliberate indifference to Graham and Burrell's rights.

194.    The actions of Defendants Adkins, Grady, and Does 1-10, jointly and

severally, caused the unlawful arrest, detention, and on-going and continuing seizure of

Plaintiffs in deprivation of Plaintiffs' right to be secure in their persons, houses, papers,

and effects, against unreasonable searches and seizures guaranteed by the Fourth

Amendment to the United States Constitution.

195.    The actions of Defendants Adkins, Grady, and Does 1-10, jointly and

severally, caused the malicious prosecution of plaintiffs without probable cause in

violation of the Fourth and Fourteenth Amendment to the United States Constitution.

196.    The actions of Defendants Adkins, Grady, and Does 1-10, jointly and

severally, proximately and directly caused Plaintiffs grievous permanent injury,

including, great distress, physical pain, anguish, fear, suffering, loss of companionship

and monetary damages.

## COUNT FIVE
### Claim Under 42 U.S.C. §§ 1983, 1985 and 1986 for Conspiracy Against the Named and Unnamed Union Parish Sheriff's Department and District Attorney's Office Individual Defendants.

197.    All of the foregoing paragraphs are incorporated by reference and

realleged as though fully set forth herein.

198.    Upon information and belief, Defendants Adkins, Grady, Averitt,

Holdman, Forbess, Hearron, Hood and John and Jane Does 1 to 20, acting together and

under color of state law, conspired together, reached an understanding and engaged in a

course of conduct – including the constitutionally deficient investigation of the Frost

Doc# 1458562\3

killings, the illegal coercion and threat of witnesses, the fabrication of false evidence, the

elicitation and presentation of false and materially misleading testimony and argument,

and the withholding of exculpatory evidence – which was designed to and had the effect

of depriving Plaintiffs of the rights guaranteed them under the Fourth, Fifth, Sixth,

Eighth, and Fourteenth Amendments to the United States Constitution and of violating

the provisions of 42 U.S.C. § 1985 and § 1986.

199.    Defendants' conspiracy proximately and directly caused Plaintiffs

grievous permanent injury, including, great distress, physical pain, anguish, fear,

suffering, loss of companionship and monetary damages.

**COUNT SIX**
*Monell* **Claim Under 42 U.S.C. § 1983 Against District Attorneys**
**Tommy Adkins and Robert Levy in their Official Capacities**
**(Unconstitutional Official Policy by Direct**
**Acts of Final Policymaker)**

200.    All of the foregoing paragraphs are incorporated by reference and

realleged as though fully set forth herein.

201.    Through his direct actions and decisions as the final and official policy

maker for the Lincoln and Union Parish District Attorney, District Attorney Tommy

Adkins intentionally, maliciously, and with reckless disregard for and deliberate

indifference to Plaintiffs' rights, created and maintained an official custom, practice

and/or policy of ordering and compelling assistant district attorney Dan Grady to proceed

with and maintain the investigation and prosecution of Plaintiffs without concern for or

consideration of the existence of probable cause or the perceived guilt or innocence of

Plaintiffs, but solely on the basis of political concerns – including, without limit, the

Doc# 1458562\3

protection of the reputation of Union Parish Sheriff Averitt and the concealment of his illegal conduct.

202.    Acting in his official policymaking capacity and under color of law, Adkins directly instituted this official custom, practice, and/or policy by ignoring the recommendation and advice of assistant district attorney Grady that the case against Plaintiffs was too weak to proceed and by instead ordering Grady to proceed with the investigation and prosecution of Plaintiffs, demanding that Grady secure an indictment and conviction of Plaintiffs, without concern for or consideration of the existence of probable cause and solely to avoid embarrassment to Union Parish Sheriff Averitt.

203.    District Attorney Adkins' official custom, practice, and/or policy resulted directly in the constitutionally deficient investigation, presentation of false affidavit testimony to the Court to establish probable cause to convene the grand jury, illegal coercion of witnesses, fabrication of evidence, presentation of false testimony, evidence and argument, false arrest, wrongful indictment, malicious prosecution, wrongful conviction, wrongful sentence and wrongful imprisonment that the rights guaranteed Plaintiffs under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

204.    District Attorney Adkins' official custom, practice, and/or policy proximately and directly caused Plaintiffs grievous permanent injury, including, great distress, physical pain, anguish, fear, suffering, loss of companionship and monetary damages.

205.   As the successor in office and liability to District Attorney Adkins, current

Lincoln and Union Parish District Attorney Robert Levy is liable for the damages caused

by the official policy of Adkins.

**COUNT SEVEN**
*Monell* **Claim under 42 U.S.C. § 1983 Against Union Parish District Attorney
Tommy Adkins and Robert Levy in their Official Capacities
(Failure to Train or Supervise)**

206.   All of the foregoing paragraphs are incorporated by reference and

realleged as though fully set forth herein.

207.   Upon information and belief, Union Parish District Attorney Tommy

Adkins in his official policymaking capacity, created and maintained an official custom,

practice and/or policy of failing to adequately train and supervise department employees

and agents, including, without limit, assistant district attorney Grady and Does 1-10,

regarding the disclosure of exculpatory evidence to opposing defense counsel and the

presentation of evidence, testimony and argument at trial.

208.   As a direct result of the Adkins' official custom, practice, and/or policy of

failing to adequately train and/or supervise department agents and employees, Grady and

Does 1-10 intentionally, maliciously and with reckless disregard for and deliberate

indifference to Plaintiffs' rights, offered false affidavit testimony to the Court to establish

probable cause to convene the grand jury, withheld exculpatory evidence from Plaintiffs'

defense counsel, illegally induced, coerced or threatened witnesses into giving false

statements and perjured testimony, elicited false and materially misleading testimony

from witnesses at Plaintiffs' criminal trials, and presented false evidence and false

argument to the jury at Plaintiffs' criminal trials and in post-trial hearings.

209.   As a direct result of Adkins' official custom, practice, and/or policy of failing to adequately train or supervise office employees and agents regarding the disclosure of exculpatory evidence, Plaintiffs were denied due process and were wrongfully prosecuted, indicted, convicted, sentenced and imprisoned without probable cause or legal justification for crimes they did not commit, in violation of the rights guaranteed Plaintiffs under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

210.   District Attorney Adkins' official custom, practice, and/or policy of failing to properly train or supervise office employees and agents proximately and directly caused Plaintiffs grievous permanent injury, including, great distress, physical pain, anguish, fear, suffering, loss of companionship and monetary damages.

211.   As the successor in office and liability to District Attorney Adkins, current Union Parish District Attorney Robert Levy is liable for the damages caused by the official policy of Adkins.

## COUNT EIGHT
*Monell* **Claim under 42 U.S.C. § 1983 Against Union Parish District Attorneys
Tommy Adkins and Robert Levy in their Official Capacities
(Unconstitutional Official Policy by Common,
Well-Settled Custom and Practice)**

212.   All of the foregoing paragraphs are incorporated by reference and realleged as though fully set forth herein.

213.   Upon information and belief, Union Parish District Attorney Adkins, in his official policymaking capacity, created and maintained a custom, policy and/or practice within his office of withholding exculpatory evidence from opposing defense counsel and presenting perjured testimony and false evidence and argument to the jury.

55

214.     These practices, even if not authorized by officially adopted or promulgated policy, were so common and well settled as to constitute a custom that fairly represents the Lincoln and Union Parish District Attorney's official custom, practice or policy.

215.     As a direct result of the Adkins' official custom, practice, and/or policy, assistant district attorney Grady and Does 1-10 intentionally, maliciously and with reckless disregard for and deliberate indifference to Plaintiffs' rights, offered false affidavit testimony to the Court to establish probable cause to convene the grand jury, withheld exculpatory evidence from Plaintiffs' defense counsel, illegally induced, coerced or threatened witnesses into giving false statements and perjured testimony, elicited false and materially misleading testimony from witnesses at Plaintiffs' trials, and presented false evidence and false argument to the jury at Plaintiffs' criminal trials and in post-trial hearings.

216.     As a direct result of Adkins' official custom, practice, and/or policy Plaintiffs were denied due process and were wrongfully prosecuted, indicted, convicted, sentenced and imprisoned without probable cause for crimes which they did not commit, in violation of the rights guaranteed Plaintiffs under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

217.     District Attorney Adkins' official custom, practice, and/or policy proximately and directly caused Plaintiffs grievous permanent injury, including, great distress, physical pain, anguish, fear, suffering, loss of companionship and monetary damages.

218.    As the successor in office and liability to District Attorney Adkins, current

Lincoln and Union Parish District Attorney Robert Levy is liable for the damages caused

by the official policy of Adkins.

**COUNT NINE**
**Claim under 42 U.S.C. § 1983 Against Union Parish**
**District Attorney Tommy Adkins and Does 1-10 in**
**their Individual Capacities**
**(Failure to Train, Supervise or Discharge)**

219.    All of the foregoing paragraphs are incorporated by reference and

realleged as though fully set forth herein.

220.    As supervisory officials for the Union Parish District Attorney, Tommy

Adkins and supervisory Does 1-10 were responsible for training and supervising the

assistant district attorneys working for the Union Parish District Attorney's Office,

including assistant district attorney Dan Grady and non-supervisory Does 1-10.

221.    In connection with the investigation and prosecution of Plaintiffs Burrell

and Graham, Adkins and supervisory Does 1-10 intentionally, maliciously, and with

reckless disregard for and deliberate indifference to Plaintiffs' rights, failed and refused

to supervise and train assistant district attorney Dan Grady and non-supervisory Does 1-

10, whom Adkins had appointed to prosecute Plaintiffs' criminal trials.

222.    As a direct result of Adkins and supervisory Does 1-10's failure to train

and/or supervise Grady and non-supervisory Does 1-10 – especially regarding the

necessity of disclosing exculpatory evidence to opposing defense counsel – Grady and

non-supervisory Does 1-10 withheld exculpatory evidence from Plaintiff's defense

counsel, offered false affidavit testimony to the Court to establish probable cause to

convene a grand jury, illegally induced, coerced or threatened witnesses into giving false

statements and perjured testimony, elicited false and materially misleading testimony from witnesses at Plaintiffs' trials, and presented false evidence and false argument to the jury at Plaintiffs' criminal trials and post-trial hearings.

223.    Upon information and belief, Adkins and supervisory Does 1-10 knew of Grady and non-supervisory Does 1-10's misconduct, yet intentionally, maliciously, and with reckless disregard for and deliberate indifference to Plaintiffs' rights, failed and refused to prevent Grady and non-supervisory Does 1-10 from continuing with this misconduct or to remove or discharge them from the investigation and prosecution of Plaintiffs' cases.

224.    As a direct result of the Adkins and supervisory Does 1-10's intentional, malicious and deliberate acts, Plaintiffs were denied due process and were wrongfully prosecuted, indicted, convicted, sentenced and imprisoned without probable cause or legal justification for crimes which they did not commit in violation of the rights guaranteed Plaintiffs under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

225.    District Attorney Adkins and supervisory Does 1-10's acts resulted proximately and directly caused Plaintiffs grievous permanent injury, including, great distress, physical pain, anguish, fear, suffering, loss of companionship and monetary damages.

Doc# 1458562\3

## COUNT TEN
*Monell* **Claim Under 42 U.S.C. § 1983 Against Sheriffs
Kenneth Larry Averitt and Bob Buckley in their Official Capacities
(Unconstitutional Official Policy by Direct
Acts of Final Policymaker)**

226.     All of the foregoing paragraphs are incorporated by reference and

realleged as though fully set forth herein.

227.     Through his direct actions and decisions as the final and official policy

maker for the Union Parish Sheriff, Sheriff Kenneth Larry Averitt intentionally,

maliciously, and with reckless disregard for and deliberate indifference to Plaintiffs'

rights, created and maintained an official custom, practice and/or policy by participating

directly and in conspiracy with other defendants in the constitutionally deficient

investigation of the Frost killings; the illegal coercion of and threats against witnesses to

force them to give false statements and perjured testimony; the fabrication of false

evidence; the presentment of perjured testimony by Sheriff's deputies; and the failure to

disclose exculpatory evidence to the District Attorney or to Plaintiffs' counsel.

228.     Sheriff Averitt's official custom, practice, and/or policy proximately and

directly caused Plaintiffs grievous permanent injury, including, great distress, physical

pain, anguish, fear, suffering, loss of companionship and monetary damages.

229.     As the successor in office and liability to Sheriff Averitt, current Union

Parish Sheriff Bob Buckley is liable for the damages caused by the official policy of

Adkins.

Doc# 1458562\3

## COUNT ELEVEN
*Monell* Claim Under 42 U.S.C. § 1983 Union Parish Sheriff
Kenneth Larry Averitt and Bob Buckley
in their Official Capacities
(Unconstitutional Official Policy by Common,
Well-Settled Custom and Practice)

230.    All of the foregoing paragraphs are incorporated by reference and realleged as though fully set forth herein.

231.    Upon information and belief, Union Parish Sheriff Kenneth Larry Averitt, in his official policy making capacity, created and maintained an official custom, practice and/or policy within his office of utilizing illegal, unreliable, discredited and constitutionally defective investigative techniques, including the using illegal and improper threats and other coercive tactics to elicit false statements from witnesses the fabrication of false evidence against criminal suspects and failing to disclose exculpatory evidence to prosecutors.

232.    These  practices, even if not authorized by officially adopted or promulgated policy, was so common and well settled as to constitute a custom that fairly represents the Union Parish Sheriff's official custom, practice or policy.

233.    As a direct result of the Averitt's official custom, practice, and/or policy, Union Parish Sheriff's Deputies, including Deputies Holdman, Forbess, Hearron, and Does 11-20,  intentionally, maliciously and with reckless disregard for and deliberate indifference to Plaintiffs' rights, threatened and coerced witnesses into giving false statements and perjured testimony, arrested Plaintiffs' without probable cause, fabricated false evidence against Plaintiffs, failed to disclose exculpatory evidence to prosecutors, and gave false and materially misleading testimony in connection with their investigation and prosecution of Plaintiffs.

60

234.    As a direct result of Averitt's official custom, practice, and/or policy

Plaintiffs were denied due process and were wrongfully arrested, prosecuted, indicted,

convicted, sentenced and imprisoned without probable cause or legal justification for

crimes which they did not commit in violation of the rights guaranteed Plaintiffs under

the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States

Constitution.

235.    Sheriff Averitt's official custom, practice, and/or policy proximately and

directly caused Plaintiffs grievous permanent injury, including, great distress, physical

pain, anguish, fear, suffering, loss of companionship and monetary damages.

236.    As the successor in office and in liability to Sheriff Averitt, current Union

Parish Sheriff Bob Buckley is liable for the damages caused by the official policy of

Averitt.

### COUNT TWELVE
***Monell* Claim Under 42 U.S.C. § 1983 Against Union Parish Sheriff
Kenneth Larry Averitt and Bob Buckley
in their Official Capacities
(Failure to Train and Supervise)**

237.    All of the foregoing paragraphs are incorporated by reference and

realleged as though fully set forth herein.

238.    Upon information and belief, Union Parish Sheriff Averitt in his official

policymaking capacity, created and maintained an official custom, policy and/or practice

of failing to adequately train and supervise department employees and agents – including,

without limit, Deputies Holdman, Forbess, Hearron and Does 11-20 – regarding

permissible investigative techniques, the elicitation of testimony from witness, or the

necessity of disclosing of exculpatory evidence to the District Attorney's Office.

61

239.    As a direct result of Averitt's official custom, practice, and/or policy of
failing to adequately train and/or supervise department agents and employees, Union
Parish Sheriff's Deputies – including Deputies Holdman, Forbess, Hearron, and Does 11-
20 – intentionally, maliciously and with reckless disregard for and deliberate indifference
to Plaintiffs' rights, arrested plaintiffs without probable cause, threatened and coerced
witnesses into giving false statements and perjured testimony, fabricated falsely
inculpatory evidence against Plaintiffs, failed to disclose exculpatory evidence to
prosecutors, and gave false and materially misleading testimony in connection with the
investigation and prosecution of Plaintiffs.

240.    As a direct result of Averitt's official custom, practice, and/or policy of
failing to adequately train or supervise office employees and agents, Plaintiffs were
denied due process and were wrongfully arrested, prosecuted, indicted, convicted,
sentenced and imprisoned for crimes which they did not commit in violation of the rights
guaranteed Plaintiffs under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments
to the United States Constitution.

241.    Sheriff Averitt's official custom practice and/or policy of failing to
properly train or supervise employees proximately and directly caused Plaintiffs grievous
permanent injury, including, great distress, physical pain, anguish, fear, suffering, loss of
companionship and monetary damages.

242.    As the successor in office and in liability to Sheriff Averitt, current Union
Parish Sheriff Bob Buckley is liable for the damages caused by the official custom,
practice, and/or policy of Averitt.

Doc# 1458562\3

## COUNT THIRTEEN
### Claim under 42 U.S.C. § 1983 Against Union Parish Sheriff Kenneth Larry Averitt and Does 11-20 in their Individual Capacities
(Failure to Train or Supervise or Discharge)

243.    All of the foregoing paragraphs are incorporated by reference and realleged as though fully set forth herein.

244.    As supervisory officials of the Union Parish Sheriff, Averitt and supervisory Does 11-20 have a duty and responsibility to train and supervise the investigators and deputies working for the Union Parish Sheriff's Department, including deputies Forbess, Holdman, Hearron and non-supervisory Does 11-20.

245.    Upon information and belief, in connection with the investigation, arrest and prosecution of Plaintiffs, Averitt and supervisory Does 11-20 intentionally, maliciously, and with reckless disregard for and deliberate indifference to Plaintiffs' rights, failed to supervise and  train deputies Forbess, Holdman, Hearron and Does 11-20 concerning the investigation, arrest and prosecution of Plaintiffs.

246.    As a direct result of the Averitt's and Does 11-20's failure to train or supervise department employees and agents, Deputies Holdman, Forbess, Hearron, and Does 11-20, intentionally, maliciously and with reckless disregard for and deliberate indifference to Plaintiffs' rights, arrested Plaintiffs without probable cause, threatened and coerced witnesses into giving false statements and perjured testimony, fabricated falsely inculpatory evidence against Plaintiffs, failed to disclose exculpatory evidence to prosecutors, and gave false and materially misleading testimony in connection with the investigation and prosecution of Plaintiffs.

Doc# 1458562\3

247.    Upon information and belief, Averitt and supervisory Does 11-20 knew of Forbess, Holdman, Hearron and non-supervisory Does 11-20's misconduct, yet intentionally, maliciously, and with reckless disregard for and deliberate indifference to Plaintiffs' rights, failed and refused to prevent or halt the deputies from continuing or to remove or discharge them from the investigation and prosecution of the Frost killings.

248.    As a direct result of the Averitt and supervisory Does 11-20's acts, Plaintiffs were denied due process and were wrongfully arrested, prosecuted, indicted, convicted, sentenced and imprisoned without probable cause or legal justification for crimes they did not commit in violation of the rights guaranteed Plaintiffs under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

249.    Sheriff Averitt and supervisory Does 11-20's acts resulted proximately and directly caused Plaintiffs grievous permanent injury, including, great distress, physical pain, anguish, fear, suffering, loss of companionship and monetary damages.

**COUNT FOURTEEN**
**Claim under 42 U.S.C. § 1983 for *Brady* Violation Against**
**Jim Hood and Does 21-30 in their Individual Capacities.**

250.    All of the foregoing paragraphs are incorporated by reference and realleged as though fully set forth herein.

251.    In violation of Plaintiff Albert Ronnie Burrell and Michael Ray Graham, Jr.'s rights under the United States Constitution, Defendants Jim Hood and Does 21-30, acting individually and in concert, intentionally, maliciously, and with reckless disregard for and deliberate indifference to Plaintiffs' rights failed to turn over exculpatory evidence – *i.e.,* Hood's exculpatory report regarding Hood's palm print investigation – to

Union Parish District Attorneys prior to or during the criminal investigation and trial of Plaintiffs.

252.    In conducting these joint and individual acts, Defendants Hood and Does 21-30 were acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs and usage of Union Parish and the State of Louisiana.

253.    At the time they engaged in the above acts, Hood and Does 21-30 knew, or should have known, that their conduct, jointly and severally. violated Plaintiffs' clearly established constitutional and statutory rights.  Nevertheless, Defendants engaged in that conduct intentionally, maliciously, and with reckless disregard for and deliberate indifference to Graham and Burrell's rights.

254.    The actions of Defendants Hood and Does 21-30, jointly and severally, caused the deprivation of Plaintiffs' liberty without due process of law, in violation of the Fifth and Fourteenth Amendment of the United States Constitution.

255.    The actions of Defendants Hood and Does 21-30, jointly and severally, caused the cruel and unusual punishment of Plaintiffs in violation of the Eighth Amendment to the United States Constitution.

256.    The actions of Defendants Hood and Does 21-30, jointly and severally, violated Plaintiffs' right to a fair trial and deprived Plaintiffs of effective assistance of counsel in violation of the Sixth Amendment to the United States Constitution.

257.    The actions of Defendants Hood and Does 21-30, jointly and severally, proximately and directly caused Plaintiffs grievous permanent injury, including, great distress, physical pain, anguish, fear, suffering, loss of companionship and monetary damages.

Doc# 1458562\3

## COUNT FIFTEEN
### Claims Against All Defendants Except Does 31-40 for
### Violation of Plaintiffs' Rights Under the Louisiana Constitution.

258.    All of the foregoing paragraphs are incorporated by reference and realleged as though fully set forth herein.

259.    The Louisiana State Constitution, like the United States Constitution, guarantees a person's right to be secure in his person and effect from unreasonable seizure, to equal protection of the law, to due process of law, to a fair trial and effective assistance of counsel,  to be free from cruel, excessive or unusual punishment and to additional unenumerated rights. *See* La. Cost. Art. I, §§ 2, 3, 5, 15, 16, 20, 22, and 24.

260.    By reason of the same intentional, malicious, reckless and deliberate conduct that violated Plaintiffs' rights under the United States Constitution, Defendants' conduct violated the rights guaranteed Plaintiffs under Article I, §§ 2, 3, 5, 16, 20, 22 and 24 of the Louisiana State Constitution.

261.    These violations of the Louisiana State Constitution directly proximately and directly caused Plaintiffs grievous permanent injury, including, great distress, physical pain, anguish, fear, suffering, loss of companionship and monetary damages.

## COUNT SIXTEEN
### Intentional and/or Reckless Infliction of Emotional Distress
### Against All Defendants Except Does 31-40.

262.    All of the foregoing paragraphs are incorporated by reference and realleged as though fully set forth herein.

263.    Defendants Adkins, Grady, Averitt, Holdman, Forbess, Hearron, Hood and Does 1-30 – acting separately and in concert, individually and in their official capacities – did intentionally, maliciously and with reckless disregard and deliberate

66

indifference to Plaintiffs' rights, engage in extreme and outrageous conduct in connection

with the arrest and prosecution of Plaintiffs – including, without limit, engaging in an

deficient investigation; arresting and prosecuting Plaintiffs without probable cause;

illegally coercing and threatening witnesses into giving false statements and presenting

false testimony; fabricating false evidence; giving and eliciting perjured testimony; and

presenting false argument and false facts to the jury – for the purpose of ensuring that

Plaintiffs were arrested, indicted, convicted, imprisoned, and sentenced to death so that

Defendants' could avoid political and professional embarrassment.

264.     Defendants desired to inflict severe emotional distress on Plaintiffs or

knew that severe emotional distress would be certain or substantially certain to result

from their joint and several conduct.

265.     As a direct and proximate result of defendants joint and several extreme

and outrageous behavior Plaintiffs suffered severe emotional distress for which they are

entitled to damages.

**COUNT SEVENTEEN**
**Malicious Prosecution**
**Against All Defendants Except Does 31-40.**

266.     All of the foregoing paragraphs are incorporated by reference and

realleged as though fully set forth herein.

267.     Defendants Adkins, Grady, Averitt, Holdman, Forbess, Hearron, Hood

and John and Jane Does 1-30 – acting separately and in concert, individually and in their

official capacities – did willfully, unlawfully, maliciously and without probable cause or

legal justification, cause plaintiffs to be indicted, prosecuted, convicted, and sentenced to

death for the Frost killings.

268.    Plaintiffs engaged in this conduct without concern for or consideration of the perceived guilt or innocence of Plaintiffs, but for the purpose of achieving political and professional gain and avoiding political and professional embarrassment in addition to other purposes unrelated to any legitimate prosecutorial concerns.

269.    Plaintiffs are, and have consistently maintained that they are, innocent of the Frost killings. The Union Parish District Court has overturned plaintiffs' convictions and granted their motions for new trials. The Louisiana District Attorney General has dismissed all charges against Plaintiffs, citing a total lack of evidence linking either Plaintiff to the killings.

270.    As a direct and proximate result of Defendants' malicious prosecution, plaintiffs suffered grievous permanent injury, including great distress, pain, anguish, fear, suffering, loss of companionship and monetary damages.

**COUNT EIGHTEEN**
**False Arrest**
**Against Union Parish Sheriff's Department Defendants**

271.    All of the foregoing paragraphs are incorporated by reference and realleged as though fully set forth herein.

272.    Defendants Averitt, Holdman, Forbess, Hearron and John and Jane Does 11-20 – acting separately and in concert, individually and in their official capacities – did willfully, unlawfully, maliciously and without probable cause or legal justification, cause plaintiffs to be arrested for the Frost killings.

273.    Defendants Averitt, Holdman, Forbess, Hearron and Does 11-20, intentionally, maliciously and with reckless disregard for and deliberate indifference to Plaintiffs' rights, fabricated false evidence, withheld exculpatory evidence, and coerced

68

witnesses into giving false testimony, and gave false testimony to preclude judicial and

prosecutorial authorities from discovering the lack of probable cause for the arrest and

ongoing detention of Plaintiffs and to ensure the conviction of Plaintiffs.

274.   As a direct and proximate result of Defendants' false arrest, plaintiffs

suffered grievous permanent injury, including great distress, pain, anguish, fear,

suffering, loss of companionship and monetary damages.

**COUNT NINETEEN**
**Wrongful Conviction and Wrongful Imprisonment**
**Against All Defendants Except Does 31 to 40**

275.   All of the foregoing paragraphs are incorporated by reference and

realleged as though fully set forth herein.

276.   Defendants Adkins, Grady, Averitt, Holdman, Forbess, Hearron, Hood

and John and Jane Does 1-30 – acting separately and in concert, individually and in their

official capacity – did willfully, unlawfully, maliciously and without probable cause or

legal justification, cause plaintiffs to be sentenced and imprisoned for an ongoing and

continuing basis lasting over thirteen years for a crime they did not commit.

277.   Defendants intentionally, maliciously and with reckless disregard for and

deliberate indifference to Plaintiffs' rights, fabricated false evidence, withheld

exculpatory evidence, and coerced witnesses into giving false testimony, and gave false

testimony to preclude judicial authorities from discovering the lack of probable cause for

the arrest and on-going detention of Plaintiffs' and to ensure the conviction of Plaintiffs;

278.   As a direct and proximate result of Defendants' wrongful imprisonment,

plaintiffs suffered grievous permanent injury, great distress, pain, anguish, fear, suffering,

loss of companionship and monetary damages.

Doc# 1458562\3

## COUNT TWENTY
### Direct Action Pursuant to Louisiana Revised Statute § 22:655
### Against Defendant Insurance Companies John Does 31-40

279.    All of the foregoing paragraphs are incorporated by reference and realleged as though fully set forth herein.

280.    Defendant Insurance Companies John and Jane Does 31-40, upon information and belief, have issued and currently have in effect one or more policies of insurance covering one or more of the other Defendants named herein.  For valuable consideration received, these policies obligate Does 31-40, jointly and/or severally, to pay on behalf of their insured Defendant(s) any sums the insured Defendant(s) may become obligated to pay to Plaintiffs or to indemnify their insured Defendant(s) for any sums the insured Defendant(s) may become obligated to pay to Plaintiffs.

281.    By reason of their illegal and unconstitutional acts, the insured Defendants are liable to Plaintiffs for all damages and injuries Plaintiffs have suffered as a result of Defendants' acts.   Upon information and belief, Does 31-40 are contractually obligated to pay these sums on behalf of the insured Defendants or are obligated to indemnify the insured Defendants for these sums.

282.    Upon information and belief, Defendant Does 31-40 are liable to Plaintiffs for any and all damages incurred by reason of the insured Defendants' acts, up to their policy limits, notwithstanding the fact that the insured Defendants may themselves be able to assert claims of privilege or immunity from liability.

283.    By reason and operation of Louisiana Revised Statute § 22:655(B), Plaintiffs are entitled and permitted to bring, and do hereby bring, a direct action against

70

Defendant Does 31-40 to recover any and all sums the Does 31-40 are obligated to pay to on behalf of their insureds or to indemnify their insureds.

## CLAIM FOR DAMAGES

284.    The actions of Defendants, jointly and severally, deprived Plaintiffs of their civil rights under the Fourth, Fifth, Sixth, Eighth and Fourteen Amendment to the United States Constitution and Article I, sections 2, 4, 5, 15, 16, 20, 22, and 24 of the Louisiana State Constitution.

285.    The actions of Defendants, jointly and severally, constituted malicious prosecution, false arrest, wrongful imprisonment and intentional infliction of emotional distress.

286.    As a direct and proximate result of Defendants' acts, Plaintiff Albert Ronnie Burrell suffered grievous permanent injury, great distress, pain, anguish, fear, suffering, loss of companionship and monetary damages for which he is entitled to compensatory damages in the amount of $25,000,000.

287.    As a direct and proximate result of Defendants' acts, Plaintiff Michael Ray Graham, Jr. suffered grievous permanent injury, great distress, pain, anguish, fear, suffering, loss of companionship and monetary damages for which he is entitled to compensatory damages in the amount of $25,000,000.

288.    Defendants' acts with respect to both Plaintiffs were intentional, malicious, deliberate, reckless, wanton and/or cruel such as to justify an award of punitive damages to each Plaintiff in the amount of $50,000,000.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

Doc# 1458562\3

A.     Award compensatory damages to Plaintiff Burrell and against the Defendants, jointly and severally, in the amount of $25,000,000;

B.     Award compensatory damages to Plaintiff Graham and against the Defendants, jointly and severally, in the amount of $25,000,000;

C.     Award punitive damages to Plaintiff Burrell and against the Defendants, jointly and severally, in the amount of $50,000,000;

D.     Award punitive damages to Plaintiff Graham and against the Defendants, jointly and severally, in the amount of $50,000,000

E.     Award and allow Plaintiffs costs and attorneys fees pursuant to 42 U.S.C. § 1988 or any other applicable law;

F.     Award and grant such other just relief.

Doc# 1458562\3

Respectfully Submitted:

Dated: _December 24, 2001_

CENTER FOR EQUAL JUSTICE

By: _____
Nicholas J. Trenticosta
LSBA #18475
7100 St. Charles Avenue
New Orleans, LA  70118
504-864-0700

**ATTORNEY FOR PLAINTIFFS
ALBERT RONNIE BURRELL
AND MICHAEL RAY GRAHAM,
JR.**

LINDQUIST & VENNUM P.L.L.P.
Charles J. Lloyd
Steven M. Pincus
Christopher L. Lynch
4200 IDS Center
80 South 8th Street
Minneapolis, MN  55402
612-371-3211

**ATTORNEYS FOR PLAINTIFF
ALBERT RONNIE BURRELL**

COCHRAN NEUFELD &
SCHECK, LLP
Peter J. Neufeld
Barry C. Scheck
99 Hudson Street
New York, NY  10013
917-237-0338

**ATTORNEYS FOR PLAINTIFF
MICHAEL RAY GRAHAM, JR.**

73

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF LOUISIANA
# MONROE DIVISION

## NOTICE OF DOCUMENTS NOT FILED IN THE RECORD

CIVIL CASE NO.        3:01cv2679

ALBERT RONNIE BURRELL, ET AL

VS.

TOMMY ADKINS, ET AL

ATTACHMENTS TO:
DOCUMENT #:   1

DESCRIPTION:   Supporting documentation to Complaint

FILED BY:        Plaintiff

FILE DATE:        12/26/01

HAVE BEEN PLACED IN AN ACCORDION FOLDER

BETH PREST
DEPUTY CLERK