## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## MONROE DIVISION

| | | |
|---|---|---|
| **ALBERT RONNIE BURRELL and MICHAEL RAY GRAHAM, JR.** | ) ) ) | **Case No. 3:01CV 2679** |
| **Plaintiffs,** | ) ) ) | |
| **vs.** | ) ) | |
| **TOMMY ADKINS, DAN J. GRADY, III, KENNETH LARRY AVERITT, DONALD HOLDMAN, MONTY FORBESS, ELMER HEARRON, JIM HOOD, ROBERT LEVY, BOB BUCKLEY and JOHN AND JANE DOES 1-40.** | ) ) ) ) ) ) ) | **JUDGE DRELL** **MAGISTRATE JUDGE KIRK** |
| **Defendants.** | ) ) | |

## PLAINTIFFS' RESPONSE IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT ON BEHALF OF UNION PARISH SHERIFF BOB BUCKLEY, FORMER UNION PARISH SHERIFF LARRY AVERITT, AND FORMER UNION PARISH SHERIFF'S DEPUTIES DONALD HOLDMAN AND MONTY FORBESS

## TABLE OF CONTENTS

Table of Authorities..................................................................................................iii

I.      Introduction.......................................................................................................1

II.     Legal Standards on Summary Judgment...........................................................10

III.    Mr. Graham and Mr. Burrell Were Deprived of Their Fourteenth
        Amendment Fair Trial Rights by the Defendants' Multiple
        Violations of Brady v. Maryland......................................................................10

        A.      The Defendants Intentionally Suppressed Exculpatory Evidence.........13

                1.      The Statements of Janet Burrell...............................................13

                2.      The Hearron Report..................................................................17

                3.      Olan Wayne Brantley.................................................................19

                4.      The St. Clairs............................................................................21

                5.      The Undisclosed Evidence, Considered Cumulatively,
                        Was Material.............................................................................23

                6.      The Sheriff Defendants Are Not Entitled to Qualified
                        Immunity for Brady Violations Committed in Their
                        Individual Capacities................................................................25

IV.     Fourth Amendment Claims..............................................................................26

V.      Failure to
        Investigate.......................................................................................................31

VI.     Union Parish is Liable Under Section 1983 for the Actions and
        the Policies and Practices of Final Policymaker Larry Averitt........................33

        A.      Legal Standard for Municipal Section 1983 Claims.............................34

        B.      Defendant Averitt's Direct Participation in Constitutional
                Violations Renders the Parish Liable.................................................36

                1.      Larry Averitt is Union Parish's Final Policymaker for Law

i

　　　　　　　　Enforcement and Criminal Investigations; His Actions
　　　　　　　　Pursuant to That Official Capacity Bind the Parish................................37

　　　　2.　　Averitt's Multiple Constitutional Violations and
　　　　　　　Direct Involvement in the Frost Investigation Render
　　　　　　　the Parish Liable Under Section 1983......................................................38

　　C.　　Policy or Custom of Failure to Supervise and Train..............................................42

　　　　1.　　Defendant Averitt Maintained an Official Policy of
　　　　　　　of Grossly Inadequate Supervision and Training......................................43

　　　　2.　　The Record also Demonstrates Averitt's and the
　　　　　　　Parish's Deliberate Indifference................................................................50

　　　　3.　　Averitt's Grossly Inadequate Supervision and Training
　　　　　　　Caused the Constitutional Violations in This Case....................................52

　　D.　　Plaintiffs' Claims are Not Premised on a Mere "Single
　　　　　Incident" of Misconduct........................................................................................55

VII.　　Supervisory Claims....................................................................................................69

VIII.　　State Law Claims.......................................................................................................62

## TABLE OF AUTHORITIES

**FEDERAL CASES**                                                                                    **Page**

Alexander v. City of South Bend, 433 F.3d 550 (7th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . 55

Allen v. Muskogee, 119 F.3d 837 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 54

Amnesty America v. Town of West Hartford, 361 F.3d 113 (2d Cir. 2004) . . . . . . . . . . . . . . 59

Ansin v. River Oaks Furniture, Inc., 105 F.3d 745 (1st Cir. 1997) . . . . . . . . . . . . . . . . . . . . . 25

Arizona v. Youngblood, 488 U.S. 51 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Atkins v. County of Riverside,151 F. App'x 501 (9th Cir. 2005) . . . . . . . . . . . . . . . . 19, 21, 24

B.F. Goodrich v. Betkoski, 99 F.3d 505 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 54

Baker v. McCollan, 443 U.S. 137 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Baptiste v. J.C. Penney Co., 147 F.3d 1252 (10th Cir.1998) . . . . . . . . . . . . . . . . . . . . . . . . . 28

Barlow v. Ground, 943 F.2d 1132 (9th Cir.1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Bennett v. Pippin, 74 F.3d 578 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 42, 56

Blow v. City of San Antonio, 236 F.3d 293 (5th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Brady v. Maryland, 373 U.S. 83 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Brown v. Bryan County, 219 F.3d 450 (5th Cir. 2000) . . . . . . . 35, 36, 41, 42, 51, 53, 54, 56, 57

Bryan County v. Brown, 520 U.S. 397 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Bryan County v. Brown, 520 U.S. 397 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Bryan v. McKinsey & Co., Inc., 375 F.3d 358 (5th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . 10

Burdeshaw v. Snell, 2004 WL 3016014 (M.D.Ala. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Burge v. St. Tamany Parish, 187 F.3d 452 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . 25, 35, 36

Caboni v. General Motors Corp., 278 F.3d 448 (5th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . 10

Carter v. Harrison, 612 F. Supp. 749, 758 (E.D.N.Y. 1985) . . . . . . . . . . . . . . . . . . . . . . . . 53, 58

Castellano v. Fragozo, 352 F.3d 939 (5th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 27

Causey v. Parish of Tangipahoa, 167 F. Supp. 2d 898 (E.D. La. 2001) . . . . . . . . . . . . . . . . . 37

City of Canton v. Harris, 489 U.S. 378 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . 35, 42, 51, 56, 57

City of St. Louis v. Praprotnik, 485 U.S. 112 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 56

Clipper v. Tacoma Park, 876 F.2d 17 (4th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33

Doe v. Taylor Independent School District, 15 F.3d 443 (5th Cir. 1994) . . . . . . . . . . . . . . . . . 60

Fields v. City of South Houston, 922 F.2d 1183 (5th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . 35

Geter v. Fortenberry, F. 2d 1550 (5th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 26

Giglio v. United States, 405 U.S. 150 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Giglio v. United States, 405 U.S. 150 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Goodwin v. Johnson, 132 F.3d 162 (5th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Gregory v. City of Louisville, 444 F.3d 725 (6th Cir. 2006) . . . . . . . . . . . . . . . . . . 51, 53, 57, 58

Guerra v. Collins, 916 F. Supp. 620 (S.D. Tex. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553 (1st Cir. 1989) . . . . . . . . . . . . . . . . . . . . . 9, 54

Haggerty v. Texas Southern University, 391 F.3d 653 (5th Cir. 2004) . . . . . . . . . . . . . . . . . . . 26

Hale v. Fish, 899 F.2d 390 (5th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 30

Hand v. Gary, 838 F.2d 1420 (5th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Harper v. Merckle, 638 F.2d 848 (5th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Jett v. Dallas Independent School District, 491 U.S. 701 (1989) . . . . . . . . . . . . . . . . . . . . . . . 37

Jones v. City of Chicago, 856 F.2d 985 (7th Cir.1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 60

Jones v. St. Tammany Parish Jail, 4 F. Supp. 2d 606 (E.D. La. 1998) . . . . . . . . . . . . . . . . . . . 37

iv

Kentucky v. Graham, 473 U.S. 159 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 42, 53

Kuehl v. Burris, 173 F.3d 646 (8th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Kyles v. Whitley, 514 U.S. 419 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 24

Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Lindsey v. King, 769 F.2d 1034 (5th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

Luna v. Beto, 391 F.2d 329 (5th Cir.1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Mahoney v. Kesery, 976 F.2d 1054 (7th Cir.1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Maldonado v. Rodriguez, 23 F.3d 576 (1st Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . 60

Marks v. CDW Computer Centers, Inc., 122 F.3d 363 (7th Cir. 1997) . . . . . . . . . . . . . . . . . 25

Mayes v. City of Hammond, 442  F. Supp. 2d 587 (N.D. Ind. 2006) . . . . . . . . . . . . . . . . 57, 59

McKonney v. City of Houston, 863 F.2d 1180 (5th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . 28

McMillian v. Johnson, 878 F.Supp. 1473 (M.D.Ala.1995) . . . . . . . . . . . . . . . . . . . . . . . . 11

Mendes-Silva v. United States, 980 F.2d 1482 (D.C. Cir. 1993) . . . . . . . . . . . . . . . . . . . 9, 54

Monell v. New York City Department of Social Services, 436 U.S. 658 (1978) . . . . . . 34, 42, 53

Monroe v. Blackburn, 607 F.2d 148 (5th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Mowbray v. Cameron County, 274 F.3d 269 (5th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . 25

Pembaur v. City of Cincinnati, 475 U.S. 469 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 37

Robinson v. Maruffi, 895 F.2d 649 (10th Cir.1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Russo v. City of Cincinnati, 953 F.2d 1036 (6th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . 9, 48

Russo v. City of Cincinnati, 953 F.2d 1036 (6th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . 48, 54

Sanders v. English, 950 F.2d 1152 (5th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 28, 32

Sellers v. Estelle, 651 F.2d 1074, 1075 (5th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 24

Shields v. Twiss, 389 F.3d 142 (5th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 24

Sornberger v. City of Knoxville, 434 F.3d 1006 (7th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . 27, 30

Thomas v. Newton International Enterprises, 42 F.3d 1266 (9th Cir. 1994) . . . . . . . . . . . . . . 58

Thomas v. Sams, 734 F.2d 185 (5th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Thompson v. Connick, No. Civ.A.03-2045, 2005 WL 3541036 . . . . . . . . . . . . . . . . . . . . . . 30, 54

TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438 (1971) . . . . . . . . . . . . . . 12, 51, 53, 56, 57

Turner v. Houma Municipal Fire & Police Civil Service Board, 229 F.3d 478
      (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Turner v. Upton County, 915 F.2d 133 (5th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

United States v. Bagley 473 U.S. 667 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

United States v. Jackson, 818 F.2d 344 (5th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 24

United States v. Thompson, 130 F.3d 676 (5th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 30

Vance v. Nunnery, 137 F.3d 270 (5th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Voutour v. Vitale, 761 F.2d 812 (1st Cir.1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Walker v. City of New York, 974 F.2d 293 (2d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Whitley v. Seibel, 613 F.2d 682 (7th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51, 53, 57

Williams v. Kaufman County, 352 F.3d 994 (5th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Wilson v. Lawrence County, 260 F.3d 946 (8th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . 38, 42, 54

Woodward v. Correctional Medical Services of Illinois, 368 F.3d 917 (7th Cir. 2004) . . . . 32, 33

Young v. City of Providence, 404 F.3d 4 (1st Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

**STATE CASES**

Jenkins v. Baldwin, 801 So.2d 485 (La. App. 4th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

Jenkins v. Jefferson Parish Sheriff's Office, 402 So.2d 669 (La. 1981) . . . . . . . . . . . . . . . . . . . 37

Progressive Security Insurance Co. v. Foster, 711 So.2d 675 (La. 1998) . . . . . . . . . . . . . . . . . . 63

**STATE STATUTES**

La. Civ. Code Art. 331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

La. Const. Art. 5, § 27 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

LSA-R.S. 33:1435 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION

| | | |
|---|---|---|
| ALBERT RONNIE BURRELL and MICHAEL RAY GRAHAM, JR. | ) ) ) | Case No. 3:01CV 2679 |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| TOMMY ADKINS, DAN J. GRADY, III, KENNETH LARRY AVERITT, DONALD HOLDMAN, MONTY FORBESS, ELMER HEARRON, JIM HOOD, ROBERT LEVY, BOB BUCKLEY and JOHN AND JANE DOES 1-40. | ) ) ) ) ) ) ) | JUDGE DRELL<br><br>MAGISTRATE JUDGE KIRK |
| Defendants. | ) ) | |

PLAINTIFFS' RESPONSE IN OPPOSITION TO MOTION FOR SUMMARY
JUDGMENT ON BEHALF OF UNION PARISH SHERIFF BOB BUCKLEY, FORMER
UNION PARISH SHERIFF LARRY AVERITT, AND FORMER UNION PARISH
SHERIFF'S DEPUTIES DONALD HOLDMAN AND MONTY FORBESS

## I.    Introduction

In 1987, Plaintiffs Michael Graham and Albert Burrell were wrongly convicted of the

double murder of Delton and Callie Frost in Union Parish.  Both Mr. Graham and Mr. Burrell,

despite being innocent of those murders, were subsequently sentenced to die in an Angola State

Penitentiary electric chair.  The tragedies of their executions were averted thirteen years later, in

late 2000 and early 2001, when Judge Woodard granted their post-conviction motions for new

trials, finding that dozens of items of material exculpatory evidence had been suppressed by the

State.  (Pl. R. 56.1 Statement ¶ 564.)  Shortly thereafter, the State of Louisiana concluded that

Mr. Graham and Mr. Burrell would not be retried, citing "a total lack of credible evidence linking

1

Graham and/or Burrell to the crime." (Pl. R. 56.1 Statement ¶ 566.) Mr. Graham and Mr.
Burrell were released from prison after fourteen years of wrongful imprisonment as innocent
men, the bulk of which was spent wrongly incarcerated on Angola's death row.

This action, brought under 42 U.S.C. § 1983, seeks to hold accountable the Union Parish
officials who are responsible for the multiple violations of Plaintiffs' right to be free of unlawful
arrest and imprisonment, and right to a fair trial, pursuant to the Fourth and Fourteenth
Amendments and Louisiana law. Plaintiffs' wrongful convictions, despite a "total lack of
credible evidence linking" them to the Frost murders, are not mere tragic mistakes illuminated
only with 20-20 hindsight. Rather, they were the direct result of the deliberate, unconstitutional
official actions and policies of former Union Parish Sheriff, defendant Larry Averitt, and
misconduct engaged in with Averitt's knowledge and/or condonation by his deputies, defendants
Monty Forbess and Donald Holdman.[1] As set forth in Plaintiff's Rule 56.1 statement and the
below-described facts,[2] Forbess and Holdman, with Averitt's active participation and express or
implicit authorization, coerced witnesses, failed to document and disclose critical, exculpatory
witness interviews, withheld additional, crucial exculpatory documents and information from the
prosecution, and in numerous other ways conducted a patently constitutionally inadequate
investigation. These blatantly illegal activities were carried out openly and notoriously in a
Sheriff's Department organized and operated pursuant to defendant Averitt's official policy of

---

[1] Plaintiffs have also named as a defendant current Union Parish Bob Buckley as a defendant in his official capacity, as the successor-in-interest to former Sheriff Averitt.

[2] The facts described in the instant Introduction are set forth in summary form to provide the Court with a narrative overview of Plaintiffs' claims, and citations are provided only as to direct quotations. Plaintiffs' evidence is set forth in full in Plaintiffs' Rule 56.1 Statement, and the facts contained therein are specifically cited in the portions of this Memorandum which address Plaintiffs' specific claims.

training and supervision designed to establish and perpetuate an official climate of utter

constitutional impunity and political corruption.  Indeed, this case is not simply about sporadic

misconduct or "rogue" action by isolated actors in a single investigation, but rather is a sobering

glimpse into a notorious and routine Parish-wide perversion of law enforcement, typified by, but

not limited to, the astounding facts demonstrating that *every* actor in the Frost case (including not

only the Sheriff Defendants but also former District Attorney Tommy Adkins and prosecutor Dan

Grady[3]) committed flagrant misconduct and constitutional violations at literally *every* step of the

investigation and prosecution of the Plaintiffs, and did so with the knowledge, encouragement,

and assistance of Union Parish policymakers - defendants Averitt and Adkins.

Plaintiffs' evidence, largely uncontroverted by the defendants, demonstrates that

defendant Averitt, acting at all times as Union Parish's final policymaker on law enforcement

issues, was intimately involved in the Frost murder investigation from its very outset, both by his

direct participation in key investigative activities with his lead investigator Monty Forbess and

chief deputy Donald Holdman, and by supervising Forbess and Holdman and setting

investigative priorities.  The Frost case was not only the first murder investigation of Averitt's

sheriff's term, but by all accounts was also one of the most important cases of Averitt's entire

tenure, one which spurred substantial outrage in rural Union Parish and created immense

pressure on Averitt's Sheriff's Department to solve the crime.  These pressures were exacerbated

by Averitt's, Forbess's, and Holdman's lack of experience or training in conducting serious

---

[3] Although relevant to Plaintiffs' claims against the Sheriff Defendants, Plaintiffs's claims against former Union Parish District Attorney Tommy Adkins (and his successor-in-interest, current District Attorney Bob Levy) ("the DA Defendants") are discussed in full in Plaintiffs' opposition to the DA Defendants' motion for summary judgment.

felony investigations, and by Averitt's decision, early in the case, to refuse assistance in the

investigation offered by local FBI agents, as well as assistance from more experienced state

criminal investigators, which Averitt knew to be readily available through his prior experience as

a Louisiana State Trooper.

For six weeks following the murders, Averitt, Forbess, and Holdman conducted, by their

own account, more than a dozen critical witness and suspect interviews. Not one of those

interviews was ever documented or disclosed to prosecutors. But on October 12, 1986,

defendant Averitt received a phone call from Janet Burrell, who, embroiled in a custody dispute

with her ex-husband, Plaintiff Albert Burrell, implicated Mr. Burrell in the Frost killings.

Despite knowing that Janet Burrell's story was contrary to known investigative facts documented

in the initial crime scene report prepared by Deputy Elmer Hearron ("the Hearron report"), in

addition to being plagued by inherent credibility problems, defendants Averitt, Forbess, and

Holdman seized upon her tale, and conducted numerous undocumented, undisclosed interviews

with Janet Burrell, before taking her recorded statement. Neither the undocumented interviews,

which demonstrated Ms. Burrell's constantly shifting and incredible accounts, nor the Hearron

report, which demonstrated Janet Burrell's story to be false, were ever disclosed to prosecutors.

Plaintiffs' evidence further demonstrates that Janet Burrell's recorded statement, which falsely

identified Albert Burrell as the sole shooter of the Frosts and hence provided exculpatory

evidence as to Plaintiff Michael Graham, was not disclosed to prosecutors by the Sheriff's

Department until after Mr. Graham's criminal trial.[4] Most shockingly, as described by sworn

---

[4] As will be discussed in greater detail below, as to certain of the dozens of items of material, exculpatory
and impeachment evidence that was not disclosed to Plaintiffs, including, for example, the non-disclosure to Michael
Graham of Janet Burrell's recorded statement, triable issues of fact exist to link the deliberate non-disclosure of

affidavits from Janet Burrell and former Farmerville Police Chief George Cothran, Janet Burrell

admitted to the Sheriff Defendants that her story was false and attempted to end her involvement

in the Frost investigation; in response, Forbess, with the knowledge and/or assistance of Averitt

and Holdman, threatened Janet Burrell with the loss of custody of her son if she recanted and

refused to testify against Plaintiffs.  Averitt, Forbess, and Holdman never disclosed to

prosecutors the obviously exculpatory fact of Janet Burrell's recantation or their shocking acts of

coercion.

The Sheriff Defendants' deliberate misconduct similarly tainted each and every

investigative step purportedly taken to corroborate Janet Burrell's incredible and shifting

inculpatory statements.  Thus, Forbess, with the knowledge and/or tacit approval of Averitt,

conducted a highly improper group interview with a friend and family members of Kenneth St.

Clair, an area man who from the outset was an important suspect in the Sheriff's Department's

investigation.  The transcript of that interview, which documented Forbess's investigative

misconduct as well as the blatant lack of veracity to and inconsistencies in the St. Clairs'

statements, was never disclosed to prosecutors.  Similarly withheld from prosecutors was

evidence that Sheriff's Department personnel, including Averitt and/or Forbess, deliberately

cultivated and manipulated a notoriously incredible jailhouse snitch, Olan Wayne Brantley, to

cause him to emerge with not one, but two false confessions from both Michael Graham and

Albert Burrell.  This misconduct was never documented or disclosed to prosecutors.  As a result

---

evidence *either* to the Sheriff Defendants, *or* to the DA Defendants.  The passage of time, the utter lack of
documentation and record-keeping, and the conflicting accounts of the defendants require Plaintiffs, at least at this
summary judgment stage, to argue in the alternative all theories of deliberate non-disclosure supported by the
evidence.

of the defendants' systematic and pervasive misconduct in the Frost investigation, Plaintiffs were wrongfully arrested and imprisoned without probable cause, in violation of the Fourth Amendment, were tried on the basis of fabricated and perjured evidence, and without access to material, exculpatory and impeachment evidence, in violation of the Fourteenth Amendment.

The egregious investigative failures and multiple, blatant constitutional violations that characterize the Sheriff Defendants' handling of the Frost case could not have been possible had even the barest minimum of investigative supervision and oversight been exercised by Union Parish's then-chief law enforcement officer, defendant Larry Averitt. Instead, Plaintiffs' evidence demonstrates that Sheriff Averitt maintained an official policy of deliberately failing to train and supervise his criminal investigators in their constitutional responsibilities - a conscious choice designed to facilitate the pervasive climate of legal impunity created by Averitt's open and notorious defrauding of the Union Parish Sheriff's Department, crimes for which he was ultimately prosecuted and convicted. Averitt recognized his Department's obligation, pursuant to Brady v. Maryland, to document and disclose to prosecutors any exculpatory or impeachment evidence obtained in criminal investigations, and fully appreciated that the documentation of all investigative activities - in particular such critical activities as witness interviews - was a crucial mechanism for assuring fulfillment of his Department's Brady obligations. Yet Averitt's Sheriff's Department had no policy concerning documentation and disclosure of investigative activities, nor did Averitt provide or ensure that his deputies received any training concerning their Brady documentation and disclosure obligations. Indeed, the *only* evidence of Averitt's Brady policies and procedures establishes that Averitt himself knowingly failed to document and disclose his own investigative activities - including any of the multiple interviews he personally

6

conducted with Janet Burrell and other critical witnesses, including Michael Graham, Albert Burrell, and the last people to see the Frosts alive, Mike Rogers and Ruth Toney - and failed to take any steps to ensure that his subordinates, including Forbess and Holdman, fulfilled their documentation and disclosure obligations.

Averitt's complete failure of oversight is even more egregious in light of the fact that neither Averitt, Forbess, nor Holdman had experience or training in conducting serious felony investigations. Indeed, Forbess, Averitt's lead investigator, was hired based not on his credentials, but rather on his father's critical support for Averitt's campaign for sheriff, and notwithstanding that Forbess had a known reputation for ineptitude as a deputy under Chief George Cothran in a neighboring police department. Yet by Averitt's own account, he provided no supervision over Forbess, and bestowed on him complete discretion to determine what to document, and what to disclose - or not disclose. Averitt maintains that direct supervision of Forbess was provided by his Chief Deputy, defendant Holdman, but Holdman's testimony in this case is that he provided no supervision to Forbess, and that he was neither hired, nor qualified, to do so. Forbess, for his part, has testified that *neither* Averitt nor Holdman supervised his investigative activities, and that he had full discretion concerning what evidence to document and disclose - or not disclose.

Moreover, Plaintiffs' evidence demonstrates that Averitt's utter failure to exercise, through policies, supervision, or training, even minimal oversight of his Sheriff's Department was a calculated choice designed to facilitate his own scheme of criminal wrongdoing. During and prior to the time of the Frost investigation, Averitt stole tens of thousands of dollars of Union Parish funds, enriching not only himself, but also Forbess and Holdman with lavish gifts and

7

vacations that Forbess and Holdman knew to have no business purpose whatsoever.  In fact, even prior to the Frost case, Averitt's theft had such a toll on the Sheriff's Department budget that he was forced to fire one of his two criminal investigators due to lack of funds.  Averitt chose to terminate Steve Randall, an experienced criminal investigator, due to the fact that terminating the inexperienced and corrupt  Monty Forbess would have been, by Donald Holdman's account, politically unwise.  Indeed, only when the financial damage caused by the Sheriff's theft became so dire that Averitt announced pay cuts for all his deputies did Forbess and Holdman cynically "turn in" their former benefactor.

The open and ongoing criminal misconduct of the Parish's final policymaker for law enforcement and criminal investigations sent through the Sheriff Department chain of command a supervisory message of the most perverse order:  The rules did not matter, and political and personal advancement outweighed the pursuit of justice.  This message was reinforced by the Union Parish District Attorney's Office (housed one floor up from the Sheriff's Department in the Union Parish courthouse), which, under the leadership of defendant Tommy Adkins, deliberately turned a "blind" eye to the Sheriff Department's obviously constitutionally inadequate policies and procedures in conducting, documenting, and disclosing their investigative activities.  The best, and most shocking, evidence that the climate of political corruption and constitutional disregard maintained in Averitt's Sheriff's Department radiated to Tommy Adkins's District Attorneys' Office is undoubtedly the sworn testimony of prosecutor, Dan Grady, that defendant Adkins instructed him to obtain Plaintiffs' for first degree murder, notwithstanding the absence of credible evidence to support a murder prosecution, for the callous and improper purpose of protecting defendant Averitt from embarrassment.  This totality of

8

evidence of corruption and impunity of the most extreme order led Plaintiff's police practices

expert, Steve Rothlein - former second-in-command of the Miami-Dade Police Department with

more than twenty years of law enforcement experience as a detective, supervisor, trainer, and

consultant to police departments around the country - to conclude in this case that Averitt "

demonstrated to his entire staff that rules don't matter; that protecting him from embarrassment

took priority over conducting a fair and professional murder investigation."[5]   (Pl. R. 56.1

Statement ¶ 396.)

In sum, Plaintiffs Michael Graham and Albert Burrell were caught in a perfect storm of

deliberate misconduct, professional incompetence, pervasive political corruption and official

illegal conduct, and a complete and utter failure of supervision on the part of every actor

responsible for law enforcement and criminal prosecutions in Union Parish.  Out of this recipe

for inevitable disaster, deliberately conceived through the conscious policymaking decisions of

defendant Averitt, emerged multiple, intentional violations of Plaintiffs' Fourth and Fourteenth

Amendment rights,  leading directly to their illegal arrests, prosecutions, convictions, and

fourteen years of wrongful incarceration.

Defendants Bob Buckley, Larry Averitt, Monty Forbess, and Donald Holdman ("the

Sheriff Defendants") now move for summary judgment on Plaintiffs' claims against them.  The

defendants' motion simply ignores the overwhelming *uncontested* evidence - to say nothing of

---

[5] "Expert opinion evidence is itself sufficient to create a genuine issue of disputed fact sufficient to defeat a summary judgment motion." Thomas v. Newton International Enterprises, 42 F.3d 1266, 1270 (9th Cir. 1994); see Allen v. Muskogee, 119 F.3d 837, 843-44 (10th Cir. 1997); B.F. Goodrich v. Betkoski, 99 F.3d 505, 526-27 (2d Cir. 1996); Mendes-Silva v. United States, 980 F.2d 1482, 1488-89 (D.C. Cir. 1993); Russo v. City of Cincinnati, 953 F.2d 1036, 1047 (6th Cir. 1992); Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553, 563-4 (1st Cir. 1989); Voutour v. Vitale, 761 F.2d 812, 821-22 (1st Cir.1985). Rothlein's multifaceted experience as a detective, supervisor, commander, trainer, and consultant in law enforcement agencies around the country make him uniquely qualified to render opinions in this case.

the contested facts which, on summary judgment, must be construed in Plaintiffs' favor - of the

deliberate, pervasive, and officially condoned constitutional violations committed by defendants

Averitt, Forbess, and Holdman.  In light of the Sheriff Defendants' utter failure to grapple with

the overwhelming evidence of their misconduct, and with well-established legal principles

establishing not only individual liability for those actions, but also Union Parish's own liability

for the official acts and policies of its final policymaker, Averitt, Plaintiffs submit that the Sheriff

Defendants' motion simply does not present even a close call on summary judgment.

## II.      Legal Standard on Summary Judgment

"Summary judgment is appropriate only if the full record discloses 'no genuine issue as to

any material fact and . . . the moving party is entitled to a judgment as a matter of law.'" Blow v.

City of San Antonio, 236 F.3d 293, 296 (5th Cir. 2001) (quoting Fed. R. Civ. P. 56).  On the

defendants' motion for summary judgment, the Court must "view the evidence and all factual

inferences from that evidence in the light most favorable to the [plaintiff] and all reasonable

doubts about the facts are resolved in favor of the [plaintiff]."  Bryan v. McKinsey & Co., Inc.,

375 F.3d 358, 360 (5th Cir. 2004).  The Court may not "weigh the evidence or evaluate the

credibility of witnesses."  Caboni v. General Motors Corp., 278 F.3d 448, 451 (5th Cir. 2002).

The Court may not grant summary judgment unless "no reasonable juror could find for" the

Plaintiffs.  Id. at 451.

## III.     Mr. Graham and Mr. Burrell Were Deprived of Their Fourteenth Amendment Fair
##          Trial Rights by the Defendants' Multiple Violations of Brady v. Maryland

It has long been clear that Section 1983 liability will lie against police officers who

violate criminal defendants' Fourteenth Amendment fair trial right by failing to disclose

10

favorable, material evidence to the prosecution. See Brady v. Maryland, 373 U.S. 83, 108

(1964); Geter v. Fortenberry, 849 F. 2d 1550, 1559 (5th Cir. 1988) ("We agree with Geter that a

police officer cannot avail himself of a qualified immunity defense if he procures false

identification by unlawful means or deliberately conceals exculpatory evidence, for such activity

violates clearly established constitutional principles."); Sanders v. English, 950 F.2d 1152, 1162

(5th Cir. 1992) (holding that a police officer's "deliberate failure to disclose this undeniably

credible and patently exculpatory evidence to the prosecuting attorney's office plainly exposes

him to liability under § 1983").[6]   "Favorable" evidence required to be disclosed encompasses

all evidence that either tends to exculpate or could be used as impeachment evidence at trial. See

Kyles v. Whitley, 514 U.S. 419, 432 (1995) (noting that the Supreme Court had "disavowed any

difference between exculpatory and impeachment evidence for Brady purposes"); Giglio v.

United States, 405 U.S. 150, 154–55 (1972) (holding that "favorable" evidence within the

meaning of Brady encompassed evidence tending to impeach a witness's credibility); Lindsey v.

King, 769 F.2d 1034, 1042 (5th Cir. 1985) (awarding new trial of prisoner convicted in Louisana

---

[6] See also Mahoney v. Kesery, 976 F.2d 1054, 1061 (7th Cir.1992) (stating that an officer may be liable under Section 1983 if he procures a prosecution by lying to the prosecutor); Barlow v. Ground, 943 F.2d 1132, 1136-37 (9th Cir.1991) (stating that an officer may be liable under Section 1983 where his omission of crucial information prevented prosecutor from making independent judgment); Robinson v. Maruffi, 895 F.2d 649, 655 (10th Cir.1990) (stating that an officer may be liable under Section 1983 for malicious prosecution if he purposefully concealed and misrepresented material facts which may have influenced prosecutor's decision to prosecute); McMillian v. Johnson, 878 F.Supp. 1473, 1502-03 (M.D.Ala.1995) (stating that an police officers have a clearly established duty to turn exculpatory evidence over to the prosecutor for disclosure to the defendant); Guerra v. Collins, 916 F. Supp. 620, 633–34 (S.D. Tex. 1995) ("The police officers and prosecutors had a duty to accurately record the statements of the witnesses, to fairly investigate the case, and to disclose all exculpatory evidence. Moreover, they had a duty to not prosecute an innocent man. They failed in these duties. These intentional omissions, during the investigation and prosecution, and the inclusion of poisonous speculations during trial, had the effect of suppressing and destroying favorable testimony that the Court finds was material to Guerra's defense. The information that the police and prosecutors failed to disclose, as well as the manner that the investigation and prosecution were conducted, hardly left a paper trail, and intentionally so. The concept of deceit was planted by the police and nurtured by the prosecutors. This conduct by the police and prosecutors could only have been deliberate and, so much so, that even the exonerating evidence was used in such a manner as to create a materially misleading impression.").

state court where impeachment evidence was withheld by the State).[7]

Withheld evidence will be deemed "material" where, considered collectively with all other suppressed evidence, "its suppression undermines confidence in the trial," such that there exists a "reasonable probability that, [had the suppressed evidence] been disclosed to the defense, the result of the trial would have been different." United States v. Bagley 473 U.S. 667, 683 (1985); see Kyles, supra, 514 U.S. at 433– 36 (holding that materiality "does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal," and that "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence"); see also Sellers v. Estelle, 651 F.2d 1074, 1075, 1077 (5th Cir. 1981) (considering collectively the effect of multiple pieces of evidence - inculpatory statements of another suspect, that suspect's criminal record, and reports documenting inculpatory statements made to other witnesses - all of which were alleged to have been withheld).[8]

---

[7] Contrary to the defendants' suggestion, there is no requirement that Plaintiffs establish that the nondisclosure of material, exculpatory evidence was done in "bad faith." United States v. Thompson, 130 F.3d 676 (5th Cir. 1997), relied on for this proposition, is a case re destruction of exculpatory evidence, not withholding, and so it's governed by Arizona v. Youngblood, 488 U.S. 51 (1988), which does impose a bad faith standard for destruction. Id. at 58; Thompson, supra, 130 F.3d at 686. But Youngblood specifically disavows the presence of a bad faith requirement in the ordinary Brady context, noting that only where a Fourteenth Amendment claim rests on the alleged wrongful destruction or failure to preserve evidence is a "difference of treatment" from ordinary Brady claims required, embodied in an additional "bad faith" requirement. See id. at 55, 57–58. Hence, proof that the defendants intentionally failed, i.e., chose, not to disclose material, exculpatory and impeachment evidence to the prosecution is sufficient to state a Brady claim under Section 1983. Malice, nefarious purpose, and bad faith are issues that "the Fourteenth Amendment, as interpreted in Brady, makes . . . irrelevant when the State fails to disclose to the defendant material exculpatory evidence." Id. at 57.

[8] See also Lindsey, supra, 769 F.2d at 1042–43 ("We cannot and should not attempt to retry the case in our imaginations. We can say, however, on the basis of our courtroom experience, that the evidence withheld by the prosecutor in today's case carried within it the potential both for the destruction of Alexander's identification of Lindsey and the discrediting, in some degree, of the police methods employed in assembling the case against him. That done, given the circumstances that we have recounted of poor lighting, distance, shortness of time to view the assailant, a single unshaken identifying witness, another suspect of very similar appearance on the scene, the degree of proof required for conviction, and--perhaps most telling--the degree of conviction in the jurors requisite to

As Judge Woodard found in her decisions vacating Plaintiffs' convictions (Pl. R. 56.1 Statement ¶ 564.), and as ample additional evidence adduced in this litigation supports, numerous items of favorable, material evidence were withheld from the Plaintiffs at all stages of their investigation and prosecution.  Plaintiffs' evidence raises triable issues of fact tracing the bulk of the <u>Brady</u> suppression in this case to Averitt's, Forbess's, and Holdman's deliberate decisions to withhold such evidence from prosecutors.  To be sure, and as discussed further in Plaintiffs' memorandum in opposition to the DA Defendants' motion for summary judgment, the utter lack of investigative documentation and conflicting accounts of the defendants do not permit clear resolution, on summary judgment, of whether the ultimate non-disclosure of several items of <u>Brady</u> material are attributable to the Sheriff Defendants or, instead, to the DA Defendants.  Regardless, where triable issues of fact are raised as to the liability of any, or several, defendants, determination of where blame ultimately lies is properly left to a jury.  In any case, the ample evidence - including the defendants' own admissions - of wide-ranging suppression of evidence, largely attributable to the deliberate actions of Averitt, Forbess, and Holdman, renders utterly hollow the defendants' bald assertion that all <u>Brady</u> material was fully disclosed to prosecutors and Plaintiffs.[9]

---

imposing the penalty of death, we find our confidence in the results of the trial undermined."); <u>Monroe v. Blackburn,</u> 607 F.2d 148, 150–52 (5th Cir. 1979) (stating that a <u>Brady</u> violation is shown by suppression of evidence that is favorable to the accused and material to the defense, and finding that a suppressed pretrial statement of the victim, containing an inconsistency in her trial testimony, was material in that it "could have been useful to the defense in attacking [the victim's] in-trial testimony").

[9] As will be discussed throughout Plaintiffs' summary judgment responses, as to certain of the dozens of items of material, exculpatory and impeachment evidence that was not disclosed to Plaintiffs, including, for example, the non-disclosure to Michael Graham of Janet Burrell's October 14 recorded statement, triable issues of fact exist to link the deliberate non-disclosure of evidence *either* to the Sheriff Defendants, *or* to the DA Defendants.  The passage of time, the utter lack of documentation and record-keeping, and the conflicting accounts of the defendants require Plaintiffs, at least at this summary judgment stage, to argue in the alternative all theories of deliberate non-disclosure supported by the evidence.

**A.** **The Defendants Intentionally Suppressed Exculpatory Evidence**

**1.** **The Statements of Janet Burrell**

As described above and in Plaintiffs' Statement of Facts, the emergence of Janet Burrell as a witness was the first break in the Sheriff's Department's six-week, fruitless investigation in the Frost case. (Pl. R. 56.1 Statement ¶ 85.) As Plaintiffs' police practices expert, Steve Rothlein, concluded, Ms. Burrell's credibility should have been questioned by Union Parish investigators at the very outset, in light of the delay in her coming forward, and the fact that her divorce from Albert Burrell and their ongoing child custody dispute created a strong motive for her to falsely implicate him in the Frost murder. (Pl. R. 56.1 Statement ¶ 397.) Instead, the Sheriff's Defendants, at all times with the direct involvement of Forbess, bungled every aspect of Ms. Burrell's involvement, and deliberately failed to document and disclose her multiple, inconsistent statements to prosecutors. (Pl. R. 56.1 Statement ¶¶ 77–149.)

Defendant Averitt was first contacted by Ms. Burrell in a telephone call to his home on October 12, 1986. (Pl. R. 56.1 Statement ¶¶ 84.) According to Averitt's handwritten notes, Ms. Burrell told Averitt that she saw Albert Burrell on the night of the Frost murder, that he had a billfold with Delton Frost's driver's licence and social security card in it, and that he showed her $2700, which he allegedly had stolen from Delton Frost. (Pl. R. 56.1 Statement ¶¶ 87.) Averitt never documented this telephone conversation in a report, and never disclosed the fact of the conversation or his notes of it to prosecutors - notwithstanding the fact that Ms. Burrell's statement that she saw Delton Frost's wallet contradicted the known investigative fact that Mr. Frost's wallet had been found at the crime scene, under other items of evidence piled on the

14

bed.[10]  (Pl. R. 56.1 Statement ¶¶ 90, 127–137.)  Later that day, Averitt, Forbess, and Holdman

conducted a second interview with Ms. Burrell, which was either never recorded or documented,

or documentation of which was destroyed; the content of this interview was never disclosed to

prosecutors.[11]  (Pl. R. 56.1 Statement ¶¶ 195–96.)  Yet another, separate, interview with Ms.

Burrell occurred again on the 12th, this time with Forbess and prosecutor Dan Grady.  Yet again,

this interview was either never recorded, or documentation of it was destroyed.  (Pl. R. 56.1

Statement ¶¶ 98–100.)

On October 14, Janet Burrell met again with Averitt, Forbess, and Holdman for a lengthy

interview, which was recorded and transcribed.  (Pl. R. 56.1 Statement ¶¶ 110–16.)  This

statement contained numerous statements undermining her credibility, as well as statements that

were directly exculpatory as to Michael Graham.  (Pl. R. 56.1 Statement ¶¶ 110–49.)  For

example, Ms. Burrell stated that Delton Frost's billfold was brown, and that it was completely

empty; Averitt, Forbess, and Holdman, however, knew, and the Hearron report stated, that the

wallet that was found in the Frosts' bedroom the morning after the murder was black, and that it

contained six dollars.  (Pl. R. 56.1 Statement ¶¶ 124–31.)  Ms. Burrell also reported that,

according to Albert Burrell, when he entered the Frost home Delton Frost was already on the

---

[10] As noted above and discussed in greater detail, _infra_, this and other known investigative facts were contained in the crime scene report prepared by Elmer Hearron ("the Hearron report"), which itself was never disclosed to prosecutors.  With access to both Ms. Burrell's prior statements and the Hearron report, Plaintiffs could have effectively impeached both Ms. Burrell and Sheriff's Department witnesses, chiefly, Monty Forbess.  Without any of those documents, Plaintiffs were completely in the dark concerning the known falsehoods contained in Ms. Burrell's incredible account.  Hence, the collective impact of the numerous items of suppressed evidence is relevant not only to the materiality of the defendants' failures to disclose, but also to the exculpatory and impeachment nature of the items in question.

[11] In light of Ms. Burrell's constantly shifting account, described _supra_ and _infra_, of what she did or didn't see on the night of the Frost murders, a reasonable jury could infer that the second undocumented and undisclosed statement of October 12 contained, at minimum, impeachment material.

floor; Averitt, Forbess, and Holdman, however, knew, and the Hearron report stated, that because glass from the front door was found under Mr. Frost's body, he must have been pulled on to the floor *after* the perpetrator entered the house.[12]  (Pl. R. 56.1 Statement ¶¶ 135–37.)  Moreover, these contradictions between Ms. Burrell's statement and the known investigative facts undermined not only the veracity of Ms. Burrell's statement, but also the credibility of the police investigation, and, hence, provided important impeachment evidence as to defendant Forbess, who testified at both trials.  Finally, Ms. Burrell's statement was directly exculpatory as to Michael Graham because she identified Albert Burrell as the sole shooter.  Indeed, her statement negated, as to Mr. Graham, the critical "specific intent to kill" element of the crime of first degree murder for which he was charged and convicted.  The October 14 statement, however, was never disclosed to Michael Graham (Pl. R. 56.1 Statement ¶ 131(a)), and a reasonable jury could conclude that Averitt, Forbess, and Holdman deliberately withheld the statement from prosecutors until the time of Albert Burrell's trial.[13]

---

[12] The statement also included numerous details that presented obvious, but unpursued, avenues of investigation for the Sheriff's Department, creating fertile impeachment material and demonstrating that Sheriff's investigators themselves did not find Ms. Burrell's credible. For example, Ms. Burrell told Averitt, Forbess, and Holdman that on the Wednesday following her meeting with Albert Burrell he stated that he had deposited in a bank the $2700 stolen from the Frosts. However, the Sheriff's Department never checked any banks to determine whether this statement was true. Additionally, Ms. Burrell's statement contained a lengthy description of an alleged attack on her husband, James Burrell, motivated by the attackers' desire to help Albert Burrell avoid prosecution for murder. Yet the Sheriff's Department never conducted further investigation of this lead, and prosecutor Dan Grady testified that he did not recall ever discussing the alleged battery with Forbess or any other investigator. (Pl. R. 56.1 Statement ¶¶ 138–49.)

[13] The record indicates that the statement was disclosed to Mr. Burrell by the District Attorney's Office. However, it was never disclosed to Michael Graham. (Pl. R. 56.1 Statement ¶ 131(a).) A reasonable jury could conclude that this failure resulted from the Sheriff's Defendants' withholding of the statement until after Mr. Graham's prosecution. In particular, a jury could rely on the fact that Janet Burrell's testimony that Albert was the shooter was not used at Michael Graham's trial, as well as Forbess's testimony that he sometimes did not disclose even transcribed witness interviews if he believed them not to be important, and Rothlein's conclusion that Forbess demonstrated a practice of disclosing only inculpatory evidence, to conclude that Forbess did not disclose Janet Burrell's October 14 statement until the time when it became *inculpatory*, i.e., when Grady would expect to see documentation of Ms. Burrell's prior allegations concerning the identity of the shooter. (Pl. R. 56.1 Statement ¶¶

16

Finally, and perhaps most shockingly, the affidavit of Janet Burrell, corroborated by the affidavit of her husband, James Burrell, as well as the affidavit and deposition testimony of George Cothran, establishes that Ms. Burrell told the Sheriff Defendants that her prior statements were not true, and that she no longer wished to be involved in the investigation. (Pl. R. 56.1 Statement ¶¶ 102–09, 297–303.) In response, Forbess, with Averitt's actual knowledge and assistance or tacit approval, threatened Ms. Burrell that she would lose custody of her children and be put in jail if she did not stand by her original, false statement. (Pl. R. 56.1 Statement ¶¶ 102–09, 297–303.) Cothran, Forbess's former supervisor at neighboring Farmerville Police Department, has testified that this was a tactic that he had seen Forbess employ on prior occasions, and, shockingly, that Forbess learned it from him.[14] (Pl. R. 56.1 Statement ¶¶ 301–03.) Averitt, Forbess, and Holdman never documented or disclosed to prosecutors that Janet Burrell had recanted her inculpatory account, or their shocking acts of coercion, both of which facts were exculpatory evidence and impeachment material to which both Michael Graham and Albert Burrell were entitled pursuant to the Fourteenth Amendment.[15] (Pl. R. 56.1 Statement ¶¶ 106–08.)

---

131(a), 319–22.)

[14] Forbess, for his part, admits having seen Cothran use such a technique, notwithstanding his denial that he employed it in this case. (Pl. R. 56.1 Statement ¶¶ 302.)

[15] The facts relating to the Sheriff Defendants' acts of coercion and intimidation to cause Janet Burrell to make false inculpatory statements in the recorded October 14 interview, as well as before the grand jury and the two criminal trials, also support a finding that Averitt, Forbess, and Holdman fabricated evidence and suborned perjury, amounting to independent violations of Plaintiffs' Fourteenth Amendment right to a fair trial. See Castellano, supra, 352 F.3d at 942 ("We hold that a state's manufacturing of evidence and knowing use of that evidence along with perjured testimony to obtain a wrongful conviction deprives a defendant of his long recognized right to a fair trial secured by the Due Process Clause . . . ."); Goodwin v. Johnson, 132 F.3d 162, 185 (5th Cir. 1997) ("A state denies a criminal defendant due process when it knowingly uses perjured testimony at trial or allows untrue testimony to go uncorrected.").

### 2.    The Hearron Report

Plaintiffs' evidence also supports the conclusion that the initial crime scene canvass report of Elmer Hearron ("the Hearron report") constituted material, exculpatory and impeachment evidence that was known to Averitt, Forbess, and Holdman and was deliberately withheld from prosecutors.[16]  As discussed above, the Hearron report documented critical details from the initial crime scene investigation, which were actually known to Averitt, Forbess, and Holdman based upon their presence at the scene and their discussions in the days following the Frost murder.  (Pl. R. 56.1 Statement ¶¶ 4–54.)  The Hearron document reveals that many of these facts known to Averitt, Forbess, and Holdman directly contradicted not only the statements of Janet Burrell, but also the trial testimony of Monty Forbess.  For example, the Hearron report documents that Hearron and Trooper Jimmy Odom discovered Delton Frost's wallet on the Frost's bed, underneath items dumped from sacks.  (Pl. R. 56.1 Statement ¶¶28–30.)  In contrast, defendant Forbess testified at Plaintiffs' criminal trials that he was the first officer to enter the scene and that he discovered Delton Frost's wallet on *top* of the bed in the Frost residence.  Forbess testified to this critical fact at trial as proof of his "theory" that Albert Burrell, after showing Frost's wallet to Janet Burrell, could have returned to the scene of the crime and tossed the wallet on to the bed through an open window.  Yet the undisclosed Hearron report demonstrates not only that Forbess's "theory," and Janet Burrell's statement, was false, but, more importantly, that Forbess *knew* them to be so.  The Hearron report also demonstrates other, important discrepancies between Janet Burrell's statement and the known, investigative facts, as described above.  For example, Ms. Burrell reported that, according to Albert Burrell, when he

---

[16] The defendants' motion does not address in any way the withholding of the Hearron report.

18

entered the Frost home Delton Frost was already on the floor.  The Hearron report establishes, however, that Averitt, Forbess, and Holdman knew that because glass from the front door was found under Mr. Frost's body, he must have been pulled on to the floor *after* the perpetrator entered the house.  ((Pl. R. 56.1 Statement ¶¶34–38.)

The Hearron report thus provided crucial evidence not only that Janet Burrell's key testimony implicating Albert Burrell in the Frost murders was false, but, equally importantly, that Averitt, Forbess, and Holdman *knew* that her statements were untrue, and nevertheless relied upon her as a witness.  This constitutes not only important impeachment evidence as to Janet Burrell and Monty Forbess, who testified at both Plaintiffs' trials, but also powerful evidence that undermined the entire Union Parish investigation.  See, e.g., Atkins v. County of Riverside,151 F. App'x 501, 504 (9th Cir. 2005) ("Evidence that a chief investigator fabricated evidence while attempting to build the case against the defendant undermines the credibility of that investigator as well as the evidence compiled in that investigation."); Lindsey, supra, 769 F.2d at 1042–43 ("We cannot and should not attempt to retry the case in our imaginations.  We can say, however, on the basis of our courtroom experience, that the evidence withheld by the prosecutor in today's case carried within it the potential both for the destruction of Alexander's identification of Lindsey and the discrediting, in some degree, of the police methods employed in assembling the case against him.").  Yet the report unquestionably was never produced to the defense, and all available evidence indicates that the Hearron report was withheld, by Averitt, Forbess, and Holdman from the prosecution. (Pl. R. 56.1 Statement ¶¶ 39–40.)

### 3.   Olan Wayne Brantley

The Sheriff Defendants also deliberately withheld from prosecutors important evidence of

their own misconduct in connection with Olan Wayne Brantley, the infamously incredible

jailhouse snitch who emerged shortly after the grand jury indictment as an alleged witness to a

jailhouse confession from Michael Graham, and again prior to Albert Burrell's prior as an

alleged witness to Mr. Burrell's confession. (Pl. R. 56.1 Statement ¶¶199–36.)  The record on

summary judgment supports a jury finding that Averitt, and/or Forbess with Averitt's knowledge,

deliberately placed Brantley in Michael Graham's cell at the Union Parish jail, and supplied

Brantley with non-public facts regarding the Frost murder, in order to fabricate a false confession

to bolster the otherwise weak case against the Plaintiffs.

   Specifically, Plaintiffs' evidence demonstrates that shortly after the grand jury indictment,

prosecutor Dan Grady expressed in a meeting attended by District Attorney Adkins, Forbess, and

possibly others that he still doubted that the State's evidence supported going forward with

Plaintiffs' prosecutions. (Pl. R. 56.1 Statement ¶¶ 430.)  Subsequently, Olan Wayne Brantley

was placed in a Union Parish jail cell with Michael Graham, and within days of the grand jury

indictment came forward with a false confession from Graham.  (Pl. R. 56.1 Statement

¶¶200–04, 209–14.)   Brantley was known to Averitt, Forbess, and the rest of the Sheriff's

Department as "Lying Wayne Brantley," prone to outrageous exaggeration and scheming.  (Pl. R.

56.1 Statement ¶¶ 199, 205–07.)  Brantley's placement in Mr. Graham's cell, according to then-

Union Parish jailer John Day, deviated from ordinary jail procedure because Brantley, as a jail

trustee, was ordinarily housed in a different location.  (Pl. R. 56.1 Statement ¶¶ 200–04.)

According to Day, however, defendant Averitt, as Sheriff, would have had the authority to

reassign Brantley's cell.  (Pl. R. 56.1 Statement ¶ 204.)   Moreover, as Day and others testified,

Brantley had substantial access to Sheriff personnel because of his trustee role, and therefore

could certainly have learned non-public details of the murder from Averitt and his deputies.  (Pl.

R. 56.1 Statement ¶¶ 200.)  Based on this evidence, a reasonable jury could infer that Averitt and

Forbess deliberately manipulated the jail cell assignment process and used their access to

Brantley as a trustee *either* to knowingly fabricate a confession from Michael Graham, or, at a

minimum, with deliberate disregard of the likelihood that Brantley would fabricate such a

confession.

Averitt and Forbess never documented or otherwise disclosed to prosecutors the

circumstances surrounding Brantley's irregular jail cell assignment, the fact that Brantley was a

trustee at the time of Michael Graham's confession, or any other known, exculpatory and

impeachment details concerning their use of Brantley to obtain false inculpatory evidence.  (Pl.

R. 56.1 Statement ¶ 208.)  These deliberately withheld facts were exculpatory and impeachment

evidence as to both Michael Graham as well as Albert Burrell.  Evidence of the Sheriff's

Department's manipulation of Brantley not only directly undermines the veracity of Brantley's

account, but it also impeaches the testimony of Monty Forbess, as lead investigator, and

undermines the integrity of the entire Union Parish investigation.  See Atkins, supra, 51 F. App'x

at 504; Lindsey, supra, 769 F.2d at 1042–43.  The critical importance of this undisclosed

impeachment material is equally great as to Albert Burrell, against whom Brantley's utterly false

and improbable testimony was also offered:  Evidence that Sheriff's investigators actually knew,

or certainly should have known, that Brantley's first statement was false directly undermined not

only the credibility of Brantley's second statement, but also the integrity of the Sheriff's

21

Department's investigation as to Albert Burrell.[17]

### 4.    The St. Clairs

Finally, a reasonable jury could find that the Sheriff Defendants deliberately withheld

from prosecutors the transcript of a pre-trial and pre-grand jury group interview with Glenda,

Jackie, and Nicki St. Clair, and their friend, Amy Opal.[18] The Sheriff Defendants were well

aware that the St. Clairs had a powerful motive to lie, in light of the fact that their brother,

Kenneth, was a suspect in the Frost case and had been questioned on several occasions early in

the case. (Pl. R. 56.1 Statement ¶¶ 150–53, 198.)  Notwithstanding the obvious need to approach

these witnesses with careful scrutiny of their motive to lie, defendant Forbess did the opposite:

As Plaintiff's expert Steve Rothlein found, his group interview violated numerous, fundamental

tenets of criminal investigation.  (Pl. R. 56.1 Statement ¶¶ 198.)  The transcript, which, as Judge

Woodard determined, was never disclosed to the defense (Pl. R. 56.1 Statement ¶¶ 564), revealed

these investigative flaws, and constituted important exculpatory and impeachment evidence for

multiple reasons.  (Pl. R. 56.1 Statement ¶¶ 165–98)

First, contrary to the testimony of the St. Clairs at the grand jury and at both criminal

---

[17] This evidence as to Olan Wayne Brantley was particularly critical to Albert Burrell in light of the additional non-disclosure, discussed fully in Part IV.C.1 of Plaintiffs' memorandum in opposition to the DA Defendants' motion, of evidence that the Sheriff's Department and the prosecution knew Brantley's second statement, regarding Albert Burrell, to be false. (Pl. R. 56.1 Statement ¶¶ 215–36.)

[18] As with the transcript of Janet Burrell's October 14 statement, it cannot be determined at this stage whether responsibility for the failure to disclose the St. Clairs' statement to Plaintiffs lies with the Sheriff Defendants or the DA Defendants.  Although the record would permit a jury finding that the DA Defendants received and deliberately withheld the St. Clairs' statements, the testimony of Monty Forbess that he selectively chose to disclose or not to disclose certain witness interviews to prosecutors, that in the specific case of the St. Clairs he might well have chosen not to disclose the interview, and his admission that he did not disclose his notes of the improper "pre-interview" support a jury finding that he intentionally failed to disclose the interview to the District Attorney's office. Because the evidence supports a reasonable jury finding that *either* the Sheriff Defendants, *or* the DA Defendants are responsible for deliberately withholding this evidence, Plaintiffs argue in the alternative for purposes of summary judgment.

trials that they saw Plaintiffs together on the night of the Frost murders, the statement in fact

reveals substantial confusion and contradictory testimony concerning the critical fact of the date

on which the St. Clairs and Ms. Opal saw Michael Graham and Albert Burrell together.  (Pl. R.

56.1 Statement ¶¶ 172–74, 178–81, 185, 195–96.)  Second, the statement reveals that, contrary to

Jackie St. Clair's criminal trial testimony that she saw Plaintiffs with large amounts of money

after the murders - important evidence to establishing the alleged motive of robbery - she

originally stated that she had only seen Albert Burrell with a one-hundred-dollar bill.  (Pl. R. 56.1

Statement ¶¶ 183.)  Third, Amy Opal's incriminating trial testimony that she saw the Plaintiffs

counting stacks of money and saw blood on Michael Graham's arm on the night of the murders is

undermined by failure to mention the money counting during the interview, and by her initial

statement that she had *not* seen blood, followed by her contradictory statement, during the same

interview and after prompting by Jackie St. Clair and deputy Forbess, that she *had* seen blood.

(Pl. R. 56.1 Statement ¶¶ 186–91.)

Finally, the transcript of the St. Clair statement reveals that deputy Monty Forbess

employed improper and utterly unreliable methods to conduct the interview, including

conducting an undocumented pre-interview which apparently revealed, at least, Glenda St.

Clair's "confusion" concerning important facts, interviewing the three witnesses together and

hence permitting them to coordinate their stories, and posing suggestive questions to Amy Opal

obviously designed to elicit from her corroboration of the other witness's accounts.  (Pl. R. 56.1

Statement ¶¶ 167–71,185, 187, 191, 196–98.)   All of these improper investigative techniques,

revealed by the statement itself, constitute critical impeachment of Monty Forbess, and

23

undermine the Sheriff's investigation as a whole.  See, Atkins, supra, 151 Fed. App'x at 504.[19]

### 5.    The Undisclosed Evidence, Considered Cumulatively, Was Material

The above-described evidence, deliberately withheld from prosecutors by the Sheriff

Defendants, was unquestionably "material" to the outcome of the Plaintiffs' capital murder trials.

The suppression of critical exculpatory facts and impeachment material that would substantially,

if not fatally, undermine the credibility of every important witness presented by the State, as well

as the integrity of the entire police investigation, certainly "undermines confidence in [Plaintiffs']

trial[s]," such that there exists a "reasonable probability that, [had the suppressed evidence] been

disclosed to the defense, the result of the trial[s] would have been different."  Bagley, supra, 473

U.S. at 683 (1985).  This is particularly so when the evidence unlawfully suppressed by the

Sheriff Defendants is considered cumulatively, together with all other demonstrably undisclosed

exculpatory and impeachment evidence, as Kyles and Bagley require.  See Kyles, supra, 514 U.S.

at 433– 36; Sellers, supra, 651 F.2d at1075, 1077 (5th Cir. 1981) (considering collectively the

effect of multiple pieces of evidence - inculpatory statements of another suspect, that suspect's

criminal record, and reports documenting inculpatory statements made to other witnesses - all of

which were alleged to have been withheld).  Viewing in that light the record evidence of non-

disclosure (Pl. R. 56.1 Statement ¶¶ 39–40, 55–60, 67–69, 73–75, 80–82, 88, 90, 93, 95–96, 100,

---

[19] In addition to the transcript of the St. Clairs' group interview, a reasonable jury could conclude that the October 13 statement of Kenneth St. Clair, which contained St. Clair's exculpatory assertion that he did not get the feeling that Plaintiffs were involved in the Frost murders, was deliberately withheld by the DA Defendants.  Forbess conceded in his deposition that he might have consciously chosen not to disclose this statement to prosecutors, based on his view that it did not contain "relevant" information.  (Pl. R. 56.1 Statement ¶¶ 150–63.)  Not only does this constitute an independent failure to disclose exculpatory and impeachment evidence to the defense, but it also provides support for a jury finding that Forbess's other instances of non-disclosure were deliberate, and can be relied upon by a reasonable jury to conclude that the numerous items of withheld evidence, considered cumulatively, were material.

107–08, 114–15, 131, 144, 148–49, 150–53, 169, 208, 221–22, 225, 236, 564), a reasonable jury could well conclude, as did the Louisiana Attorney General's Office when considering whether to reprosecute Plaintiffs following Judge Woodard's vacatur, that the taint of the pervasive <u>Brady</u> violations in this case leaves "a total lack of credible evidence" linking Plaintiffs to the Frost murders. (Pl. R. 56.1 Statement ¶ 566.) At a minimum, Plaintiffs' evidence raises genuine issues of material fact for a jury to weigh.[20]

### 6.     The Sheriff Defendants Are Not Entitled to Qualified Immunity for <u>Brady</u> Violations Committed in Their Individual Capacities

The defendants do not clearly raise a qualified immunity defense with respect to Plaintiffs' individual capacity Fourteenth Amendment fair trial claims. Plaintiffs nevertheless note that the obligation of police officers to disclose material, exculpatory and impeachment evidence to prosecutors, and certainly to refrain from fabricating evidence and suborning perjury, was unquestionably clearly established in 1986. Indeed, as the Fifth Circuit held in <u>Burge v. St. Tammany Parish</u>, 187 F.3d 452 (5th Cir. 2003), the obligation was established decades earlier. <u>See id.</u> at 480 n.11 ("We summarily reject Hale's alternative legal argument that the law was not 'clearly established' . . . . Twenty-one years before <u>Geter</u>, this court declared that suborning perjury and concealing exculpatory evidence by police officers were constitutional violations. <u>See Luna v. Beto</u>, 391 F.2d 329, 332 (5th Cir.1967).").[21] Crediting Plaintiffs' allegations, no

---

[20] Courts routinely characterize materiality inquiries in other contexts as mixed questions of fact and law, ordinarily inappropriate for resolution on summary judgment. <u>See, e.g.</u>, <u>TSC Industries, Inc. v. Northway, Inc.</u>, 426 U.S. 438, 450 (1971); <u>Marks v. CDW Computer Centers, Inc.</u>, 122 F.3d 363, 370 (7th Cir. 1997); <u>Ansin v. River Oaks Furniture, Inc.</u>, 105 F.3d 745, 754 (1st Cir. 1997).

[21] The defendants' reliance on <u>Mowbray v. Cameron County</u>, 274 F.3d 269 (5th Cir. 2001), for the proposition that no constitutional violation is committed by police officers who fail to disclose evidence to *defense counsel*, misses the mark. Plaintiffs' claim that the Sheriff Defendants intentionally withheld multiple items of

reasonable police officer in 1986 could have believed that deliberate acts of withholding

material, exculpatory and impeachment evidence, coercing witnesses, fabricating evidence, and

suborning perjury were lawfully performed.  (Pl. R. 56.1 Statement ¶¶ 39–40, 55–60, 67–69,

73–75, 80–82, 88, 90, 93, 95–96, 100, 107–08, 114–15, 131, 144, 148–49, 150–53, 169, 208,

221–22, 225, 236, 564.) Qualified immunity for such conduct would be manifestly inappropriate.


## IV.   Fourth Amendment Claims

The defendants' suppression of material, exculpatory and impeachment evidence from the

prosecution also gives rise to Plaintiffs' Fourth Amendment claims for false arrest and false

imprisonment.[22]  A state actor violates the Fourth Amendment's guarantee against unreasonable

searches and seizures by causing a citizen to be falsely arrested or falsely imprisoned where the

following elements are met:  1) intent to confine the plaintiff(s), 2) acts resulting in confinement,

3) without probable cause, and 4) the plaintiff's consciousness of confinement.  See Harper v.

Merckle, 638 F.2d 848, 869 (5th Cir. 1981); see also Haggerty v. Texas Southern University, 391

F.3d 653, 655 (5th Cir. 2004); Vance v. Nunnery, 137 F.3d 270, 273—77 (5th Cir. 1998)

---

material, exculpatory and impeachment evidence from *prosecutors* in this case - a claim that Mowbray itself
recognizes.  See id at 278 n.5 ("Mowbray does not allege, nor do the facts support a finding, that [defendants]elicited
false evidence and deliberately concealed exculpatory evidence from all parties, including the prosecution.  Cf. Geter
v. Fortenberry, 849 F.2d 1550, 1558 (5th Cir.1988) (concluding such allegations defeat a police officer's qualified
immunity under § 1983).").  As the plaintiff in Mowbray, in contrast to Plaintiffs here, advanced no claim that police
withheld evidence from prosecutors, the case is simply inapposite.

[22] There is no dispute that Albert Burrell was arrested on the basis of Janet Burrell's initial statements to the
Sheriff Defendants.  (Pl. R. 56.1 Statement ¶ 101.)  Although Michael Graham was already in the custody of the
Union Parish Sheriff's Department on unrelated forgery charges (Pl. R. 56.1 Statement ¶ 150), Mr. Graham may well
be able to prove at trial that, in the absence of capital murder charges being wrongfully brought against him, he
would have been able to post bail and secure his release from custody.  Hence, a jury could find that the defendants
caused, if not his wrongful arrest, at least his wrongful pretrial detention.

(finding Fourth Amendment violated where suspect was arrested notwithstanding absence of credible evidence linking him to crime).[23]  It has long been well-established that reliance on a patently incredible witness to establish probable cause is per se unreasonable.  See Hale v. Fish, 899 F.2d 390, 399 (5th Cir. 1990) ("The appellants contend that no evidence of Shell's veracity was required in the affidavit, as he was a 'victim eyewitness' whose reliability need not be proven.  Although this is generally true, an exception is made in cases where the witness has a motivation to lie, or there is some other indication that the information is not reliable."); United States v. Jackson, 818 F.2d 344, 348–49 (5th Cir. 1987) (holding that an arrest warrant was not supported by probable cause where complaining witness had reason to "shade any information he gave" and the affidavit for probable cause provided no corroboration for veracity of the complaining witness);  State v. Derouen, 790 So. 2d 88, 91 (La. App. 4 Cir. 2001) (probable cause determination depends on both "the content of information possessed by police and its degree of reliability") (quoting Alabama v. White, 496 U.S. 325, 330 (1990)).

Crediting Plaintiffs' version of the facts, as must be done at summary judgment, there was no probable cause for Plaintiffs' arrest and indictment, nor could the Sheriff Defendants reasonably have believed there to have been probable cause based upon the statements of Janet

---

[23]   The Fifth Circuit's decision in Castellano v. Fragozo, 352 F.3d 939 (5th Cir. 2003) (en banc), does not preclude Plaintiff's Fourth Amendment claims.  Castellano held simply that the state law tort of malicious prosecution was not, per se, a constitutional tort arising under either the Fourth or Fourteenth Amendments.  Id. at 942.  However, in so holding Castellano expressly affirmed the availability of false arrest and imprisonment claims arising under the Fourth Amendment.  See id. at 953 ("The initiation of criminal charges without probable cause may set in force events that run afoul of explicit constitutional protection--the Fourth Amendment if the accused is seized and arrested, for example, or other constitutionally secured rights if a case is further pursued.").  The Fifth Circuit has continued, since Castellano, to recognize a cause of action under Section 1983 for Fourth Amendment false arrest and false imprisonment claims.  See, e.g., Shields v. Twiss, 389 F.3d 142, 150 (5th Cir. 2004) (stating that Castellano permits a plaintiff to allege a Fourth Amendment Section 1983 claim against a prosecutor for false arrest).

Burrell and the St. Clairs. The primary, inherently incredible, witness against the Plaintiffs was

Janet Burrell, who came forward six weeks after the murder and had a strong motive to lie in

light of her prior marriage to Albert Burrell, her current marriage to Albert Burrell's brother,

James, and her avowed interest in regaining custody of her son from her ex-husband. (Pl. R. 56.1

Statement ¶¶ 77–127, 397.) By the time of the grand jury proceedings, Janet Burrell had given

multiple, shifting statements to Averitt, Forbess, Holdman, and even prosecutor Dan Grady, and,

a reasonable jury could infer, had already recanted her story on at least one occasion.[24] (Pl. R.

56.1 Statement ¶¶ 84–149.) Janet Burrell's account of allegedly meeting with Albert Burrell on

the night of the Frost murders was also inconsistent with key investigative facts known to the

Union Parish Sheriff's Department from the outset of the investigation, including her allegation

that Albert Burrell possessed Delton Frost's wallet, that the wallet was brown and contained no

money, and that Albert Burrell found Delton Frost lying in front of the door when he entered the

---

[24] This finding is supported by Janet Burrell's description, in her affidavit, that she recanted her story immediately when she found out that Albert Burrell was in "a lot of trouble" for what she had said. (Pl. R. 56.1 Statement ¶ 102.) It is further supported by the fact that Ms. Burrell's statement, although taken on at least three previous occasions on October 12, was recorded and transcribed on October 14 - suggesting that Averitt, Forbess, and Holdman knew that there was a need to create a record of Ms. Burrell's account. (Pl. R. 56.1 Statement ¶¶ 84–111.) Finally, the transcript of the October 14 interview itself indicates that pressure had been applied to Ms. Burrell: Averitt and Forbess both refer to the possibility that Janet Burrell might be viewed as an accessory to murder if she does not "maintain to tell us the truth." (Pl. R. 56.1 Statement ¶ 110–48.) In any case, regardless of when Janet Burrell recanted her inculpatory statements, Averitt, Forbess, and Holdman had an ongoing duty, under the Fourth Amendment, to disclose that evidence to prosecutors. See Sanders, supra, 950 F.2d at 1162 (holding that police have an obligation to take steps to release criminal defendants when exculpatory evidence vitiating probable cause surfaces); McKonney v. City of Houston, 863 F.2d 1180, 1185 (5th Cir. 1989) (holding that continued detention for a crime is illegal once police officers know that the defendant is innocent); see also Kuehl v. Burris, 173 F.3d 646 (8th Cir. 1999) ("An officer contemplating an arrest is not free to disregard plainly exculpatory evidence, even if substantial inculpatory evidence (standing by itself) suggests that probable cause exists. . . . For example, an officer may make an arrest if a credible eyewitness claims to have seen the suspect commit the crime, but the officer may not arrest the suspect if, in addition, the officer is aware of DNA evidence and a videotaped account of the crime that conclusively establish the suspect's innocence." (internal citations omitted)); Baptiste v. J.C. Penney Co., 147 F.3d 1252, 1257 (10th Cir.1998) (finding no probable cause to arrest plaintiff for shoplifting despite security guards' informing police that plaintiff stole merchandise, where officers viewed videotape rebutting guards' account and where plaintiff explained her actions to officers and produced receipts for the merchandise in question).

Frost's home after shooting them, all contained in the undisclosed Hearron report. (Pl. R. 56.1 Statement ¶¶ 116–49.) Moreover, as to Michael Graham, at least one of Janet Burrell's pre-grand jury statements was directly exculpatory: According to Ms. Burrell, Albert Burrell admitted that he had shot the Frosts, a fact that, if true, would have vitiated, as to Michael Graham, the specific intent element of first degree murder under Louisiana law at the time. (Pl. R. 56.1 Statement ¶ 122.)

Finally, the only evidence offered prior to the grand jury to corroborate Janet Burrell's false statement, and to inculpate Michael Graham at all, was the testimony of the St. Clair family and Amy Opal. (Pl. R. 56.1 Statement ¶¶ 150–98.) However the evidence available to Averitt, Forbess, and Holdman made clear that the St. Clairs' and Ms. Opal's statements were either completely false or highly incredible. Again, the family had a strong motive to lie in light of the fact that Kenneth St. Clair was, early in the Frost investigation, identified as a potential suspect and was interviewed multiple times in connection with murders. (Pl. R. 56.1 Statement ¶¶ 150–53.) More importantly, the pre-grand-jury group interview conducted by Monty Forbess both revealed the extent of the St. Clairs' and Amy Opal's incredibility, and, through Forbess's patently improper interview techniques, affirmatively undermined any actual recollection those witnesses might have had: Forbess conducted an undocumented "pre-interview" before taking the statement, during which some confusion was expressed concerning the crucial fact of what night the Plaintiffs had allegedly been at the St. Clairs' home; Forbess then improperly interviewed the St. Clairs and Amy Opal together in a group, permitting them to coordinate their accounts; during the interview itself, Glenda St. Clair continued to express uncertainty regarding the date on which she allegedly saw Plaintiffs together; and Amy Opal's retraction, upon

prompting from Jackie St. Clair and Forbess, of her initial statement that she did *not* see blood on Michael St. Clair, revealed lack of corroboration of a key fact allegedly supporting guilt.   (Pl. R. 56.1 Statement ¶¶ 164–98, 399-400.)  These facts establish that the St. Clairs and Amy Opal were highly unreliable witnesses whose accounts could not, as a matter of law, be relied upon to establish probable cause. (Pl. R. 56.1 Statement ¶¶ 534.)  See Hale, supra, 899 F.2d at 399 (holding that probable cause cannot rest on the word of a witness with "a motivation to lie, or [where] there is some other indication that the information is not reliable"); Jackson, supra, 818 F.2d at 348–49 (same).

The defendants' attempt to rely on the grand jury's decision to indict as an intervening factor absolving them of liability for their illegal seizure of the Plaintiffs finds no support in the facts or the law.  Governing precedent from the Fifth Circuit and other courts establishes that any presumption of probable cause created by a grand jury indictment is vitiated where the deliberations of the grand jury are "tainted" by the withholding of evidence.  See Shields, supra, 389 F.3d at 150; Hand v. Gary, 838 F.2d 1420, 1427—28 (5th Cir. 1988) ("[T]he chain of causation is broken only where all the facts are presented to the grand jury, where the malicious motive of the law enforcement officials does not lead them to withhold any relevant information or other independent intermediary from the independent intermediary.").[25]  Notwithstanding the defendants' bare assertion that all facts were fully disclosed to and vetted before the grand jury, there is absolutely no indication, in the grand jury transcript or elsewhere, that any of the

---

[25] See also Jones v. City of Chicago, 856 F.2d 985, 993 (7th Cir.1988) (holding that if "police officers have been instrumental in the plaintiff's continued confinement or prosecution, they cannot escape liability by pointing to the decisions of prosecutors or grand jurors or magistrates to confine or prosecute him"); Thomas v. Sams, 734 F.2d 185, 191 (5th Cir. 1984) (finding that falsely sworn arrest warrant did not create presumption of probable cause to break chain in malicious prosecution action).

following evidence was revealed to the grand jury (or, in large part, to the defendants): 1) any of Janet Burrell's prior, inconsistent and exculpatory statements; 2) the Hearron Report and other available Sheriff's Department reports establishing that Ms. Burrell's statements were contrary to known, investigative facts; and 3) the transcript of the St. Clair group statement disclosing Forbess's manipulation of the interview and the witness's shifting, exculpatory accounts. Any one of these facts, and certainly all of them in combination, constitutes material, exculpatory and impeachment evidence sufficient to call into question whether, had the evidence been disclosed, the grand jury would have returned an indictment.

Finally, the Sheriff Defendants' assertions of qualified immunity for their Fourth Amendment violations should be rejected. Certainly a reasonable jury, crediting Plaintiffs' allegations, could conclude that no reasonable police officer who was aware, as Averitt, Forbess, and Holdman were, of the multiple, inconsistent, undocumented statements of Janet Burrell, of her recantation and of inappropriate, coercive pressure applied to her, of the inconsistency between her statements and the Hearron report, and of the patent incredibility of the St. Clairs and Amy Opal, could conclude that probable cause existed. At a minimum, the above-described evidence raises genuine issues of fact, inappropriate for resolution on summary judgment, as to whether any reasonable officer could have believed that probable cause existed for the defendants' prosecution.

## V.    Failure to Investigate

The defendants' above-described intentional conduct in not only suppressing material, exculpatory and impeachment evidence, but also knowingly and deliberately disregarding exculpatory investigative leads, gives rise to an independent cause of action under Section 1983

31

for their deliberate failure to investigate.  See Wilson v. Lawrence County, 260 F.3d 946, 955

(8th Cir. 2001) ("Appellants concede that intentional acts of failing to investigate other leads

would violate due process and they do not challenge the district court conclusion that this right

was clearly established at the time of the alleged violation."); Sanders, supra, 950 F.2d at 1162

("A fact-finder reasonably could conclude that Lt. McCoy deliberately looked the other way in

the face of exonerative evidence indicating that he had arrested the wrong man: three alibi

witnesses deemed credible by Lt. McCoy, a negative identification by one of the witnesses who

helped compose the police sketch, and a belated identification by the victim under peculiar

circumstances. Lt. McCoy's deliberate failure to disclose this undeniably credible and patently

exculpatory evidence to the prosecuting attorney's office plainly exposes him to liability under §

1983."); Clipper v. Tacoma Park, 876 F.2d 17, 20 (4th Cir. 1989) ("We would not suggest that

Starkey's failure to investigate the leads that Clipper provided was, in itself, sufficient to negate

probable cause.   In our view, however, the evidence of that omission, the evidence of Wortman's

statement to Starkey, and the speculative nature of the other information and investigative

instincts upon which Starkey relied in making the arrest form a sufficient evidentiary base to

sustain the verdict upon post-trial motions and on appeal."); Whitley v. Seibel, 613 F.2d 682, 686

(7th Cir. 1980) (Upholding jury verdict in favor of plaintiff in 1983 action against police officer

because "[a]lthough some of the defendant's acts of omission may have been only negligent,

there is a strong suggestion of intentional and concealed corner-cutting to accomplish the

arrest."); Burdeshaw v. Snell, 2004 WL 3016014, at *5 (M.D.Ala. 2004) ("Burdeshaw argues

that Snell had a duty to investigate this information and to release Burdeshaw upon ascertaining

its truth. The court agrees. By failing to acknowledge or investigate Burdeshaw's explanation,

Snell essentially 'assumed' that the substance was prednisone and that the plaintiff possessed them unlawfully. In so doing, Snell may have negated a 'reasonable belief' that probable cause existed.").[26]

As Plaintiffs' expert, Steve Rothlein found, the Union Parish Sheriff's Department "investigation was conducted without properly documenting the chain of events, documenting the interviews, cataloging the evidence, and documenting all other investigative actions which were material to the case," failing to meet even minimally acceptable standards of investigation. (Pl. R. 56.1 Statement ¶ 377–92.)  A reasonable jury could find Rothlein's opinion well-supported by the above-described, record evidence of the Sheriff Defendants' multiple, intentional acts of unconstitutional conduct, as well as substantial additional evidence that Averitt, Forbess, and Holdman engaged in knowing investigative deception and misconduct by deliberately failing to pursue known investigative leads that could corroborate or contradict witness accounts.  Such evidence includes failing to investigate, in order to corroborate or contradict, key details in Janet Burrell's and the St. Clairs' statements (Pl. R. 56.1 Statement ¶ 138–49, 185, 197), and failing to conduct investigation to reconcile Mike Rogers' and Ruth Toney's accounts of there whereabouts prior to the Frost murders with the statements of other witnesses (Pl. R. 56.1 Statement ¶ 55–76).   The defendants assert that Plaintiffs had no constitutional right to have every lead investigated in their case, relying principally on Baker v. McCollan, 443 U.S. 137 (1979).  But the defendants' authorities address claims asserted for

---

[26] Moreover, for qualified immunity purposes, this right was clearly established in 1986. See Wilson, supra, 260 F.3d at 949 (affirming availability of a Section 1983 claim for intentional failure to investigate with regard to a 1986 police investigation); Clipper, supra, 876 F.2d at 20 (holding, with respect to a 1971 criminal investigation, that the deliberate failure to investigate, coupled with other failures, gave rise to a Section 1983 claim).

police officers' alleged *negligent* failures to investigate, and do not involve circumstances, such as those presented here, where investigators deliberately suppressed exculpatory evidence, fabricated inculpatory evidence and suborned perjury, *and* failed to take basic steps to pursue known investigative leads that pointed away from Plaintiffs.  Under such circumstances, the Fifth Circuit in Sanders, as well as numerous other courts, have found viable Section 1983 claims.

## VI.  Union Parish is Liable Under Section 1983 for the Actions and the Policies and Practices of Final Policymaker Larry Averitt

Responsibility for the multiple, egregious violations of Plaintiffs' constitutional rights and their ensuing fourteen years of wrongful incarceration extends beyond the individual defendants in this case.  Union Parish itself, by and through its designated final policymaker for law enforcement, Larry Averitt, is liable for Averitt's policymaking actions, and for the grossly inadequate investigative policies and practices deliberately maintained by him, which led directly to Plaintiffs' constitutional deprivations.

### A.     Legal Standard for Municipal Section 1983 Claims

A municipality may be held liable under Section 1983 for violations of a plaintiff's constitutional rights by individual municipal actors when the constitutional deprivations are the result of execution of official municipal policy.  See Monell v. New York City Department of Social Services, 436 U.S. 658, 694 (1978) (holding that municipalities are liable for constitutional torts  "when execution of [the municipality's] policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury").  Government "policy" for purposes of a Monell Section 1983 claim encompasses not simply formally promulgated law or edicts, but also the direct actions of a final

34

policymaker for the municipality, or the maintenance by a final policymaker of a policy, custom, or practice that is deliberately indifferent to the constitutional rights of citizens. Brown v. Bryan County, 219 F.3d 450, 457 (5th Cir. 2000) (holding that "official policy, for purposes of § 1983 liability," including "a persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy," as well as, in some instances, "a final decisionmaker's adoption of a course of action tailored to a particular situation and not intended to control decisions in later situations" (internal quotations and citations omitted)); Burge, supra, 187 F.3d at 471 (5th Cir. 1999) (holding that the "official policy" requirement for municipal Section 1983 liability may be met either "when the action of the policymaker itself violated a constitutional right" or where "the policymaker fails to act affirmatively at all," under circumstances evincing "'deliberate[] indifference to the need'" to "take some action to control the agents of the local governmental entity" (quoting City of Canton v. Harris, 489 U.S. 378, 390 (1989)); see also Fields v. City of South Houston, 922 F.2d 1183, 1192 (5th Cir. 1991) (reversing dismissal of municipal Section 1983 claims where plaintiff's affidavits on summary judgment provided evidence of "tacit City approval" for unconstitutional practices).

In order to prevail fully against Union Parish for the constitutional violations of Averitt, Forbess, and Holdman, Plaintiff need ultimately prove only one theory of municipal Section 1983 liability. However, triable issues of fact support two independent theories of liability against Union Parish. The first, Plaintiff's "direct action" claim against defendant Averitt in his official capacity, contends that Averitt, as final policymaker for Union Parish on law enforcement

35

issues, personally and directly committed constitutional violations within the scope of his final

policymaking authority, and hence the Parish is liable for his actions.[27]   The second, Plaintiff's

"supervision" claim, contends that Averitt, as final policymaker, maintained an official policy,

custom, and practice of grossly inadequate supervision and training, which was the direct cause

of the constitutional violations committed by Forbess and Holdman.

## B.   Defendant Averitt's Direct Participation in Constitutional Violations Renders the Parish Liable

Union Parish may be held liable under Section 1983 for constitutional deprivations

caused by the direct actions of its final policymakers, acting in their policymaking capacity.  See

Pembaur v. City of Cincinnati, 475 U.S. 469, 480 (1986) ("If the decision to adopt [a] particular

course of action is properly made by that government's authorized decisionmakers, it surely

represents an act of official government 'policy' as that term is commonly understood."); Brown,

supra, 219 F.3d at 462 ("We thus conclude that a single decision by a policymaker may, under

certain circumstances, constitute a policy for which the County may be liable."); Turner v. Upton

County, 915 F.2d 133, 136 (5th Cir. 1990) ("[T]he municipality may be held liable for the illegal

or unconstitutional actions of its final policymakers themselves as they engage in the setting of

goals and the determination of how those goals will be achieved." ).  Indeed, even a single

unconstitutional, if performed by a final policymaker in the course of executing his or her final

---

[27] "Official capacity" claims against municipal policymakers are in actuality claims against the municipality. See Burge, supra, 187 F.3d at 468–70. Although an individual actor is named as a defendant, because he or she is named in an official capacity, the municipality is the real party in interest and immunity defenses are inapplicable. "Unlike government officials sued in their individual capacities, municipal entities and local governing bodies do not enjoy immunity from suit, either absolute or qualified, under § 1983." Id. at 466 (citing Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 166 (1993)); see also Kentucky v. Graham, 473 U.S. 159, 167 (1985) (stating that only applicable Eleventh Immunity protections extend to Monell official capacity claims); Turner v. Houma Municipal Fire & Police Civil Service Board, 229 F.3d 478, 484 (5th Cir. 2000).

policymaking functions, will give rise to municipal liability.  See Pembaur, supra, 475 U.S. at

481 ("More importantly, where action is directed by those who establish governmental policy,

the municipality is equally responsible whether that action is to be taken only once or to be taken

repeatedly." (internal footnote omitted)); Bennett v. Pippin, 74 F.3d 578, 586 (5th Cir. 1996)

(holding that a municipality is liable under Section 1983 for the single act of a final policymaker

if the act was within the purview of final policymaking authority, and notwithstanding existence

of an established, official policy contrary to the act).

### 1.   Larry Averitt Is Union Parish's Final Policymaker for Law Enforcement and Criminal Investigations; His Actions Pursuant to That Official Capacity Bind the Parish

Defendant Larry Averitt, serving in his official capacity as Union Parish Sheriff, was

unquestionably the Parish's final policymaker on issues concerning the conduct and supervision

of criminal investigations and the administration of the Sheriff's Department - a proposition that

is undisputed by the defendants' motion.  Louisiana sheriffs are final policymakers for parishes in

the area of law enforcement.  See  La. Const. Art. 5, § 27 ("[The sheriff] shall be the chief law

enforcement officer in the parish."); Causey v. Parish of Tangipahoa, 167 F. Supp. 2d 898, 907

(E.D. La. 2001) ("Under Louisiana law, it is clear that 'the Sheriff in his official capacity is the

appropriate governmental entity responsible for any constitutional violations committed by his

office.'" (quoting Jones v. St. Tammany Parish Jail, 4 F. Supp. 2d 606, 614 (E.D. La. 1998));

Jenkins v. Jefferson Parish Sheriff's Office, 402 So.2d 669, 670–71 (La. 1981).[28]  Moreover,

---

[28] "State law determines whether a particular actor is a county or municipality final decisionmaker with respect to a certain sphere of activity."  Bennett, supra, 74 F.3d at 586; see also City of St. Louis v. Praprotnik, 485 U.S. 112, 124 (1988); Jett v. Dallas Independent School District, 491 U.S. 701, 737 (1989).

Averitt's actions in the course of directing and participating in the Frost investigation were

undertaken entirely within the scope of his authority as the chief, and final, law enforcement

officer for Union Parish - again, a proposition that the defendants do not dispute.  See LSA-R.S.

33:1435 ("Each sheriff shall be the keeper of the public jail of his parish and shall preserve the

peace and apprehend public offenders."); La. Civ. Code Art. 331 ("Deputy sheriffs and other

employees of the sheriff are subject to his direction and supervision, and shall perform the duties

assigned to them by law, and by the sheriff.  The sheriff is responsible for the performance or

non-performance of their official duties by his deputies and other employees.").  Hence, the

Parish is liable for violations of Plaintiffs' constitutional rights caused by his participation in and

supervision of the Frost investigation.  Cf. Williams v. Kaufman County, 352 F.3d 994, 1013–14

(5th Cir. 2003) ("[S]heriffs in Texas are final policymakers in the area of law enforcement.

Therefore, it is clear that the County can be held liable for Harris's intentional conduct, to the

extent it constitutes the 'moving force' behind the alleged injury."  (footnote omitted)).

## 2. Averitt's Multiple Constitutional Violations and Direct Involvement in the Frost Investigation Render the Parish Liable Under Section 1983

As set forth above, supra Part III.A, defendant Averitt, acting in his official capacity as

chief law enforcement officer for Union Parish, directly committed multiple violations of

Plaintiffs' Fourth and Fourteenth Amendment rights when he failed to document and disclose -

or take any steps to ensure that his subordinates, including Forbess, documented and disclosed -

critical exculpatory and impeachment evidence that formed the basis for Plaintiffs' wrongful

arrest, indictment, and conviction.  Specifically, Averitt failed to document or disclose at least

38

two, and possibly more, interviews with Janet Burrell between October 12 and October 14, 1986.

(Pl. R. 56.1 Statement ¶¶ 84–131). Averitt was also present for, aware of, and therefore

responsible for intentionally failing to disclose Janet Burrell's October 14, 1986 statement to

Michael Graham. (Pl. R. 56.1 Statement ¶¶ 110–131(a)). Furthermore, a reasonable jury could

infer, based upon Averitt's close involvement in every aspect of Janet Burrell's initial statements

to police, based upon Janet Burrell's description that she "immediately" recanted her statement

upon discovering the trouble she had caused for Albert Burrell, and based upon Averitt's

participation in the first attempt by the Sheriff Defendants to in any way document Janet

Burrell's account, that he was personally aware of, and hence responsible for intentionally failing

to disclose, Ms. Burrell's recantation and the illegal coercion exerted by Forbess.

Furthermore, Averitt's conduct in failing to document or disclose clearly exculpatory and

impeachment evidence known to him was *admittedly* intentional: According to Averitt, he

"didn't do" reports, and gave Monty Forbess complete discretion to decide whether or not to

document interviews. (Pl. R. 56.1 Statement ¶¶ 241–42, 252–55, 270.) But Averitt's alleged

reliance on his investigators to fulfill *his* documentation and disclosure obligations (including, in

at least one instance, documenting and disclosing the contents of an interview - Janet Burrell's

initial phone call - for which *only* he was present (Pl. R. 56.1 Statement ¶¶ 84–88 )) was utterly,

and obviously, misplaced, given their total lack of qualifications, training, or supervision to be

making the discretionary decisions that were wholly abdicated to them. (Pl. R. 56.1 Statement ¶¶

24–25, 243–54, 308–21.) Indeed, and as discussed further below, a reasonable jury could infer

that defendant Averitt created such an environment of laxity for the specific purpose of insulating

from scrutiny his own, extensive, official misconduct. (Pl. R. 56.1 Statement ¶¶ 274–95.)

Defendant Averitt's conscious and deliberate failure to document and disclose material, exculpatory evidence known to him in the Frost investigation constituted an official act taken pursuant to his final policymaking authority as Union Parish's chief law enforcement official. Contrary to the defendants' assertions of Averitt's lack of involvement in the Frost investigation, Plaintiffs' evidence demonstrates that Averitt was in fact intimately involved in the case from its very commencement.  By his own admissions, Averitt responded to the scene of the crime when the Frosts' bodies were discovered on Labor Day, 1986, remained at the scene, and discussed with Forbess and Holdman the initial investigative findings.  (Pl. R. 56.1 Statement ¶¶ 22–23, 54.)  Between Labor Day and October 12, 1986 Averitt discussed the case with his deputies, and participated with Forbess in interviewing Mike Rogers and Ruth Toney, as well as both Michael Graham and Albert Burrell.  (Pl. R. 56.1 Statement ¶¶ 54–55, 73–76, 264–69, 323, 330–31.)

In addition to uncontroverted evidence of Averitt's direct engagement in day-to-day investigative tasks, Plaintiffs' evidence also demonstrates that Averitt was intimately involved in dictating the course and scope of his Department's investigation of the Frost case.  Importantly, Averitt made the early, affirmative decision to refuse offered assistance in the investigation from the Louisiana State Police and local FBI agents, as described by Dan Grady.  (Pl. R. 56.1 Statement ¶ 489, 501–02.)  Relatedly, Averitt was directly responsible for the decision on October 12 to rely on the incredible and shifting statements of Janet Burrell to focus what had to date been a fruitless investigation on Plaintiffs Michael Graham and Albert Burrell.  (Pl. R. 56.1 Statement ¶ 84–131.)  Hence, the evidence amply supports defendant Holdman's characterization of Averitt as "very involved" in the investigation.

Hence, defendant Averitt, in addition to being charged, pursuant to his official duties,

40

with ultimate responsibility for the Frost investigation, was in fact actively engaged in directing and investigating the case. This evidence demonstrates that Averitt's own deliberate misconduct in that investigation were official acts undertaken in the scope of his role as final policymaker for Parish criminal investigations - in essence, constitutionally deficient acts of direct policymaking. Moreover, the scope of Averitt's personal involvement in the Frost investigation is probative of Averitt's intent. In light of his extensive role in the Frost investigation, including, crucially, participating in and being debriefed concerning the initial crime scene canvass, and personally interviewing Janet Burrell on at least three separate occasions, Averitt had actual knowledge of the exculpatory nature of the Hearron report in light of Janet Burrell's statements, as well as actual knowledge that the known investigative facts contained in that report severely undermined the credibility of Janet Burrell's account. (Pl. R. 56.1 Statement ¶ 84–131.) His failure to ensure that those facts, which constituted material, exculpatory and impeachment evidence, were documented and/or disclosed to the prosecutor violated the Plaintiffs' Fourth and Fourteenth Amendment rights, see supra Parts III, IV, and V. Union Parish, in turn, is liable under Section 1983 for these constitutionally deficient policymaking acts undertaken by Averitt.

For the reasons set forth infra, these actions deprived Plaintiffs of material exculpatory and impeachment evidence at trial, and therefore violated their Fourteenth Amendment fair trial right. Because Averitt had an obligation *in his official capacity* for ensuring that documentation and disclosure took place, Union Parish is liable for his deliberate actions. See Bryan County v. Brown, 520 U.S. 397, 404–05 (1997) ("[T]he conclusion that the action taken or directed by the municipality or its authorized decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains.");

41

Bennett, supra, 74 F.3d at 586.[29]

### C.      Policy or Custom of Failure to Supervise and Train

In addition to defendant Averitt's direct participation in the constitutional violations

committed against Plaintiffs in the course of the Frost investigation, the evidence establishes that

Averitt's official department policy of providing grossly inadequate supervision and training to

his deputies concerning their constitutional investigative responsibilities caused the egregious

deprivations of Plaintiffs' rights committed by the Sheriff Defendants in this case.

As the Supreme Court and the Fifth Circuit have recognized, where a municipality's

failure to adequately train and supervise its employees rises to the level of official policy or

widespread practice, such a failure will give rise to Section 1983 liability where "in light of the

duties assigned to specific officers . . . the need for more or different training is so obvious, and

the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of

the city can reasonably be said to have been deliberately indifferent to the need." City of Canton,

supra, 489 U.S. at 390; Brown, supra, 219 F.3d at 460 ("The failure to train may be actionable

under section 1983."). A municipality's policy or practice of failing to train or supervise will be

said to have "caused" the constitutional violation at issue where the failure was a "moving force"

behind the constitutional violation. Monell, supra, 436 U.S. at 694; see Kentucky v. Graham,

---

[29] Plaintiffs note that "deliberate indifference" is not a required element of a Monell claim premised on the direct, intentional actions of a final policymaker. See Williams, supra, 352 F.3d at 1014 n.66 ("The district court did not need to determine whether Harris's conduct also amounted to deliberate indifference, because that element must be shown only when there is a claim that the municipality's facially lawful action caused an employee to inflict the injury, not when the municipality (through its policymaker) has directly caused the injury, as has occurred here."). Nevertheless, as the foregoing evidence of *intentional* conduct by defendant Averitt indicates, a reasonable jury could readily conclude that he acted with deliberate indifference to the rights of citizens in general, and Plaintiffs in particular.

473 U.S. 149, 166 (1985) (stating that plaintiff must shown that policy was "a moving force" or

"played a part" in constitutional violation); Young v. City of Providence, 404 F.3d 4, 26, 29 (1st

Cir. 2005) (holding that Monell causation was established where plaintiff could show that the

policies in question were a "cause[] - at least in part" of the constitutional violations).

### 1. Defendant Averitt Maintained an Official Policy of Grossly Inadequate Supervision and Training

The defendants' concession that Averitt was "not a micro manager of his subordinate

officers" (Sheriff Brief, at 29) is a dramatic understatement of the extent to which Averitt

completely, and deliberately, abdicated his responsibility to ensure that Sheriff's Department

personnel fulfilled their constitutional obligations in conducting criminal investigations -

including, crucially, their obligation to document and disclose exculpatory and impeachment

evidence to prosecutors.  Plaintiffs' evidence demonstrates that, despite Averitt's appreciation of

the constitutional strictures that governed his office's investigative activities, defendant Averitt's

Sheriff's Department was quite literally a lawless institution - devoid of policies and procedures

to ensure compliance with known constitutional standards, devoid of any training regimen to

supplement the utterly deficient investigative experience and knowledge possessed by deputies

like Forbess and Holdman, and utterly devoid of supervision to oversee or check deputies' total

discretion concerning the documentation and disclosure of exculpatory and impeachment

evidence.  Indeed, the only active supervisory signal communicated by defendant Averitt through

his chain of command was the message that rules and legal obligations simply do not matter, as

evidenced by his open and notorious theft from Union Parish, carried out with the knowledge of

defendants Forbess and Holdman.

The record on summary judgment contains absolutely no evidence that defendant Averitt

promulgated or maintained any written policies concerning his deputies' constitutional

obligations pursuant to Brady v. Maryland.[30]  According to Averitt himself, in testimony given on

behalf of Union Parish pursuant to Fed. R. Civ. P. 30(b)(6), the policy of his department was that

each investigating officer had discretion concerning what documents to create and maintain in

the investigative file, and what documents to disclose to prosecutors.  (Pl. R. 56.1 Statement ¶¶

241–42, 251–55) Although Averitt expected full documentation of witness interviews and other

critical investigative tasks (Pl. R. 56.1 Statement ¶¶ 241, 257, 261), he had absolutely no idea in

1986 and 1987 how, when, or in what manner documents were provided to prosecutors in any

Sheriff's Department investigations.  (Pl. R. 56.1 Statement ¶¶ 242.) Averitt's own description of

his departmental "policies" concerning documentation of investigations and communication with

prosecutors was consistent with his deputies' understandings.  According to defendant Forbess,

who was by all accounts the Sheriff Department's lead investigator (Pl. R. 56.1 Statement ¶¶

251–53 ), he had full discretion to decide what to document, or what not to document, and what

reports or information to disclose, or not disclose, to the prosecutor; if Forbess believed that a

witness interview or other information was not "relevant," he did not disclose it.  (Pl. R. 56.1

Statement ¶¶ 316–21.)[31]  Holdman also confirmed that he knew of no policies or procedures

---

[30] The defendants rely on defendant Averitt's deposition testimony that he was "pretty sure" that a policy manual was in effect in 1986.  Of course, on summary judgment, the Court is not required - or even permitted - to credit Averitt's version of events, particularly where no evidence supports his self-serving assertion.  Moreover, whether or not such a manual existed as a general matter, there is no evidence that it addressed investigators' Brady obligations, or any other constitutional strictures with respect to criminal investigations.  None of the defendants, including Averitt himself, specifically recalled any written policy governing their documentation and disclosure obligations during the time period of this case.

[31] Similarly, Forbess testified concerning his group interview with the St. Clairs and Amy Opal - a technique that Plaintiff's expert Steve Rothlein characterized as violating "basic investigative procedure" (Rothlein at 399–400) - that he had never heard from Averitt or any other source that group interviews of suspects were

44

concerning documenting witness interviews or disclosing evidence to prosecutors, and that individual investigators had discretion whether to create reports of witness interviews, and whether to disclose notes from unrecorded witness interviews. (Pl. R. 56.1 Statement ¶¶ 259–62.) Indeed, Holdman testified that he had no idea what the term "Brady material" even meant, and believed that "impeachment" meant removing a public official from office. (Pl. R. 56.1 Statement ¶¶ 358–59.) In light of his review of the above-described facts, Plaintiff's police practices expert Steve Rothlein concluded "that Sheriff Averitt and the Union Parish Sheriff's Department failed to establish acceptable policy, procedures, and training requiring his investigators to document their investigative activities in accordance with their obligations following the 1963 United States Supreme Court decision of Brady v Maryland." (Pl. R. 56.1 Statement ¶¶ 394.)

In the context of defendant Averitt's utter failure to provide express guidance concerning his deputies' documentation and disclosure obligations through express policies, his complete abdication of his responsibility to ensure that his deputies received supervision and oversight in their conduct of criminal investigations is all the more egregious. By Averitt's own admission, he provided no supervision or guidance to Averitt concerning criminal investigations, documentation of witness interviews and other investigative tasks, or disclosure of evidence to prosecutors, and in fact had no idea when Forbess did or did not document witness interviews, and no idea how or when Forbess disclosed evidence to prosecutors. (Pl. R. 56.1 Statement ¶¶

---

prohibited. (Forbess at 171.) Averitt's testimony that he did not think Forbess's technique was "a good idea" only demonstrates the extent of Averitt's ineffectiveness as a supervisor that he would either never know of Averitt's conduct during a key interview in the most important investigation of his tenure as sheriff, or that he would, knowing of it, condone it.

245, 251–53).[32]   Although Averitt suggested in deposition testimony that he delegated to

defendant Holdman responsibility for supervising Forbess ((Pl. R. 56.1 Statement ¶ 258),

Holdman's testimony was that he provided no supervision to investigators, including Forbess,

that he viewed Forbess as being completely in charge of criminal investigations and as receiving

supervision, if any, only from Averitt.  (Pl. R. 56.1 Statement ¶¶ 353–56.)  Indeed, by Holdman's

own account, he was neither hired for the purpose of supervising criminal investigators, nor was

he qualified to do so.  (Pl. R. 56.1 Statement ¶¶ 353–56.)  Forbess, for his part, testified that he

viewed himself as acting with *no* supervision, and believed he had complete discretion to

conduct criminal investigations as he saw fit.  (Pl. R. 56.1 Statement ¶¶ 316–21, 259.)

Moreover, and notwithstanding the defendants' contention that Averitt, Forbess, and

Holdman possessed "extensive" experience and training, a reasonable jury could easily conclude

that Averitt knew or should have known that his investigators were completely deficient in the

training and experience required to conduct serious felony investigations.  The record contains no

evidence that Averitt, Forbess, or Holdman ever received training concerning their constitutional

obligations to document and disclose to prosecutors exculpatory and impeachment evidence, and

the only record evidence concerning the defendants' awareness of those principles demonstrates

---

[32] Plaintiffs note that Averitt's admissions in this regard are in no way inconsistent with the substantial evidence that he was nonetheless extensively involved in conducting the Frost investigation, at times side-by-side with Forbess and Holdman.  Indeed, the fact that Averitt admittedly had actual knowledge of the investigative steps being taken by Forbess, and yet took no steps to provide oversight regarding Forbess's conduct, is powerful evidence of Averitt's deliberate indifference.  For example, Averitt testified that, following his participation in multiple interviews of Janet Burrell with Forbess, Averitt expected that Forbess would prepare all necessary documentation (notwithstanding the fact that *only* Averitt himself was present for the initial October 12 phone conversation with Janet Burrell), but never took any steps to assure himself that such documentation would be prepared.

46

fundamental misunderstanding - or deliberate disregard - of <u>Brady</u> obligations.[33]  Forbess's and

Holdman's lack of awareness of basic investigative rules and principles was obvious to Averitt

from the moment of their hiring - or, at a minimum, would have been so in the absence of

Averitt's deliberate indifference.  Prior to joining the Union Parish Sheriff's Department (and,

indeed, prior to the Frost investigation), Forbess had no experience conducting serious felony

investigations, and could not recall ever having been trained concerning such basic investigative

tasks as documenting witness interviews or disclosing exculpatory evidence.  (Pl. R. 56.1

Statement ¶¶ 310–11 248, 243–44.).  Holdman similarly lacked experience in conducting (much

less supervising) felony investigations, testified that he had never received any training in felony

investigations, and that he was completely unqualified to supervise such investigations.  (Pl. R.

56.1 Statement ¶¶ 353–55.)

But Averitt made it apparent from the very beginning of his tenure that he possessed little

or no concern regarding his deputies' actual qualifications for their jobs.  A reasonable jury could

infer, based on the defendants' own account, that both Forbess and Holdman were hired, at least

in part, based upon their instrumental roles in Averitt's election - Holdman, as a friend and

supporter, and Forbess, as the son of a key political operative in Union Parish.  (Pl. R. 56.1

Statement ¶¶ 279–81, 313–15.)  By both Forbess's and Holdman's account, Averitt made little or

no inquiry into their qualifications prior to hiring them; indeed, the record indicates that the only

---

[33] Forbess testified that he had full discretion to decide what to document, or what not to document, and what reports or information to disclose, or not disclose, to the prosecutor, and that if he believed that a witness interview or other information was not "relevant," he did not disclose it.  (Forbess 198).  Indeed, Plaintiff's police practices expert, Steve Rothlein, concluded based upon his review of Forbess's investigative work that he demonstrated a pattern of documenting *only* inculpatory evidence.  Holdman testified that he had no idea what the term "<u>Brady</u> material" even meant, and believed that "impeachment" meant removing a public official from office. (Holdman at 113.)

information that Averitt *did* have concerning Forbess was the opinion of George Cothran,

Forbess's former supervisor in the Farmerville Police Department, that Forbess was not a

competent investigator.  (Pl. R. 56.1 Statement ¶¶ 248–49.)  Plaintiff's expert Steve Rothlein

concluded, after reviewing the record evidence concerning the defendants' experience, training,

and qualifications, that "none of the individuals involved in this case had the required

investigative training or experience to conduct the investigation into the double murders of Mr.

and Mrs. Frost," "that Sheriff Averitt hired Monty Forbess . . . without any concern if he was

qualified for the position," and that "Forbess was hired for political reasons and placed in a

position he was not qualified to handle, especially without any supervision."[34]  (Pl. R. 56.1

Statement ¶¶ 395.)

But perhaps the most shocking evidence of Averitt's official policy of deficient

supervision and training  - indeed, the evidence that most starkly distinguishes Plaintiffs'

municipal supervision claim from other <u>Monell</u> cases - are Averitt's admitted, affirmative acts of

*illegal* supervision, which, in their totality, fostered a climate of utter impunity, a climate that

enabled Averitt and his subordinates to commit precisely the sorts of constitutional violations

suffered by Plaintiffs' in this case.  In his Rule 30(b)(6) deposition testimony, defendant Averitt

---

[34] The defendants' motion highlights what they characterize as "extensive experience and training" (Sheriff Brief at 28) on the part of Forbess and Holdman.  As the above evidence illustrates, there is, at minimum, a fact issue as to whether the defendants had received *any* specific training concerning <u>Brady</u> disclosure obligations, and certainly also as to the applicability of any of the defendants' training and experience to serious felony investigations.  See <u>Russo</u>, <u>supra</u>, 953 F.2d at 1046 (reversing summary judgment on *Monell* training claim where "none [of the officers] were able to give specific responses as to the content of their training," and plaintiff's expert found training inadequate).  Additionally, a reasonably jury could conclude that *some* amount of tangentially related investigative experience and training is wholly inadequate in circumstances where there is a *complete* absence of day to day supervision.  Indeed, Forbess's and Holdman's own testimony amply demonstrates that, regardless of what training or experience they had, they possessed fundamental misunderstandings of their constitutional responsibilities as well as minimally accepted investigative practices.

affirmed his understanding, as the Parish's chief law enforcement officer, that the integrity of a law enforcement chain of command, as in all paramilitary organizations, hinged upon rules and regulations being modeled from the top down, and that one of the worst things that could occur in a police department is for the top of the chain of command to ignore the rules and send a message through the chain of command that rules don't matter.  (Pl. R. 56.1 Statement ¶¶ 238.) Yet Averitt organized and operated his Sheriff's Department in direct contravention of this principle, not simply by modeling constitutionally deficient investigative conduct (as in his failure to document exculpatory interviews with Janet Burrell), but by engaging in corruption of the most extreme order, funneling tens of thousands of dollars from Union Parish over the course of his tenure as sheriff, for the enrichment of himself as well as his deputies, Forbess and Holdman.  (Pl. R. 56.1 Statement ¶¶ 274–94.)

As Averitt himself described, and as the official records of his criminal indictment and conviction on theft charges corroborate, Averitt used tens of thousands of dollars of Parish funds to purchase suits for himself, purchase expensive riding boots for Forbess and Holdman, and take Forbess on a pleasure trip to Bossier City.  (Pl. R. 56.1 Statement ¶¶ 287–90.)  Averitt admitted knowing that his misappropriation of funds was wrong, and that he believed both Forbess and Holdman were aware that his gifts to them were purchased with Union Parish funds.  (Pl. R. 56.1 Statement ¶¶ 288.)  Even prior to the Frost investigation, Averitt's theft had taken a concrete toll on the work of the Union Parish Sheriff's Department, creating budget shortfalls that forced Averitt to fire his experienced criminal investigator, Steve Randall, leaving only the inexperienced and incompetent Forbess to handle all criminal investigations.  (Pl. R. 56.1 Statement ¶¶ 274–94.) As defendant Holdman testified, the decision to terminate Randall, instead

49

of Forbess, was made not based on the respective qualifications of the two men, but rather on the

fact that firing Forbess would have been politically untenable for Averitt. (Pl. R. 56.1 Statement

¶¶ 284–85.) A reasonable jury could readily conclude, as Plaintiff's expert Steve Rothlein did,

that Averitt's open and notorious illegal conduct, carried on with the knowledge and to the direct

benefit of his deputies, Forbess and Holdman, "demonstrated to his entire staff that the rules

don't matter."[35] (Pl. R. 56.1 Statement ¶¶ 396.)

In sum, Plaintiffs' evidence on summary judgment - including, crucially, Averitt's own

description of his customs and practices of supervision and training - amply supports the

conclusion that Union Parish, by and through their final policymaker Larry Averitt, maintained

an official policy of grossly inadequate supervision and training in the conduct of criminal

investigations.

## 2.    The Record Also Demonstrates Averitt's, and the Parish's, Deliberate Indifference

The above-described evidence also amply demonstrates that Averitt, and hence Union

Parish, was deliberately indifferent to the known *and* obvious risk that in the complete absence of

supervision concerning their constitutional documentation and disclosure obligations, Union

Parish deputies, confronted on a *regular basis* with the critical task of documenting and

disclosing evidence to prosecutors - would perform their investigative tasks in a constitutionally

---

[35] The defendants suggest that Forbess and Holdman, far from being complicit in Averitt's scheme, actually are responsible for bringing Averitt to justice. The record demonstrates, however, that Forbess and Holdman accepted inappropriate and illegal gifts from Averitt without objection, until Averitt's scheme of theft took such a toll on the Sheriff's Department budget that pay cuts were announced. (Pl. R. 56.1 Statement ¶ 291.) Only then, by Forbess's and Holdman's own admission, did they approach District Attorney Tommy Adkins to report Averitt's wrongdoing. (Pl. R. 56.1 Statement ¶ 292.) Conveniently, neither reported their own illegal gifts as evidence of Averitt's conduct. (Pl. R. 56.1 Statement ¶ 293.)

deficient manner.  See City of Canton, supra, 489 U.S. at 390 & n.10; Gregory v. City of

Louisville, 444 F.3d 725, 753 (6th Cir. 2006)  ("In their investigative capacities, police officers

regularly uncover exculpatory materials. The Supreme Court has laid down very specific

obligations of police officers on the disclosure of exculpatory materials.  Widespread officer

ignorance on the proper handling of exculpatory materials would have the highly predictable

consequence of due process violations." (internal quotations and citations omitted); Walker v.

City of New York, 974 F.2d 293, 300 (2d Cir. 1992) (finding that a jury could conclude that

failing to train concerning Brady disclosure would likely result in district attorneys making the

wrong choices); Brown, supra, 219 F.3d at 457 (noting that proof of municipal policy and proof

of municipal culpability may overlap in a municipal Section 1983 claim).[36] Indeed, a reasonable

jury could conclude, based upon the summary judgment record, that Averitt's policy and practice

of non-supervision and illegal supervision was *deliberately devised* to ensure that misconduct

such as his own illegal schemes would be insulated from scrutiny.

That Averitt was utterly unconcerned with the known legal obligations of his office

arguably provides the *only* logical explanation for his carrying out open and ongoing scheme of

stealing Union Parish funds, a scheme that he took no steps to hide from his deputies,

notwithstanding his appreciation not only of its illegality, but also of the detrimental supervisory

impact that his misconduct would have on his chain of command.  This conclusion is reinforced

by Averitt's own testimony, on his own behalf and as the 30(b)(6) witness designated by Union

---

[36] See also Thompson v. Connick, No. Civ.A.03-2045, 2005 WL 3541036, at *13 ("Following Canton's 'so obvious' standard, and viewing the evidence in the light most favorable to plaintiff, the DA's office knew to a moral certainty that assistants would acquire Brady material, that without training it s not always obvious what Brady requires, and that withholding Brady material will virtually always lead to a substantial violation of constitutional rights.")). Cf. Brown, supra, 219 F.3d at 462 ("[W]e take it as elemental that police officers need at least some training to perform their job safely and effectively.").

Parish, that he recognized that he was vested with the ultimate responsibility for ensuring that criminal investigations were conducted properly (Pl. R. 56.1 Statement ¶¶ 238), that he appreciated the importance of documenting investigative action in order to ensure disclosure of exculpatory and impeachment evidence to prosecutors (Pl. R. 56.1 Statement ¶¶ 238), and that he assumed that such steps were being taken by his deputies, including Forbess (Pl. R. 56.1 Statement ¶¶ 257, 261–62).  Yet Averitt's testimony in this case is that as a matter of policy and practice he did nothing to ensure that Forbess complied with his documentation and disclosure obligations, and communicated to Forbess and Holdman that documentation and disclosure of exculpatory and impeachment evidence was, in their words, discretionary.  (Pl. R. 56.1 Statement ¶¶ 257, 261–62.)  Indeed, in the Frost case itself, Averitt modeled precisely this "discretionary" attitude by failing to take any steps to document or disclose interviews with Janet Burrell that he conducted with Forbess and Holdman, and by failing even to inquire as to whether Forbess and Holdman had done so.  Averitt's "don't ask, don't tell" policy of non-transparency and insulation of both misconduct and incompetence is further evidenced by his decision, early in the Frost investigation, to refuse assistance from the Louisiana State Police and the FBI - notwithstanding that neither he nor any of his deputies had experience handling serious felony cases, and notwithstanding their failure for six weeks to identify even a single, solid suspect in the Frost double murder.  (Pl. R. 56.1 Statement ¶¶ 393.)

In sum, faced with evidence that Averitt admittedly, as a matter of policy, took no steps to ensure that his Sheriff's Department's criminal investigations were conducted in a manner consistent with the Constitution, and that in the Frost investigation in particular he affirmatively took steps that *thwarted* compliance with those obligations, a reasonable jury could conclude that

52

the only possible explanation for such conduct lies in Averitt's deliberate indifference.

### 3. Averitt's Grossly Inadequate Supervision and Training Caused the Constitutional Violations in This Case

The substantial record evidence of Averitt's deliberate indifference to the obvious risk that his official policies would lead - almost inevitably - to his deputies' constitutionally inadequate performance of their investigative responsibilities also supports a finding that Averitt's policies were the "moving force" behind the constitutional violations committed by Averitt's deputies. See Monell, supra, 436 U.S. at 694; Kentucky, supra, 473 U.S. at 166; Young, supra, 404 F.3d at 26, 29. As the Fifth Circuit has noted, it is "elemental that police officers need at least some training to perform their job safely and effectively." Brown, supra, 219 F.3d at 462. Courts have repeatedly found that failing to train police officers with respect to their Brady disclosure obligations and other routine investigative tasks will frequently result in the "wrong choice" being made. See, e.g., Gregory, supra, 444 F.3d at 753 ("Widespread officer ignorance on the proper handling of exculpatory materials would have the highly predictable consequence of due process violations." (internal quotations and citations omitted)); Walker, supra, 974 F.2d at 300 (holding that a jury could find that the complete failure to train or supervise prosecutors regarding disclosure of Brady material would likely result in the wrong choices being made); Thompson, supra, 2005 WL 3541036, at *8("[W]ithout training it is not always obvious what Brady requires, and . . . withholding Brady material will virtually always lead to a substantial violation of constitutional rights."); Carter v. Harrison, 612 F. Supp. 749, 758 (E.D.N.Y. 1985) (holding that the failure of a police department to promulgate policies concerning Brady documentation and disclosure would as a matter of law have "potentially

egregious consequences"). A reasonable jury could readily conclude that Averitt's official policy of utterly failing to supervise his subordinates in their compliance with their obligations to document and disclose their investigative activities, *and* of providing affirmatively illegal supervision both in specific investigations - as his own constitutional violations in the Frost investigation reveal - and in his notorious official misconduct, led directly to the deliberate misconduct that caused the deprivations of Plaintiffs' constitutional rights in this case.

As Plaintiff's expert Steve Rothlein concluded, the climate of impunity created by Forbess sent a message to his chain of command that "the rules don't matter."[37] (Pl. R. 56.1 Statement ¶ 396.) That Averitt's message was received and internalized by his subordinates is evident from their own testimony. As Forbess candidly acknowledged, his deliberate decisions in this case not to document critical witness interviews, and/or not to disclose those interviews that he considered "irrelevant," were made pursuant to Averitt's policy of devolving to him complete discretion in such matters - a policy that led directly, and inevitably, to the nondisclosure of <u>Brady</u> material in this case. (Pl. R. 56.1 Statement ¶¶ 317–22.) Cf. <u>Williams, supra</u>, 352 F.3d at 1014 (holding that where testimony from police subordinates was that they acted "according to the Sheriff Department's unwritten policy for executing 'hazardous' warrants[,] . . . . Harris's actions as policymaker were undeniable the moving force behind, and the direct cause of, the violation of plaintiff's constitutional rights, thereby establishing the County's municipal liability.").

---

[37] Courts routinely rely on expert testimony to establish causation in <u>Monell</u> training cases. <u>See, e.g.</u>, <u>Brown, supra</u>, 291 F.3d at 463–64; <u>Thomas, supra</u>, 42 F.3d at 1270 ( "Expert opinion evidence is itself sufficient to create a genuine issue of disputed fact sufficient to defeat a summary judgment motion."); <u>see also Allen, supra</u>, 119 F.3d at 843-44; <u>B.F. Goodrich</u>, 99 F.3d 505, 526-27 (2d Cir. 1996); <u>Mendes-Silva, supra</u>, 980 F.2d at 1488-89; <u>Russo, supra</u>, 953 F.2d at 1047; <u>Gutierrez-Rodriguez, supra</u>, 882 F.2d at 563-4.

Additionally, Plaintiffs' evidence demonstrates that both Forbess and Holdman possessed fundamental misunderstandings of, or deliberately disregarded, the scope and nature of their constitutional obligations to document and disclose exculpatory and impeachment evidence to prosecutors. Forbess's testimony in this case demonstrates that his understanding of his <u>Brady</u> obligations was, at best, highly selective and did not encompass impeachment evidence. (Pl. R. 56.1 Statement ¶¶ 319–21.) At worst, as Plaintiff's expert Steve Rothlein found, Forbess's own description of his documentation and disclosure obligations reveals that he followed a routine practice of only disclosing *inculpatory* evidence. (Pl. R. 56.1 Statement ¶¶ 401.) Holdman, for his part, had no idea what the term "<u>Brady</u> material" encompassed, and believed that the term "impeachment" referred to removing an official from office. (Pl. R. 56.1 Statement ¶¶ 358–59.) A reasonable jury could readily conclude that these misconceptions concerning such basic and well-established constitutional obligations, which would undoubtedly be remedied by even the barest modicum of supervision or training, neither of which was provided by Averitt, led directly to the <u>Brady</u> violations in this case.

**D.     Plaintiffs' Claims Are Not Premised on a Mere "Single Incident" of Misconduct**

While virtually ignoring the substantial evidence - which, on summary judgment, must be credited - of Averitt's direct involvement in multiple constitutional violations, of his knowing failure to take any steps to ensure that his deputies acted within the constitutional strictures that he understood to bind them, and of his callous fostering of a climate of corruption in the Sheriff's Department, the defendants rely on a single Seventh Circuit decision, <u>Alexander v. City of South Bend</u>, 433 F.3d 550 (7th Cir. 2006), to advance the erroneous legal contention that Plaintiffs'

Monell claims are fatally based on "one flawed investigation." (Sheriff Brief at 27.)   Crucially,

the defendants' argument is simply irrelevant to Plaintiffs' direct action claim against Union

Parish based upon the constitutional violations committed by defendant Averitt in his official

capacity:   Long-standing Supreme Court and Fifth Circuit precedent establishing that a

municipality may be held liable under Section 1983 based on a *single* illegal act by a final

policymaker. See, e.g., Praprotnik, supra, 485 U.S. at 123 (stating that the single unconstitutional

act by a final policymaker may give rise to Section 1983 municipal liability); Brown, supra, 219

F.3d at 459 ("We think it is clear from the Court's decisions in City of Canton and Bryan County,

that, under certain circumstances, § 1983 liability can attach for a single decision not to train an

individual officer even where there has been no pattern of previous constitutional violations."

(internal citation omitted)); Bennett, supra, 74 F.3d at 586.

The defendants' reliance on Alexander is equally misplaced with respect to Plaintiffs'

claim against the Parish based upon Averitt's policy and practice of grossly inadequate training

and supervision.   The proposition for which they allege that it stands - that liability for a

municipal policy or practice may not lie based on a single constitutional violation - is clearly

inconsistent with Supreme Court precedent, as well as the law of this circuit.   As City of Canton

held, a *single* constitutional violation may give rise to municipal liability for a policy or practice

of inadequate training and supervision when "in light of the duties assigned to specific officers . .

. the need for more or different training is so obvious, and the inadequacy so likely to result in the

violation of constitutional rights, that the policymakers of the city can reasonably be said to have

been deliberately indifferent to the need." City of Canton, supra, 489 U.S. at 390; see

also Brown, supra, 219 F.3d at 458–59; Thompson, supra, 2005 WL 3541036, at * 12–*13.   To

establish that a need for training and/or supervision is "obvious," "the situation need not be frequent or constant; it must merely be of the type that officers can reasonably expect to confront." Brown v. Gray, 227 F.3d 1278, 1288 (10th Cir. 2000).  For example, in City of Canton, the Supreme Court observed that  "city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons," and that therefore officers must be trained in the constitutional limits on the use of deadly force.  City of Canton, supra, 489 U.S. at 390 n.10.[38]

Even more so than the situation presented in City of Canton, law enforcement policymakers know "to a moral certainty" that criminal investigators will be routinely required to document and disclose Brady material, and that investigators' failure to properly do so will frequently cause the constitutional rights of criminal suspects to be violated.  See Gregory, supra, 444 F.3d at 753 ("In their investigative capacities, police officers regularly uncover exculpatory materials. The Supreme Court has laid down very specific obligations of police officers on the disclosure of exculpatory materials.  Widespread officer ignorance on the proper handling of exculpatory materials would have the highly predictable consequence of due process violations." (internal quotations and citations omitted); Walker, supra, 974 F.2d at 300 (finding that a jury could conclude that failing to train concerning Brady disclosure would likely result in district attorneys making the wrong choices); Thompson, supra, 2005 WL 3541036, at *13 ("Following Canton's 'so obvious' standard, and viewing the evidence in the light most favorable to plaintiff, the DA's office knew to a moral certainty that assistants would acquire Brady material, that

---

[38] See also Brown, supra, 227 F.3d at 1288 (concluding that the off-duty use of lethal force was a situation that police officers would so inevitably confront that the need for training was obvious).

without training it s not always obvious what <u>Brady</u> requires, and that withholding <u>Brady</u>

material will virtually always lead to a substantial violation of constitutional rights."); <u>Carter,</u>

<u>supra</u>, 612 F. Supp. at 758 ("Plaintiff has further demonstrated that the City may well have failed

to adopt an adequate policy regarding the preservation and production of exculpatory evidence.

There is no doubt that such a failure, if it existed, constitutes gross negligence because of its

potentially egregious consequences. ").  Hence, <u>City of Canton</u> and its progeny in this and other

circuits establish that a municipality, or its final policymaker, that nevertheless fails to provide

supervision or training concerning police officers' documentation and disclosure obligations

pursuant to <u>Brady</u> - particularly where, as here, the final policymaker has actual notice that full

compliance with those obligations is almost certainly *not* occurring  <u>Alexander</u> does not hold

otherwise.[39]

More to the point, the defendants' assertion that "'the shortcoming in this investigative

are not indicative of a custom or policy; rather they are indicative of one flawed investigation'"

(Def. Mem. at 27) simply ignores the overwhelming evidence that Averitt, the Parish's chief law

enforcement officer, acting in this official capacity, directly participated in and sanctioned the

multiple constitutional violations committed by multiple actors in the Frost investigation, and,

furthermore, did so pursuant to what he, Forbess, and Holdman uniformly described as an official

policy, across investigations, of utterly abdicating his official supervisory responsibilities

concerning his deputies' compliance with their constitutional obligations.  Crucially, although

---

[39] Moreover, subsequent and prior decisions of the Seventh Circuit itself contradict the proposition for which defendants cite <u>Alexander</u>.  <u>Sornberger v. City of Knoxville</u>, 434 F.3d 1006, 1029—30 (7th Cir. 2006); <u>Woodward v. Correctional Medical Services of Illinois</u>, 368 F.3d 917,  929 (7th Cir. 2004) (finding "more than a single instance of flawed conduct" in light of "repeated failures" with respect to one individual "as well as a culture that permitted and condoned violations of policies").

courts have looked to a pattern of prior misconduct as *evidence* of a municipality's notice of a risk that its policies and practices would lead to constitutional deprivations, it is clear that the touchstone is not the pattern itself, but rather a showing of "deliberate indifference," or a "conscious choice" to maintain deficient policies. See, e.g., Amnesty America v. Town of West Hartford, 361 F.3d 113, 128 (2d Cir. 2004) ("While we have held that proof of a policymaker's failure to respond to repeated complaints of civil rights violations would be sufficient to establish deliberate indifference, we have never required such a showing. The means of establishing deliberate indifference will vary given the facts of the case and need not rely on any particular factual showing. The operative inquiry is whether the facts suggest that the policymaker's inaction was the result of a 'conscious choice' rather than mere negligence."); Mayes v. City of Hammond, 442 F. Supp. 2d 587, 636–37 (N.D. Ind. 2006) (finding that evidence of multiple constitutional violations in a single investigation, together with evidence that the police supervisor "fostered an environment that facilitated minimally acceptable police practices of which he was aware and which he condoned and that he was personally involved in certain aspects of the alleged constitutional violations in this matter" raised triable issue in a Section 1983 municipal failure to supervise claim).   For all of the reasons set forth above,  Plaintiff's evidence shows *not* sporadic misconduct untethered to any departmental policy, but rather multiple, egregious constitutional violations by multiple officers, including the final policymaker himself, in the course of a single investigation, pursuant to a final policymaker's official practice across investigations of affirmatively tolerating and facilitating his own, and his deputies', illegal conduct. The defendants can point to no authority for the suggestion that a municipality may be shielded from Section 1983 liability in the face of such overwhelming evidence of deliberate

59

indifference.

## VII.   Supervisory Claims

Plaintiffs have stated Section 1983 supervisory liability claims against both Larry Averitt

and Donald Holdman in their individual capacities.  Plaintiffs' contention is that, separate and

apart from these defendants' respective individual liability for their direct commission of acts

violating Plaintiffs' Fourth and Fourteenth Amendment rights, defendants Averitt and Holdman

are individually liable for their deliberately indifferent supervision in the Frost investigation,

which was the direct cause of constitutional violations committed by their subordinates - in the

case of Averitt, Forbess and Holdman, and in the case of Holdman, Forbess.  The defendants'

motion does not address these claims.

The Fifth Circuit has recognized that such a claim may lie under essentially "the same

standards of fault and causation" as those applicable to Section 1983 claims against

municipalities for their policies and practices of failing to supervise and train.  See Doe v. Taylor

Independent School District, 15 F.3d 443, 553 (5th Cir. 1994) (en banc).  Hence, Averitt and

Holdman are liable for their failures to supervise to the extent (1) that they knew or should have

known of the constitutional violations committed, (2) that their failures to supervise directly

caused the constitutional violations committed, and (3) that they manifested deliberate

indifference to the constitutional rights of the Plaintiffs by failing to take action that was

obviously necessary to prevent the violations.  See id. at 454.[40]

---

[40] See also Maldonado v. Rodriguez, 23 F.3d 576, 582 (1st Cir. 1994) ("One way in which a supervisor's behavior may come within this rule is by formulating a policy, or engaging in a custom, that leads to the challenged occurrence.  Thus, even if a supervisor lacks actual knowledge of censurable conduct, he may be liable for the foreseeable consequences of his conduct if he would have known but for his deliberate indifference or willful blindness, and if he had the power and authority to alleviate it."); Jones, supra, 856 F.2d at 991 (stating that supervisors maybe be liable under Section 1983 for the conduct of their subordinates where they "know about the

Because, under Fifth Circuit law, the standards for Section 1983 municipal liability for failure to supervise and train are identical to the legal elements of an individual failure to supervise claim, the evidence set forth in Plaintiffs' discussion of Union Parish's liability for defendant Averitt's failure to supervise and train, supra Part VI.C, raises triable issues as to defendant Averitt's individual liability for those failures as well.[41]  In sum, a reasonable jury could credit the following record evidence, described in detail above, supra Part VI.C: that Averitt and his subordinates, Forbess and Holdman, committed multiple, intentional constitutional violations; that Averitt had actual and constructive knowledge of his subordinates' misconduct based upon his personal involvement in the constitutional deprivations in this case and his knowledge that his subordinates were unsupervised and untrained; and that the constitutional violations committed in this case were the direct result of the supervisory climate of constitutional and professional impunity created by Averitt's complete abdication of his supervisory responsibilities, his active encouragement of illegal conduct in the course of investigations, and his open and notorious engagement, with the cooperation of his subordinates Forbess and Holdman, in a crippling scheme of theft from Union Parish.  These facts raise triable issues with regard to Averitt's individual liability under Section 1983 for his grossly inadequate policy of supervision and training.

Plaintiffs' evidence also permits a reasonable jury to conclude that defendant Holdman is individually liable for his failure to supervise Monty Forbess - a task that, at least by Averitt's

---

conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see").

[41]  Plaintiffs emphasize that, although as a factual matter their individual supervisory claims against Averitt and Holdman closely track their "supervision" claim against Union Parish, Averitt's and Holdman's personal liability for their failures of supervision is legally separate and distinct from the Parish's liability for Averitt's official policy of supervision and training.

account, was within the scope of Holdman's obligation and authority as Chief Deputy for the Department (Pl. R. 56.1 Statement ¶ 258), and which Holdman, by his own account, did not perform (Pl. R. 56.1 Statement ¶ 259.)  Holdman participated in the initial crime scene canvass and other initial investigative events, and so when he assisted in interviewing Janet Burrell on October 12 he, like Averitt and Forbess, would have been aware that Janet Burrell's account, aside from its inherent incredibility, was inconsistent with several known, investigative facts, and therefore was exculpatory and/or impeachment evidence.  (Pl. R. 56.1 Statement ¶¶ 123–49.) Holdman also interviewed Albert Burrell two days after Janet Burrell's initial statements which gave rise to his arrest.  (Pl. R. 56.1 Statement ¶ 344.)  Yet Holdman, by his own admission, took no steps to ensure that Forbess documented or disclosed either the Janet Burrell interview or any other investigative acts performed by Forbess during the Frost investigation.[42]  (Pl. R. 56.1 Statement ¶ 259.)  In addition, Holdman and Forbess together were complicit benefactors of Sheriff Averitt's illegal scheme to defraud Union Parish - a comradery that is utterly inconsistent with Holdman's purported obligation to supervise Forbess's conduct in the Sheriff's Department. (Pl. R. 56.1 Statement ¶¶ 287–95.)  In sum, these facts raise triable issues to permit a jury to conclude that Holdman's failure to supervise Monty Forbess, despite his direct involvement in and knowledge of the Frost investigation and Forbess's conduct in the case, was both deliberate and a proximate cause of the constitutional violations committed by Forbess against Plaintiffs.

## VIII.   State Law Claims

---

[42] Nowithstanding Holdman's testimony that he had no idea what <u>Brady</u> obligations entailed, (Pl. R. 56.1 Statement ¶ 358), a jury would not be required to credit Holdman's arguably self-serving account, and could instead find that Holdman recognized his and Forbess's <u>Brady</u> documentation and disclosure obligations and intentionally failed, in his duties as a supervisor, to ensure that Forbess executed those duties.

Plaintiffs have also brought claims against the Sheriff Defendants pursuant to Louisiana tort and constitutional law, specifically, claims for malicious prosecution, unreasonable search and seizure, illegal withholding of material, exculpatory and impeachment evidence, intentional infliction of emotional distress, and negligence, and respondeat superior.  Plaintiffs respectfully submit that the foregoing evidence - in particular Averitt's, Forbess's and Holdman's multiple, intentional acts of withholding Brady material, their intentional conduct in causing Plaintiffs to be arrested and imprisoned without probable cause and deception of the grand jury by intentionally withholding material, exculpatory evidence that would vitiate a probable cause finding, their additional, intentional failures to investigate known leads that would exculpate Plaintiffs, and Averitt's deliberate acts of official misconduct and policy of grossly inadequate supervision and training - amply supports the requisite findings of intentional, outrageous, and malicious misconduct in the course of a criminal investigation to support the state tort claims alleged.  See Progressive Security Insurance Co. v. Foster, 711 So.2d 675, 688 (La. 1998) stating that the Louisiana Constitution's guarantee of due process is equivalent to that under the United States Constitution); Jenkins v. Baldwin, 801 So.2d 485, 497 (La. App. 4th Cir. 2001) (stating that "evidence of malice or deliberate intent to suppress exculpatory evidence or otherwise mislead the Court" will give rise to tort liability for police officers' criminal investigations);

Additionally, as the defendants essentially concede, Union Parish is liable for the torts of Averitt, Forbess, and Holdman committed in their official capacities.  Because, as described above, each and every act of flagrant misconduct in this case was committed pursuant to the defendants' official duties as, respectively, the Parish's final policymaker concerning law enforcement matters, and Parish deputies charged with investigating criminal conduct, Union

Parish is liable for their torts.  Accordingly, Plaintiffs' state law claims should not be dismissed.

Respectfully submitted,

LIVGARD & RABUSE, P.L.L.P.

By: _____
    Charles J. Lloyd
2520 University Avenue S.E.
Suite 202
Minneapolis, MN 55414
Tel: (612) 825-7777
Fax: (612) 825-3997

**ATTORNEYS FOR ALBERT RONNIE
BURRELL**

COCHRAN NEUFELD & SCHECK, LLP

By: _____
    Nick Brustin
    Jennifer E. Laurin
99 Hudson Street
New York, NY 10013
Tel:  (212) 965-9081
Fax:  (212) 965-9084

**ATTORNEYS FOR MICHAEL RAY
GRAHAM, JR.**

**CENTER FOR EQUAL JUSTICE**

By: _____
    Nicholas J. Trenticosta (18475)
7100 St. Charles Avenue
New Orleans, LA 70118
Tel:  (504) 864-0700
Fax:  (504) 864-0780

**ATTORNEYS FOR ALBERT RONNIE
BURRELL AND MICHAEL RAY
GRAHAM, JR.**

## CERTIFICATE OF SERVICE

I hereby certify that on December 7, 2006 a copy of the Plaintiffs' Response in Opposition to Motion for Summary Judgment on Behalf of Union Parish Sheriff Bob Buckley, Former Union Parish Sheriff Larry Averitt, and Former Union Parish Sheriff's Deputies Donald Holdman and Monty Forbess, was filed electronically with the Clerk of Court using the CM/ECF system. The accompanying exhibits were filed manually. Notice of this filing will be sent to all parties, through counsel, at the following addresses:

Nicholas J. TrenticostaCenter for Equal Justice
7100 St Charles Ave.
New Orleans, LA 70118

Charles J. Lloyd
Livgard & Rabuse
2520 University Ave. S E
Suite 202
Minneapolis, MN 55141

H. Clay Walker, V
Henry Clay Walker
Walker Tooke et al.
1700 Irving Pl.
Shreveport, LA 71101

Nick Brustin
Jennifer Laurin
Cochran Neufeld & Scheck
99 Hudson St. 8th Fl.
New York, NY 10013

David Michael Hufft
Pivach Pivach et al
P O Box 7125
Belle Chasse, LA 70037

Ralph R Alexis, III
Porteous Hainkel et al.
704 Carondelet St.
New Orleans, LA 70130

L. Fred Schroeder
Craig E Frosch
Usry Weeks & Matthews
1615 Poydras St.
Suite 1250
New Orleans, LA 70112

I also certify that a copy of the foregoing will be sent to all non-CM/ECF participants by United

States Mail, properly addressed and postage paid.

Charles J. Lloyd.