U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED

OCT 2 2 2007

ROBERT H. SHEMWELL, CLERK
BY _____
                DEPUTY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION


ALBERT RONNIE BURRELL, et al.,          CIVIL ACTION
                Plaintiffs              NO. CV01-2679-M

VERSUS

TOMMY ADKINS, et al.,                   JUDGE D. "DEE" DRELL
                Defendants              MAGISTRATE JUDGE JAMES D. KIRK


REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE (DOC. # 207, 221)


Before the court is a civil rights complaint filed pursuant to 42 U.S.C. § 1983, as well as Louisiana state law, by plaintiffs Albert Ronnie Burrell ("Burrell") and Michael Ray Graham ("Graham") on December 26, 2001. The named defendants are Tommy Adkins (former district attorney of Union and Lincoln Parishes, official capacity only[1]), Robert Levy (current district attorney of Union and Lincoln Parishes, official capacity only), Dan J. Grady III[2] (former Union Parish Assistant District Attorney), John and Jane Does employed by the Union and Lincoln Parishes' district

---

[1] The individual liability claims against Adkins were dismissed by judgment of the Fifth Circuit on June 28, 2004 (Doc. Item 125).

[2] The action against Grady was dismissed by judgment of the Fifth Circuit on June 28, 2004 (Doc. Item 125).

attorney's office, the North Louisiana Criminalistics Laboratory, the Union Parish Sheriff (individual capacities), Jim Hood as(employed at the North Louisiana Criminalistics Laboratory), Kenneth Larry Averitt (former sheriff of Union Parish, individual and official capacities), Robert Buckley (current sheriff of Union Parish, official capacity only), Donald Holdman (former Union Parish Deputy Sheriff, individual capacity only), Monty Forbess (former Union Parish Deputy Sheriff, individual capacity only), Elmer Hearron (former Union Parish Deputy Sheriff, individual capacity only).[3]

Plaintiffs Burrell and Graham each spent more than thirteen years on death row at the Louisiana State Penitentiary in Angola after having been convicted of a double murder ("the Frost murders") by a jury in the Louisiana Third Judicial District Court in Union Parish. State v. Burrell, 561 So.2d 692 (La. 1990); State v. Graham, 566 So.2d 403 (La. 1990).  On March 3, 2000, Union Parish District Court Judge Woodard granted a new trial motion filed on behalf of Graham, finding that Graham was entitled to a new trial because the defendants, and thus the jury, had not been given all of the facts and evidence known to the prosecution, and

---

[3] Plaintiffs' claims against John and Jane Does employed by the Union and Lincoln Parish District Attorney's Office, John and Jane Does employed by the Union Parish Sheriff, John and Jane Does employed the North Louisiana Criminalistics Laboratory, John and Jane Does employed by defendants' unnamed insurers, Jim Hood, and Elmer Hearron have been dismissed (Doc. Items 159, 196).

that the information which was withheld could very likely have

changed the outcome of the trial.  The state district court judge

found the State had withheld significant exculpatory evidence and

impeachment evidence bearing on the credibility of its main

witnesses.[4]  On December 28, 2000, the Louisiana Attorney General

_____

[4] Many of the factual issues considered herein were raised
and litigated in Graham's hearing on his motion for new trial
before Judge Cynthia T. Woodard, of the Third Judicial District
Court, Union Parish, Louisiana.  Judge Woodard made findings on
the factual issues in her ruling (Doc. Item 225, Pl. Ex. pp.
1199-1236):
    "The Court finds that the defendant has met his burden
    of proving that he is entitled to a new trial because
    the State repeatedly withheld material evidence
    favorable to the defendant in violation of Brady v.
    Maryland, and because of certain other newly discovered
    evidence.  Because the jury did not have all of the
    correct facts, the jury's assessment of the weight of
    the evidence, and the jury's determination of the
    credibility of certain witnesses was affected.  From
    the record, it is clear that if the jury had been able
    to consider the items of evidence favorable to the
    defendant which were wrongfully withheld by the State,
    and if the jury had been able to consider the other
    newly discovered evidence, there is a reasonable
    probability that the result of this trial would have
    been different."
Judge Woodard specifically listed and discussed at length
the numerous items of material evidence which had been
deliberately withheld from the defendants and concluded the jury
had been misled about certain areas of the law and many of the
facts of the case such that the court could have no confidence in
the outcome of the trial (Doc. Item 225, Ex. 39).  Judge Woodard
made specific findings in many instances that the State had
"deliberately withheld" exculpatory and impeachment evidence,
"deliberately elicited and failed to correct" false testimony,
and "actively misled" the jury (Doc. Item 225, Ex. 39).  These
factual findings formed the basis of Judge Woodard's judgment
granting Graham's motion for new trial and, subsequently,
Burrell's motion for new trial, as well.
    In a separate report and recommendation, the undersigned
found res judicata applicable to the issues raised in this suit

filed a dismissal of all charges against Graham and Burrell, stating there was a "total lack of credible evidence" linking either man to the crimes and that it would be a "breach of ethics to proceed to trial without evidence that would make it reasonable to argue to a jury that proof beyond a reasonable doubt exists in this instance" (Doc. Item 207, Ex. I; Doc. Item 225, Ex. 42). Graham was released from prison in December 2000, and Burrell was released from prison pursuant to a joint motion by Burrell and the State of Louisiana on January 2, 2001.

Plaintiffs allege the named defendants maliciously, intentionally, and with deliberate indifference to their constitutional rights, conspired to indict, arrest, detain, prosecute, and obtain death penalties against the plaintiffs on the basis of coerced false witness statements, affidavits, and testimony, and withheld exculpatory and impeachment evidence in violation of Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-1207 (1963). Plaintiffs also allege supplemental state law claims. For relief, plaintiffs ask for general and punitive

---

between the "DA defendants" and the plaintiffs. However, res judicata does not apply to the issues between the "Sheriff's Office defendants" and the plaintiffs. Since the "Sheriff's Office defendants" were not parties in the criminal proceedings, Louisiana law precludes application of res judicata to the state court's findings and judgment to these defendants. See State v. Arnold, 593 So.2d 1293, 1297 (La. App. 1st Cir. 1991), writ den'd, 594 So.2d 1305 (La. 1992)(sheriff's deputies in prior civil proceeding were not the "same parties" as the district attorney and the state in subsequent criminal proceeding for purposes of collateral estoppel).

damages, attorney fees, and costs.

Defendants Buckley, Averitt, Holdman, and Forbess (the "Sheriff's Office defendants") filed a motion for summary judgment with documentary exhibits (Doc. Items 207, 221) and a reply brief (Doc. Item 230). Plaintiffs filed a brief in response to the motion for summary judgment, with an affidavit and a statement of undisputed facts[5] (Doc. Items 224, 225, 226, 228, 230). The Sheriff's office defendants' motion for summary judgment is now before the court for consideration.[6]

Law and Analysis

## The Law of Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure mandates that a summary judgment:

> "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, [submitted concerning the motion for summary judgment], if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

Paragraph (e) of Rule 56 also provides the following:

> "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by

---

[5] Much of plaintiffs' unduly long "statement of undisputed facts" is actually just argument.

[6] The "D.A. defendants," Adkins and Levy, also filed a motion for summary judgment which is dealt with in a separate report and recommendation.

affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.   If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party."

Local Rule 56.2W (formerly 2.10W) also provides that all material facts set forth in a statement of undisputed facts submitted by the moving party will be deemed admitted for purposes of a motion for summary judgment unless the opposing party controverts those facts by filing a short and concise statement of material facts as to which that party contends there exists a genuine issue to be tried.

In this regard, the substantive law determines what facts are "material."   A material fact issue exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.   However, the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient to preclude summary judgment; there must be evidence on which the jury could reasonably find for the plaintiff.   Stewart v. Murphy, 174 F.3d 530, 533 (5th Cir. 1999), 528 U.S. 906, 120 S.Ct. 249 (1999), and cases cited therein.

If the movant produces evidence tending to show that there is no genuine issue of material fact, the nonmovant must then direct the court's attention to evidence in the record sufficient to establish the existence of a genuine issue of material fact for trial.   In this analysis, we review the facts and draw all

inferences most favorable to the nonmovant.  <u>Herrera v. Millsap</u>, 862 F.2d 1157, 1159 (5th Cir. 1959).  However, mere conclusory allegations are not competent summary judgment evidence, and such allegations are insufficient, therefore, to defeat a motion for summary judgment.  <u>Topalian v. Ehrman</u>, 954 F.2d 1125, 1131 (5th Cir.), cert. den., 506 U.S. 825, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992).

### <u>Sheriff's Office Defendants</u>

Plaintiffs claim Sheriff Averitt, Deputy Holdman, and Deputy Forbess conducted a constitutionally deficient investigation of the murders, illegally coerced and threatened witnesses into giving false statements and false testimony against Burrell and Graham, fabricated evidence against Burrell and Graham, gave false and materially misleading testimony at the trials, failed to turn over exculpatory evidence to the district attorney or to plaintiffs' counsel prior to or during the criminal trials, and falsely arrested and imprisoned plaintiffs without probable cause.

Plaintiffs also allege <u>Monell</u>[7] claims against former Sheriff Averitt, contending he created and maintained official customs, practices and/or policies for inadequate investigation of crimes,

---

[7] In <u>Monell v. New York City Dept. of Social Services</u>, 436 U.S. 658, 689, 98 S.Ct. 2018, 2035 (1978), the Supreme Court held that municipalities and other local governmental bodies are "persons" within the meaning of Section 1983, and that, since there is no respondeat superior liability under Section 1983, a municipality may not be held liable under Section 1983 solely because it employs a tortfeasor.

illegal coercion of witnesses to force them to give false statements and perjured testimony, fabrication of false evidence, giving perjured testimony, and failing to disclose exculpatory evidence, and failing to train or supervise the deputies. Current Sheriff Buckley is made a defendant in his official capacity as Averitt's successor in office. Plaintiffs also claim malicious prosecution and intentional infliction of emotional distress.

As stated above, Plaintiffs are suing Holdman and Forbess in their individual capacities only, former Sheriff Averitt in both his official and individual capacities, and current Sheriff Buckley in his official capacity only.

## 1. Qualified Immunity

Defendants claim the defense of qualified immunity. The defense of qualified immunity protects a public official from both litigation and liability, absent a showing that the official violated a constitutional right that was clearly established at the time of the incident. Woods v. Smith, 60 F.3d 1161, 1164 (5th Cir. 1995), cert. den., 516 U.S. 1084, 116 S.Ct. 800 (1996). Qualified immunity cloaks a police officer from personal liability for discretionary acts which do not violate well established law. Officers have qualified immunity if their actions could reasonably have been thought consistent with the right they are alleged to have violated. Richardson v. Oldham, 12 F.3d 1373, 1380-81 (5th Cir. 1994), and cases cited therein. Qualified immunity operates

8

to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful. Hope v. Pelzer, 536 U.S. 730, 122 S.Ct. 2508, 2515 (2002).

Invocation of the qualified immunity defense shifts the burdens of proof in federal civil rights lawsuits brought against public officials for actions or omissions attending their performance of official duties:

> "The defendant official must initially plead his good faith and establish that he was acting within the scope of his discretionary authority. Once the defendant has done so, the burden shifts to the plaintiff to rebut this defense by establishing that the official's allegedly wrongful conduct violated clearly established law."

Bazan v. Hidalgo County, 246 F.3d 481, 489 (5th Cir. 2001), citing Salas v. Carpenter, 980 F.2d 299, 306 (5th Cir. 1992).

The bifurcated test for qualified immunity is: (1) whether the plaintiff has alleged a violation of a clearly established constitutional rights; and, (2) if so, whether the defendant's conduct was objectively unreasonable in the light of the clearly established law at the time of the incident. Hare v. City of Corinth, 135 F.3d 320, 325 (5th Cir. 1998), and cases cited therein.

The first step is to determine whether the plaintiff has alleged violation of a clearly established constitutional right. This analysis is made under the currently applicable constitutional standards. Hare, 135 F.3d at 325. A constitutional right is clearly established if, in light of pre-existing law, the unlawfulness is apparent. Officials must observe general, well-

developed legal principles.  <u>Doe v. Taylor Independent School Dist.</u>, 15 F.3d 443, 445 (5th Cir.), cert. den., 513 U.S. 815, 115 S.Ct. 70 (1994).

The second prong of the qualified immunity test is better understood as two separate inquiries: (1) whether the allegedly violated constitutional rights were clearly established at the time of the incident and, if so, (2) whether the conduct of the defendants was objectively unreasonable in the light of that then clearly established law.  <u>Hare</u>, 135 F.3d at 325-36.  Objective reasonableness is a question of law for the court.  The analysis for objective reasonableness is different from that for deliberate indifference (the subjective test for addressing the merits).  For qualified immunity, the subjective deliberate indifference standard serves only to demonstrate the clearly established law in effect at the time of the incident and, under that standard (the minimum standard not to be deliberately indifferent), the actions of the individual defendants are examined to determine whether, as a matter of law, they were objectively unreasonable.  <u>Hare</u>, 135 F.3d at 328.

The qualified immunity doctrine does not protect an official whose subjective intent was to harm the plaintiff, regardless of the objective state of the law at the time of his conduct.  <u>Douthit v. Jones</u>, 619 F.2d 527, 533 (5th Cir. 1980).  A party seeking to avoid a qualified immunity defense must prove that the official

either actually intended to do harm to him, or took an action which, although not intended to do harm, was so likely to produce injury that the harm can be characterized as substantially certain to result. <u>Douthit</u>, 619 F.2d at 533.

Finally, it is noted that the defense of qualified immunity is not available to a defendant sued in his official capacity. A suit brought against a defendant in his official capacity is, effectively, a suit against the governmental unit that employs the defendant. <u>Monell v. Dept. of Social Services</u>, 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 2035 n. 55, 56 L.Ed.2d 611 (1978); <u>Brooks v. George County, Ms.</u>, ____F.3d____, 1996 WL 84650, *5 (5th Cir. 1996).[8] Municipalities are not entitled to qualified immunity, <u>Owen v. City of Independence, Mo.</u>, 445 U.S. 622, 650, 100 S.Ct. 1398, 1415, 63 L.Ed.2d 673 (1980), nor is a sheriff sued in his official capacity, <u>Rodgers v. Jabe</u>, 43 F.3d 1082, 1089 (6th Cir. 1995); <u>Ruehman v. Sheahan</u>, 34 F.3d 525, 527 (7th Cir. 1994).

Defendants' qualified immunity defense will be considered as to the individual capacity claims, as set forth below.

## 2. Sheriff Buckley

As stated above, Current Sheriff Buckley is made a defendant

---

[8] Municipal liability under §1983 attaches where, and only where, a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question. <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 484, 106 S.Ct. 1292, 1300, 89 L.Ed.2d 452 (1986).

in his official capacity as Averitt's successor in office. Defendants argue Buckley should be dismissed because he was not involved in any of the events complained of herein. However, a successor sheriff may be held liable in his official capacity for the torts for which his predecessor in office was liable in his official capacity. Riley v. Evangeline Parish Sheriff's Office, 94-0202 (La. 4/4/94), 637 So.2d 395, citing Jenkins v. Jefferson Parish Sheriff's Office, 402 So.2d 669, 671 (La. 1981). Also, Burge v. Parish of St. Tammany, 187 F.3d 452, 470 (5th Cir. 1999).

In 1976, La.R.S. 33:9001, et seq., created a law enforcement district in each parish for the purpose of providing financing to the office of sheriff for that parish. The boundaries of each district are coterminous with the boundaries of the parish and the duly elected sheriff of the parish (or in the parish of Orleans, the criminal sheriff or his successor) is the chief executive officer of the district. Also, City of Shreveport v. Caddo Parish, 27,519 (La.App. 2 Cir. 6/23/95), 658 So.2d 786, 794-795, writ den., 95-2285, 95-2298 (La. 11/27/95), 663 So.2d 728, 729. La. R.S. 33:9001, et seq., empower the sheriff to raise revenues to finance his facilities and services through the law enforcement district, whose corporate existence survives the term of office of any individual sheriff. Prator v. Caddo Parish, 38,085 (La. App. 2 Cir. 1/28/04), 865 So.2d 932, 936, vac'd in part on other grounds, 2004-0794 (La. 12/1/04), 888 So.2d 812.

12

Therefore, a suit against Sheriff Averitt and Sheriff Buckley in their official capacities is actually a suit against the Union Parish Law Enforcement District.

Since Sheriff Buckley in his official capacity is liable, as Averitt's successor, for any damages the court may determine are owed by Averitt in his official capacity to the plaintiffs, defendants' motion for summary judgment in favor of Sheriff Buckley should be denied.

## 3. Monell Claims Against Sheriff Averitt

Plaintiffs allege Averitt, in his official capacity, maintained an official custom, practice, or policy of defective investigative techniques that cause the violation of plaintiffs' constitutional rights.  Plaintiffs allege Averitt failed to properly train or supervise his deputies, and maintained an official policy, practice, or custom of failing to adequately train and supervise his deputies.

A plaintiff seeking to impose liability on a municipality under Section 1983 is required to identify a municipal "policy" or "custom" that caused the plaintiff's injury.  Locating a "policy" ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality.  Board of Cty. Comm'rs of Bryan Cty. v. Brown, 520 U.S. 397, 403-404, 117 S.Ct. 1382, 1388

13

(1997). In <u>Burge</u>, the Fifth Circuit explained that the official policy requirement may be met in at least three different ways: (1) when the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy, (2) where no official policy was announced or promulgated but the action of the policymaker itself violated a constitutional right; and (3) even when the policymaker fails to act affirmatively at all, if the need to take some action to control the agents of the local governmental entity is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need. <u>Burge</u>, 187 F.3d at 471, and cases cited therein.

Under Louisiana law, the sheriff is a final policymaker. <u>Craig v. St. Martin Parish Sheriff</u>, 861 F.Supp. 1290, 1300 (W.D.La. 1994), citing La. Const. Art. 5, § 27 ("[The sheriff] shall be the chief law enforcement officer in the parish."). Also, <u>McNeese v. State of Louisiana</u>, 2006 WL 1751055 (W.D.La. 2006). As the chief executive officer for the Union Parish Law Enforcement District, the Union Parish Sheriff is the independent and final official policymaker for all of the law enforcement district. A deputy sheriff is an appointed public officer of his parish law enforcement district, of which the sheriff is the head. La.R.S.

33:1433, 33:9001.   Also, <u>Lewis v. Jefferson Parish Sheriff's Office</u>, 01-257 (La. App. 5th Cir. 9/25/01), 798 So.2d 249, 251.

Municipal liability under Section 1983 attaches where a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.   Therefore, municipal liability may attach to a *single decision* to take unlawful action made by a municipal policymaker. <u>Pembauer v. City of Cincinnati</u>, 475 U.S. 469, 483, 106 S.Ct. 1292, 1300 (1986).   Also, <u>Bd. of Cty. Comm'rs of Bryan County v. Brown</u>, 520 U.S. 397, 117 S.Ct. 1382 (1997); <u>Burge</u>, 187 F.3d at 470-471. Where action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken *only once* or to be taken repeatedly. <u>Pembauer</u>, 475 U.S. at 481, 106 S.Ct. at 1299.

The plaintiff must also show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.   Accordingly, proof that a municipality's *authorized decision maker* has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably. <u>Board of Cty. Comm'rs of Bryan Cty.</u>, 520 U.S. at 404, 117 S.Ct. at 1388-90.

Defendants contend they are entitled to a summary judgment on

these claims because, as shown in Averitt's deposition, Averitt's deputies underwent the training required by Louisiana law, and Deputies Holdman and Forbess had experience and training as law enforcement officers prior to being hired by Averitt and attended additional training seminars (Doc. Item 225, Ex. 27, Holdman Affid. Ex. , p. 99; Doc. Item 225, Forbess Affid. Ex. 9, pp. 552-557; Doc. Item 225, Averitt Affid. Ex. 27, p. 1046-1047; Doc. Item 221, Averitt Affid. Ex. K, p. 10). Moreover, Averitt also states in his depositions (Doc. Item 225, Ex. 3, pp. 61, 78 & Ex. 27, pp. 1055, 1059) that it was the practice in his office for the entire criminal investigation file to be provided to the prosecutors, and that he delegated certain responsibilities to both Chief Holdman and Investigator Forbess. Defendants argue plaintiffs have not shown Sheriff Averitt was deliberately indifferent to his deputies training and their use of proper investigative techniques. Defendants also argue plaintiffs' have not adduced any evidence of any official policy of Averitt's office which violated plaintiffs' constitutional rights. Defendants further argue the "single incident" of constitutional violations is insufficient to prove liability under Monell.

Plaintiffs contend, of course, that they meet the requirement of Monell through Averitt's direct involvement in the investigation of the murders with which they were charged, as well as through a pattern of constitutional violations in the investigation of the

16

Frost murders.  Plaintiffs argue that Averitt failed to document and disclose, or take any steps to ensure Holdman and Forbess documented and disclosed, critical exculpatory and impeachment evidence, including at least two October 1986 interviews with Janet Burrell, Janet Burrell's October 16, 1986 statement to Michael Graham, Janet Burrell's recantation of her initial statements implicating Burrell, and the coercion of Janet Burrell by Forbess.

First, it is noted that there is no Section 1983 liability for failure to supervise.  The doctrine of respondeat superior, which makes an employer or supervisor liable for an employee's alleged tort, is unavailable in suits under 42 U.S.C. §1983.  Thompkins v. Belt, 828 F.2d 298, 303 (5th Cir. 1987).  Well settled §1983 jurisprudence establishes that supervisory officials cannot be held vicariously liable for their subordinates actions.  Supervisory officials may be held liable only if: (1) they affirmatively participate in acts that cause constitutional deprivation; or (2) implement unconstitutional policies that causally result in plaintiff's injury.  Mouille v. City of Live Oak, Tex., 977 F.2d 924, 929 (5th Cir. 1992), cert. den., 508 U.S. 951, 113 S.Ct. 2443, 124 L.Ed.2d 660 (1993); Thompkins, 828 F.2d at 303.  Therefore, this court must determine whether there is a genuine issue of material fact as to whether Averitt actually participated in the investigation and as to whether Averitt implemented any unconstitutional policies that resulted in plaintiffs' arrests,

17

indictments, or convictions.

In overturning plaintiffs' convictions, the state court judge held there had been numerous violations of plaintiffs' right to exculpatory and impeachment evidence by the prosecutors in this case (Doc. Item 225, Pl. Ex. pp. 1199-1236); those violations constituted violations of plaintiffs' constitutional rights. However, as defendants argue, plaintiffs must prove an official custom or policy for the parish to be held liable for their violations of plaintiffs' constitutional rights pursuant to Monell.

Plaintiffs allege Sheriff Averitt "failed to document or disclose clearly exculpatory and impeachment evidence" because he did not fulfill his documentation and disclosure obligations and gave his investigator, Forbess, wide discretion as to whether or not to document interviews. However, plaintiffs have not cited any law imposing on Averitt an "obligation" to document his deputies' investigations. Although investigating officers have a duty to disclose exculpatory and impeachment evidence to the state's attorneys, this court finds no legal requirement for "documentation" of evidence by deputies (although some such type of system is probably the most practical and efficient way to handle evidence), nor any requirement for the sheriff to follow and document all of his deputies' investigations; as a practical matter, that would probably be impossible for a sheriff to do.

Moreover, Averitt is not personally liable under Section 1983 for any failure on the part of his deputies to disclose inculpatory or impeachment evidence.[9]   Finally, it is noted that it is the District Attorney, rather than the Sheriff, who should implement policies, training and procedures to insure the acquisition of Brady material from the Sheriff's Office, its secure distribution to the appropriate assistants, and its disclosure to criminal defendants when the evidence is material to guilt or punishment. Burge, 187 F.3d at 473.

Plaintiffs also allege Averitt was present for and failed to disclose Janet Burrell's October 14, 1986, statement to Michael Graham, which was both exculpatory and impeachment evidence; thus, plaintiffs allege Averitt himself violated plaintiffs' constitutional rights.  Plaintiffs further allege Averitt failed to document Janet Burrell's "initial telephone call," which Averitt himself received; unfortunately, plaintiffs do not state when that call took place or what Janet stated during that call.  However, Forbess states in his deposition that Averitt set up a meeting with Janet Burrell the same day, and told Forbes and Holdman to be there, also; Janet Burrell made her statement implicating Burrell at that meeting (Doc. Item 225, Ex. 9, p. 535).

_____

[9] Moreover, if Holdman and Forbess intentionally withheld the exculpatory and impeachment evidence in order to make arrests in the case and spare the sheriff embarrassment, as alleged by plaintiffs, then issues as to deficiencies training appear to be moot.  Training on proper procedures does not prevent intentional misconduct.

Plaintiffs have not alleged specifically any policy or custom implemented by Averitt which led to the violation of their constitutional rights.   Plaintiffs' allegation that Averitt "created such an atmosphere of laxity for the specific purpose of insulating from scrutiny his own extensive, official misconduct," without citing any evidence or facts, is the type of vague and wholly unsupported allegation which is prevalent in plaintiffs' brief and which will not defeat a motion for summary judgment.   The allegation that Averitt personally participated in the investigation because he "responded to the scene of the crime" when the bodies were initially discovered, discussed the initial investigative findings with his deputies, participated in four interviews - of Mike Rogers, Ruth Toney, Michael Graham, and Albert Burrell - not any of which is claimed to be exculpatory or impeachment evidence which was withheld from the plaintiffs, and purportedly refused an offer of assistance from the FBI (which he had no legal obligation to accept), simply do not demonstrate that Averitt violated plaintiffs' constitutional rights by personally withholding exculpatory and impeachment evidence.   The flaw in plaintiffs' argument is simple - some direct involvement in the murder investigation does not equal direct involvement in the (alleged) intentional violation of plaintiffs' constitutional rights.

Finally, plaintiffs contend Averitt had an official policy of

failing to adequately train and supervise his deputies.  However, as already discussed, Deputies Holdman and Forbess were already trained and experienced when Averitt hired them, and they continued to attend training courses.  Again, plaintiffs make very colorful allegations in their brief, but have adduced no evidence to show Averitt violated the legal requirements for training deputies, La.R.S. 33:1342 and La.R.S. 40:2405, nor have they shown that Averitt failed to exercise any supervision over them.  Both Holdman and Forbess testified they underwent the training required by law as well as numerous additional seminars (Doc. Item 225, Ex. 6, pp. 190-192 and Ex. 4, pp. 150-151).  The fact that Averitt delegated investigative duties, responsibilities, and discretion to them does not prove they were wholly unsupervised, nor have plaintiffs shown that is was inappropriate for Averitt to have made such delegations.  Whether or not Forbess or Holdman actually withheld exculpatory or impeachment evidence from the state's attorneys remains at issue, but plaintiffs have provided no legal basis for holding Sheriff Averitt liable for any such indiscretions proven to have been committed by his deputies.

Since plaintiffs have not actually alleged or shown with proper summary judgment evidence that Averitt had a custom or policy of failing to train or supervise his deputies, or that Averitt directly participated in the violation of plaintiffs' constitutional rights by withholding exculpatory or impeachment,

there are no genuine issues of material fact which would preclude a summary judgment in favor of Averitt on these issues.

## 4. Failure to Investigate

Plaintiffs allege defendants Averitt, Forbess, and Holdman, in their individual capacities, conducted a constitutionally deficient investigation by suppressing exculpatory and impeachment evidence and by knowingly and deliberately disregarding exculpatory investigative leads. Specifically, plaintiffs alleged in their complaint that defendants knew or should have known Janet Burrell's statement implicating Burrell in the murders was false and failed to investigate; failed to investigate and confirm the statements by Kenneth, Glenda, Jackie, and Nickie St. Clair and Amy Opal, and failed to investigate false statements by Olan Wayne Brantley, which were presented to the grand jury and used in both trials.

There is no constitutional right to an investigation. Mitchell v. McNeil, 487 F.3d 374 (6th Cir. 2007). Therefore, there is no constitutional basis for a Section 1983 action based on an "unreasonable investigation." Shields v. Twiss, 389 F.3d 142 (5th Cir. 2004). The due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm. Mitchell, 487 F.3d at 376. Also, Kingsland v. Miami, 382 F.3d 1220, 1228-1231 (11th Cir. 2004); Biasella v. City of Naples, 2005 WL 1925705, *4 (M.D.Fla. 2005). Plaintiff must point to harm caused by the deficient investigation

- a false arrest or imprisonment.  Hence, this claim is subsumed within the false arrest/imprisonment claim discussed below.

Therefore, defendants' motion for summary judgment should be granted on plaintiffs' "failure to investigate" claim.

## 5. Section 1983 False Arrest/Imprisonment

Next, plaintiffs claim the Sheriff's Office defendants, in their individual capacities, falsely arrested and imprisoned them without probable cause, since they knew the warrants were based on false statements, false testimony and fabricated evidence, and they intentionally failed to turn over exculpatory evidence to the district attorney or to plaintiffs' counsel prior to or during the criminal trials.[10]

In addition to the qualified immunity analysis, the

---

[10] More specifically, plaintiffs claim defendants coerced Janet Burrell into giving a false statement and perjured testimony; suppressed Janet Burrell's recantation of her false statements, as well as her statement that deputies, including Forbess and Holdman, coerced and threatened her; falsely arrested and imprisoned (without bail) Burrell on the basis of Janet Burrell's coerced statement, without probable cause to believe Burrell was involved in the murders; suppressed the early interviews with Kenneth St. Clair and other members of the St. Clair family which did not implicate either Burrell or Graham; used conflicting statements by Kenneth, Glenda, Jackie, and Nickie St. Clair and Amy Opal which they knew to be false; falsely arrested and imprisoned (without bail) Graham on the basis of Kenneth St. Clair's false statement, without probable cause to believe Burrell was involved in the murders; coerced and/or failed to investigate false statements by Olan Wayne Brantley, which were presented to the grand jury and used in both trials; suppressed Brantley's plea bargain, criminal history, and history of mental illness; suppressed Janet Burrell's exculpatory statement; suppressed exculpatory crime lab reports, physical evidence, witness statements, and police reports; and coerced a statement from James Burrell (Burrell's brother).

constitutional torts of false arrest, unreasonable seizure, and false imprisonment require a showing that there was no probable cause. Brown v. Lyford, 243 F.3d 185, 189 (5th Cir. 2001), cert. den., 534 U.S. 817, 122 S.Ct. 46 (2001). The right to be free from arrest without probable cause is a constitutional right that was clearly established at the time of plaintiffs' arrests for the Frost murders. See Beck v. Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 225 (1964) (the right to be free from arrest without probable cause is a clearly established constitutional right).

An officer has probable cause to arrest if, at the time of the arrest, he had knowledge that would warrant a prudent person's belief that the person arrested had already committed or was committing a crime. See Gladden v. Roach, 864 F.2d 1196, 1199 (5th Cir.), cert. den., 491 U.S. 907, 109 S.Ct. 3192 (1989). Also, Hunter v. Bryant, 502 U.S. 224, 228, 112 S.Ct. 534 (1991). It is undisputed that officers may submit warrant applications containing hearsay, fleeting observations, and tips received from unnamed informants. Franks, 438 U.S. at 167, 98 S.Ct. at 2682. Also, Bennett v. City of Grand Prairie, 883 F.2d 400 (5th Cir. 1989). If probable cause for an arrest even arguably existed, immunity cannot be lost. Brown, 243 F.3d at 190. Therefore, if the plaintiffs cannot show that defendants lacked probable cause, they have failed to state the violation of a constitutional right and the defendants are entitled to qualified immunity. Sorenson v. Ferrie, 134 F.3d

325, 328 (5th Cir. 1998).

In <u>Franks v. Delaware</u>, 438 U.S. 154, 171-172, 98 S.Ct. 2674 (1978), the Supreme Court held that if an officer, in an affidavit supporting a search warrant, makes a false statement knowingly and intentionally, or with reckless disregard for the truth, the false statements must be disregarded in determining whether the affidavit is sufficient to support a finding of probable cause.  The holding in <u>Franks</u> applies to omissions as well.  <u>Hale v. Fish</u>, 899 F.2d 390, 400 n.3 (5th Cir. 1990), citing <u>United States v. Thompson</u>, 615 F.2d 329 (5th Cit. 1980).  The same rule also obtains with regard to false swearing of an affidavit in support of an arrest warrant. <u>Malley v. Briggs</u>, 475 U.S. 335, 344-345, 106 S.Ct. 1092 (1986).

Accordingly, a police officer's fabrication of evidence later used against a defendant at trial is an indisputable violation of the defendant's constitutional rights.  <u>Bibbins v. City of Baton Rouge</u>, 489 F.Supp. 2d 562, 572 (M.D.La. 2007), citing <u>Castellano</u>, 352 F.3d at 955.  Also, <u>Young v. Biggers</u>, 938 F.2d 565, 569-570 (5th Cir. 1991)("framing" someone for a crime that he did not commit deprives that person of his constitutional rights).  Officers are not entitled to qualified immunity if they knowingly presented false information in the affidavit for an arrest warrant.  <u>Young</u>, 938 F.2d at 570 n.9.  An officer cannot avail himself of qualified immunity if he procures false identification by unlawful means or deliberately conceals exculpatory evidence, for such activity

violates clearly established constitutional rights.   <u>Bibbins</u>, 489 F.Supp. at 572.   A police officer's deliberate failure to disclose patently exculpatory evidence to the prosecuting attorney's office plainly exposes him to liability under Section 1983.   <u>Bibbins</u>, 489 F.Supp. 2d at 572, citing <u>Mowbray v. Cameron Cty., Tex.</u>, 274 F.3d 269, 278 (5th Cir. 2001), cert. den., 535 U.S. 1055, 122 S.Ct. 1912 (2002), and <u>Geter v. Fortenberry</u>, 849 F.2d 1550, 1559 (5th Cir. 1988).   See also, <u>Miller v. Prince George's Cty.</u>, 475 F.3d 621 (4th Cir. 2007), cert. den., __ S.Ct.__, 2007 WL 1551803 (U.S. 2007)(officer not entitled to qualified immunity for making false statements and omissions on warrant affidavit, resulting in arrest without probable cause); <u>Burke v. Town of Walpole</u>, 405 F.3d 66, 81 (1st Cir. 2005) (officer who recklessly withheld, pre-arrest, exculpatory evidence is not entitled to qualified immunity in Section 1983 suit by murder arrestee); <u>Shields</u>, 389 F.3d at 150 (an arrest pursuant to a warrant issued by a neutral and detached magistrate breaks the chain of causation and insulates the initiating party from liability for false arrest, *absent* a showing that the decision of the justice of the peace was influenced or tainted in some way by actions of a defendant); <u>Castellano v. Fragozo</u>, 352 F.3d 939, 953 (5th Cir. 2003), cert. den., 543 U.S. 808, 125 S.Ct. 31, 33 (2004).   However, police officers do not have a duty pursuant to <u>Brady</u> to turn over exculpatory evidence to defendants and their counsel.   <u>Bibbins</u>, 489 F.Supp. 2d 562, 573 n.4

(M.D.La. 2007), citing <u>Mowbray</u>, 274 F.3d at 278. Although a <u>Brady</u> violation occurs when the government fails to turn over evidence known only to police investigators and not to the prosecutor, it is the prosecutor who has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police. <u>Youngblood v. West Virginia</u>, 126 S.Ct. 2188, 2190 (U.S. 2006). Also, <u>Steidl v. Fermon</u>, 494 F.3d 623 (7th Cir. 2007). However, police officers and other state actors may be liable under Section 1983 for failing to disclose exculpatory information to the prosecutor. This duty was clearly established in 1986, at the time of Graham's and Burrell's arrests and subsequent trials. <u>Steidl</u>, 494 F.3d at 630-631, citing <u>Youngblood</u>, 126 S.Ct . at 2190.

A complaining witness has qualified immunity for the statements made in his affidavit. A standard of objective reasonableness defines the qualified immunity accorded an officer whose request for a warrant allegedly causes an unconstitutional arrest. Only where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable will the shield of immunity be lost. The question is whether a reasonably well-trained officer would have known that his affidavit failed to establish probable cause and he should not have applied for the warrant. <u>Malley v. Briggs</u>, 475 U.S. 335, 344-345, 106 S.Ct. 1092, 1098 (1986).

Plaintiffs contend defendants fabricated evidence by coercing false testimony, failed to investigate untrustworthy statements, suppressed exculpatory evidence from the prosecuting attorney as well as the defendants, and gave false statements in order to obtain arrests warrants for and prosecutions of the plaintiffs.[11] This was allegedly done to save the Sheriff embarrassment, as stated by Dan Grady in his affidavit (Doc. Item 225, Exs. 30, 31). Defendants Holdman and Forbess argue they did their jobs as well as they could, they believed they had probable cause to arrest the plaintiffs for the murders, and they did not do so in order to help the sheriff avoid embarrassment.

Defendants further argue that the grand jury indictment is an intervening cause which insulates them from liability. However, it is noted that plaintiffs were arrested and imprisoned in August 1986, *before* the grand jury indictment was returned in October 1986 (Doc. Item 225, Ex. 9, pp. 531-532; Ex. 14; Ex. 38, p. 1135).

---

[11] To the extent plaintiffs also appear to complain that defendants testified falsely at their trials, defendants are protected by the absolute immunity protecting witnesses. Police officers acting as government witnesses perform the same function as private witnesses. The absolute immunity for witnesses protects them even from liability under Section 1983 even if they give perjured testimony. Mowbray, 274 F.3d at 277; McQueen v. U.S., 264 F.Supp.2d 502 (S.D.Tex. 2003), aff'd, 100 Fed.Appx. 964 (5th Cir. 2004), citing Briscoe v. LaHue, 460 U.S. 325, 103 S.Ct. 1108 (1983). Moreover, a witness who testifies before a grand jury or at trial is protected by absolute immunity from liability under Section 1983, regardless of the falsity of his testimony; likewise, absolute witness immunity bars Section 1983 suits for conspiracy to commit perjury. Mowbray, 274 F.3d at 277-278.

Since plaintiffs were not arrested pursuant to the indictment, the indictment does not insulate defendants from liability. Furthermore, plaintiffs contend the indictment was returned due to the alleged evidentiary problems created by defendants. Supporting that allegation is the fact that both Judge Woodard and the Louisiana Attorney General concluded there was no credible evidence implicating either Burrell or Graham Adkins in the murders (Doc. Item 225, Exs. 29 & 42).

Plaintiffs contend defendants failed to investigate Janet Burrell's credibility after she gave a statement implicating her ex-husband, Albert Burrell, in the murders, even though she was at that time in a custody battle with Albert Burrell (who had been awarded custody of their child), failed to disclose and investigate Janet Burrell's prior inconsistent statements to the police, one of which was exculpatory to Michael Graham, and threatened Janet Burrell with loss of custody of her children if she recanted her statements implicating the plaintiffs in the murders.  Plaintiffs also claim that details set forth in Deputy Elmer Hearron's initial crime scene report indicated Janet Burrell's statements to the police implicating Burrell were false, so (assuming defendants had read Hearron's report) defendants must have known her statements were false.  Plaintiffs have submitted an affidavit by George Cothran, Chief of Police in Farmerville, Union Parish, Louisiana in 1986, which shows Cothran provided the Union Parish Sheriff's

deputies with a .22 Remington 550 rifle which one of his officers had found in a dumpster about eight miles from the location of the murder victims (Doc. Item 225, Ex. 37). Cothran further states the Union Parish deputies threw the rifle in a corner and, to his knowledge, never had it tested and eventually threw it out (Doc. Item 225, Ex. 37). However, in his deposition, Cothran admitted only part of a rifle had been found, in a landfill near a dumpster (Doc. Item 225, Ex. 2, p. 17). Cothran also testified in his deposition that he did not like Forbess personally, in part because he was employed due to his father's political pull and in part because he was having an extramarital affair, and did not like Averitt because he did not believe he would be an honest sheriff and he refused to back him in the election (Doc. Item 225, Ex. 2, pp. 8-11). Cothran testified that he was aware Forbess had a practice of threatening to have the children of female witnesses taken away from them when the female witnesses would not provide the testimony he sought; Cothran explained he had taught Forbess how to threaten to involve child protective services in cases where a woman would allow her boyfriend to hide drugs or a gun in her home, in order to induce her to tell the truth (Doc. Item 225, Ex. 2, pp. 10-11). Cothran further testified that he had explained to Forbess it was not a good tactic to use in any case that might end up in court, such as a robbery, rape or murder (Doc. Item 225, Ex. 2, p. 11).

Forbess testified in his deposition that he was the primary investigator in the Frost murders.  Forbess' deposition shows some of Janet Burrell's statements were not recorded and the defendants were unaware of Janet's custody battle with Albert Burrell (Doc. Item 225, Ex. 9, pp. 538-539).  Forbess stated in his deposition that Janet Burrell never waivered in her story from the time she gave her initial statement through the time of trial (Doc. Item 225, Ex. 9, p. 546).  Forbess also testified that, on October 27, 1986, Wayne Brantley made his statement to the police as to the jailhouse confessions purportedly made to him by the plaintiffs (Doc. Item 225, Ex. 9, p. 551), and that he was unaware that Brantley had a reputation for lying (Doc. Item 225, Ex. 9, p. 552-553).  Forbess further testified that, had he known of Brantley's propensity for lying, he still would have turned the transcript of Brantley's statement over to the District Attorney's office and let them evaluate it (Doc. Item 225, Ex. 9, p. 554).  Forbess testified that threatening someone with calling child protective services  in order to induce them to tell the truth was not a tactic he would use, but he recalled seeing George Cothran do so one time (Doc. Item 225, Ex. 9. p. 576).  Finally, Forbess stated Cothran brought him a piece of a gun, the barrel and trigger mechanisms; the stock was completely gone and the butt was almost gone, although rotted pieces of wood remained in the back of the stock (Doc. Item 225, Ex. 9, p. 578).  Forbess testified the piece of gun Cothran brought

him had been in the weather; the wood had rotted away, the metal was pitted and rusted, and the mechanisms did not work (Doc. Item 225, Ex. 9, p. 578). Forbess testified the gun had obviously been lying outside longer than the two months that had passed between the murders and the time the gun had been found, so the gun had no relevance to the murders (Doc. Item 225, Ex. 9, p. 578).

Chief Deputy Holdman testified in his deposition that he had been with Forbess many times during witness interviews and had never heard Forbess threaten to have a female witness's children taken away from a witness (Doc. Item 225, Ex. 4, p. 121). Holdman also testified that Forbess had worked on the Frost murder investigation more than he had (Doc. Item 225, Ex. 4, pp. 121, 135). Holdman testified that Tommy Adkins and Sheriff Averitt did not have a good working relationship (Doc. Item 225, Ex. 4, p. 123). Holdman further testified that, when Averitt called he and Forbess in one Sunday afternoon to hear new evidence concerning the Frost murders, Janet Burrell was there when they arrived and gave her statement to the police shortly after they arrived; Forbess and Averitt questioned her (Doc. Item 125, Ex. 4, pp. 136-137). Holdman testified he did not know Janet or Albert Burrell at that time and Holdman did not know of any investigation of Janet after she gave her statement (Doc. Item 125, Ex. 4, pp. 137, 139). Holdman further testified he did not know Olan Wayne Brantley before the murder investigation, but had heard him referred to as

32

"Lying Wayne Brantley" (Doc. Item 225, Ex. 4, p. 143).   Finally, Holdman testified that Forbess had showed him the "rifle" brought to them by the Farmerville officers, and that it had a rusted barrel and part of a chamber, no stock, and looked like it had been in the weather for several years (Doc. Item 225, Ex. 4, p. 137).

Defendants have also submitted Janet Burrell's affidavit to show she was coerced into testifying and not permitted to recant her original false statement to the police (Doc. Item 225, Ex. 16), James Burrell's affidavit showing he testified falsely at trial because his wife (Janet) had been threatened by the sheriff's deputies (Doc. Item 225, Ex. 17), and Amy Hutto's affidavit showing she testified falsely at the trial because she was told to by the St. Clair's and she was scared of them (Doc. Item 225, Ex. 23).

From the deposition evidence, it does not appear the gun turned over to the defendants by the Farmerville city police was exculpatory evidence, since apparently it was not functional at the time the murders were committed.   However, there appear to be genuine issues of material fact created by Janet Burrell's and James Burrell's affidavits, as well as defendants' depositions, concerning whether the defendants suppressed exculpatory evidence or fabricated evidence (testimony) which preclude a summary judgment on the issues of false arrest/false imprisonment and entitlement to qualified immunity.   Defendants' motion for summary judgment and qualified immunity should be denied at this time on

33

the issues of false arrest and false imprisonment.

6. Deputy Holdman

Defendants make very few "allegations" as to Holdman. Defendants show in their statement of undisputed facts (Doc. Item 228) that Holdman assisted at the murder scene, he attempted to make a plaster cast of a footprint and accidentally destroyed it in the process, indicating a lack of training, he was present when Janet Burrell made her statement implicating Burrell, he failed to "document" the discrepancy between Janet's statement, that she found Delton Frost's billfold in Burrell's car and it did not have any money in it, and Deputy Elmer Hearron's report that the billfold was found at the crime scene and it contained six one-dollar bills, he assisted in questioning the Maddux brothers and Albert Burrell, he had been delegated the responsibility to supervise Forbess but was not qualified to supervise investigators, he did not understand what exculpatory or impeachment evidence is, and he did not make a report of Mr. White's statement that he saw a white car of unknown make and model near the Frosts' residence around the time of the murders. Averitt, Forbess, and Holdman all stated in their depositions, and plaintiffs show in their statement of undisputed facts (Doc. Item 228, Stmt. 251) that Forbess was in charge of the investigation of the Frost murders. Forbess provided the information to the state judge which was the basis for the arrest

34

warrants (Doc. Item 225, Ex. 27, p. 1062).

In order to establish the personal liability of a certain defendant to plaintiffs who are claiming damages for deprivation of his civil rights, plaintiffs must show that particular defendant's action or inaction was a violation of the plaintiffs' civil rights. Reimer v. Smith, 663 F.2d 1316, 1322 n. 4 (5th Cir. 1981). Also, Malley v. Briggs, 475 U.S. 335, 106 S.Ct. 1092, 1098 n. 7, 89 L.Ed.2d 271 (1986). Plaintiffs have not alleged or offered any proof of any act or omission by Donald Holdman which constitutes a violation of their civil rights. At most, plaintiffs allege negligence by Holdman; this does not satisfy the deliberate indifference standard required to sustain a Section 1983 action. Therefore, plaintiffs' action against Donald Holdman should be dismissed with prejudice.

## 7. Section 1983 Malicious Prosecution Claim

Plaintiffs also allege an action against defendants in their individual capacities for malicious prosecution. However, there is no Section 1983 claim for malicious prosecution - causing charges to be filed without probable cause does not, without more, violate the Constitution. Shields, 389 F.3d at 150. Therefore, defendants are entitled to a summary judgment on this on plaintiffs' Section 1983 malicious prosecution claim.

## 8. Conspiracy

The plaintiffs also raise general claims against the

defendants for conspiracy, pursuant to 42 U.S.C. §§ 1983, 1985, and 1986. Part 1 of Section 1985 deals with conspiracy to prevent a person from accepting or holding office or to interfere with the duties of an officer of the United States; therefore, Part 1 is inapplicable to plaintiffs' case. Section 1985 provides, in parts two and three:

> "(2) If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified, or to influence the verdict, presentment, or indictment of any grand or petit juror in any such court,...or if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws;
> (3) ... in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

Section 1986 provides an action against those who (1) know of wrongs conspired to be done, which are proscribed under Section 1985 and (2) have the power to prevent or aid in preventing the commission of the wrongs, but (3) neglect or refuse to do so. See

U.S. ex rel. Simmons v. Zibilich, 542 F.2d 259 (5th Cir. 1976); Garrison v. City of Texarkana, Tex. , 910 F.Supp. 1196 (E.D.Tex. 1995), citing Taliaferro v. Voth, 774 F.Supp. 1326 (D.Kan. 1991).

The first part of Section 1985(2) pertains only to federal judicial proceedings and thus is inapplicable to plaintiffs' claims as to their state criminal proceedings. The second part of Section 1985(2) applies to conspiracies to obstruct the course of justice in state courts. Kush v. Rutledge, 460 U.S. 719, 724, 103 S.Ct. 1483, 1486 (1983). Under the second part Section 1985(2), the plaintiff must allege and prove racial or otherwise class-based discriminatory animus. Salmon v. Miller. 951 F.Supp. 103 (E.D.Tex. 1996). Likewise, Section 1985(3) applies to conspiracies to deny equal protection of the laws, and there must be some racial or other class-based animus behind the conspiracy. United Brotherhood of Carpenters & Joiners of America v. Scott, 463 U.S. 825, 928-829, 103 S.Ct. 3352, 3355-3357 (1983); Hilliard v. Ferguson , 30 F.3d 649, 652-653 (1994). In the case at bar, plaintiffs have neither alleged nor shown a class-based discrimination which would support a claim under Section 1985(2) or (3).

Finally, a Section 1986 action is premised upon a violation of Section 1985. Since plaintiffs have not alleged or proven a Section 1985 claim, their Section 1986 claim must likewise fail. See Doucet v. Wadja, 1993 WL 92527, *4 (E.D.La. 1993), citing Rhodes v. Mabus, 676 F.Supp. 755, 760 (S.D.Miss. 1987).

Since there are no genuine issues of material fact which would preclude a summary judgment in favor of defendants on plaintiffs' Section 1985 and Section 1986 conspiracy claims, defendants' motion for summary judgment should be granted on the conspiracy issues.

## 9. Supplemental State Law Claims

Finally, plaintiffs contend defendants are liable to them in their individual capacities for intentional infliction of emotional distress, malicious prosecution, and wrongful conviction.

### 1. Respondeat Superior Liability

First, it is noted that Louisiana state law does not impose vicarious liability on Sheriff Averitt in his individual capacity for constitutional violations by his deputies.

A sheriff in his official capacity as employer of his deputies is liable for the deputy's torts committed in the course and scope of his employment. Jenkins v. Jefferson Parish Sheriff's Office, 402 SO.2d 669, 671 (La. 1981). Therefore, as previously discussed above, Sheriff Averitt (and Sheriff Buckley as his successor in office) are liable in their official capacities only for any torts committed by the deputies; the public funds of the parish law enforcement district, which are controlled by the Sheriff are used to compensate victims of the torts committed by sheriff's deputies. Jenkins v. Jefferson Parish Sheriff's Office, 402 So.2d 669, 671 (La. 1981). Also, Riley v. Evangeline Parish Sheriff's Office, 94-0202 (La. 4/4/94), 637 So.2d 1078.

38

Defendants' motion for summary judgment should be granted in favor of Averitt in his individual capacity on the issue of respondeat superior. However, since Averitt and Buckley may be liable in their official capacities for any torts found to have been committed by the deputies, their motion for summary judgment should be denied as respondeat superior claims against them in their official capacities.

### 2.  Malicious Prosecution

Next, plaintiffs allege a state law claim against defendants for malicious prosecution.

In <u>Miller v. East Baton Rouge Parish Sheriff's Dept.</u>, 511 So.2d 446, 452 (La. 1987), the Louisiana Supreme Court discussed malicious prosecution under Louisiana state law in the context of a case similar to the one at bar. The court stated that an action for malicious prosecution in a criminal proceeding lies in all cases where there is a concurrence of the following elements: (1) the commencement or continuance of an original criminal proceeding; (2) its legal causation by the present defendant against plaintiff who was defendant in the original proceeding; (3) its bona fide termination in favor of the present plaintiff; (4) the absence of probable cause for such proceeding; (5) the presence of malice therein; and (6) damage conforming to legal standards resulting to plaintiff.

Chief among the elements of a malicious prosecution claim is

the requirement that the plaintiff must sustain the burden of proof that the criminal proceeding was initiated or continued without probable cause.  Probable cause for arrest exists when facts and circumstances within the knowledge of the arresting officer and of which he has reasonable and trustworthy information are sufficient to justify a man of average caution in the belief that the person to be arrested has committed or is committing an offense.  The appearances must be such as to lead a reasonable person to set the criminal process in motion; unfounded suspicion and conjecture will not suffice.  Verification may be required to establish probable cause where the source of the information seems unworthy, or where further information about a serious charge would be readily available.  The reputation of the accused, his opportunity to offer explanation, and the need for prompt action, if any, are all factors in determining whether unverified information furnishes probable cause.  Second of importance in actions of malicious prosecution is the element of defendant's malice.  But it is not essential to prove such ill will.  Malice is found when the defendant uses the prosecution for the purpose of obtaining any private advantage, for instance, as a means to extort money, to collect a debt, to recover property, to compel performance of a contract, to "tie up the mouths" of witnesses in another action, or as an experiment to discover who might have committed the crime. Since the determination of malice in a malicious prosecution case

40

is a question of fact, the issue is to be determined by the trier of fact unless only one conclusion may reasonably be drawn from the evidence. <u>Miller</u>, 511 So.2d at 452-453. A malicious prosecution action must clearly establish that the forms of justice have been perverted to the gratification of private malice and the willful oppression of the innocent. <u>Kennedy v. Sheriff of East Baton Rouge</u>, 2005-1418 (La. 7/10/06), 935 So.2d 669. Also, <u>Winn v. City of Alexandria</u>, 96-492 (La. App. 3d Cir. 11/20/96), 685 So.2d 281.

Plaintiffs allege defendants intentionally prosecuted them for the Frost murders, regardless of their guilt or innocence, in order to save the sheriff embarrassment and to appease the public. However, the decision to prosecute Burrell and Graham was made by the prosecutors, not the Sheriff's office defendants. "The district attorney has entire charge and control of every criminal prosecution instituted...in his district, and determines whom, when, and how he shall prosecute." La.C.Cr.P. art. 61. Therefore, the motion for summary judgment by the sheriff's office defendants should be granted on this issue.

### 3. False Arrest/Imprisonment

Plaintiffs are also suing the defendants for false arrest or false imprisonment under state law.

The Louisiana tort of false arrest or false imprisonment consists of two elements: (1) detention of the person and (2) the unlawfulness of the detention. <u>Kennedy</u>, 935 So.3d at 690. Malice

41

is not a necessary element of the tort of false imprisonment and is immaterial except as it may affect the question of damages. <u>Edmond v. Hairford</u>, 539 So.2d 815 (La. App. 3d Cir. 1989). A false arrest or imprisonment occurs when a person is restrained and the restraining officer lacks either a warrant or other statutory authority. If police officers act pursuant to statutory authority in arresting and incarcerating a citizen, they are not liable for damages for false arrest and imprisonment. <u>Kyle v. City of New Orleans</u>, 353 So.2d 969, 971 (La. 1977). In other words, an officer who arrests someone with probable cause or a valid warrant is not liable for false arrest simply because the innocence of the suspect is later established. <u>Anderson v. Nosser</u>, 438 F.2d 183, 195 (5th Cir. 1971), and cases cited therein. The plaintiff bears the burden of proving the arrest or detention was made without color of legal authority. <u>Williams v. Regional Transit Authority</u>, 546 So.2d 150 (La. 1989); <u>Deville v. Jefferson Parish Sheriff's Dept.</u>, 1999-1629 (La. App. 3d Cir. 5/3/00), 762 So.2d 641, writ den., 2000-1589 (La. 8/31/00), 766 So.2d 1281. While verification may be required to establish probable cause where the source of the information seems untrustworthy, it is well established that the reputation of the accused, his opportunity to offer explanation, and the need for prompt action are all factors in determining whether unverified information furnishes probable cause. <u>Miller v. East Baton Rouge Parish Sheriff's Dept.</u>, 511 So.2d 446, 452-53 (La. 1987). The

42

determination of probable cause, unlike the determination of guilt at trial, does not require the fine resolution of conflicting evidence required at trial, and credibility determinations are seldom crucial in deciding whether available evidence supports a reasonable belief that the person to be arrested has committed a crime.  Probable cause deals with probabilities.  An officer need not have sufficient proof to convict but must have more than a mere suspicion.  <u>Gibson v. State</u>, 1999-1730 (La. 4/11/00), 758 So.2d 782, 788-789, cert. den., 531 U.S. 1052, 121 S.Ct. 656 (2000).

In the case at bar, the arresting officers originally arrested plaintiffs pursuant to a warrant supported by Forbess' oral statement to the judge, which was subsequently supported by indictments.  Plaintiffs argue that, since the defendants coerced and fabricated evidence and relied on testimony they knew to be false (or would have known had they investigated) to create probable cause,[12] the defendants knew the arrest warrants were not

_____

[12] As set forth above, plaintiffs allege defendants coerced Janet Burrell into giving a false statement and perjured testimony; suppressed Janet Burrell's recantation of her false statements, as well as her statement that deputies, including Forbess and Holdman, coerced and threatened her; falsely arrested and imprisoned (without bail) Burrell on the basis of Janet Burrell's coerced statement, without probable cause to believe Burrell was involved in the murders; suppressed the early interviews with Kenneth St. Clair and other members of the St. Clair family which did not implicate either Burrell or Graham; used conflicting statements by Kenneth, Glenda, Jackie, and Nickie St. Clair and Amy Opal which they knew to be false; falsely arrested and imprisoned (without bail) Graham on the basis of Kenneth St. Clair's false statement, without probable cause to believe Burrell was involved in the murders; coerced and/or failed to investigate false statements by Olan Wayne

supported by probable cause. This argument is reinforced by Adkins' testimony that he sent the matter to the grand jury for a determination of probable cause, and by the fact that both the Attorney General's and Judge Woodard's conclusion, by both Judge Woodard and the Louisiana Attorney General, that there was no credible evidence implicating Burrell and Graham in the murders. As discussed above, since the arrests were made prior to the matter being presented to the grand jury, there are clearly genuine issues of material fact as to whether defendants had probable cause to arrest plaintiffs which preclude a summary judgment.

However, plaintiffs have not alleged or shown that either Holdman or Averitt (in his individual capacity) was actually involved in their arrest. Plaintiffs only show Holdman was supposed to "supervise" Forbess, but admit Forbess was in charge of the investigation. Although plaintiffs complain Holdman inadvertently destroyed a footprint when he attempted to make an impression of it, they have neither alleged nor shown the footprint was exculpatory evidence; it could have been made by one of the victims. Therefore, plaintiffs' action against Holdman and Averitt in his individual capacity should be dismissed with prejudice.

---

Brantley, which were presented to the grand jury and used in both trials suppression of Brantley's plea bargain, criminal history, and history of mental illness; suppressed Janet Burrell's exculpatory statement; suppressed exculpatory crime lab reports, physical evidence, witness statements, and police reports; and coerced a statement from James Burrell (Burrell's brother).

Therefore, defendants' motion for summary judgment should be granted on the state law issue of false arrest/imprisonment as to Holdman and Averitt in his individual capacity, and denied as to Averitt in his official capacity, Buckley and Forbess.

4. Intentional Infliction of Emotional Distress

Plaintiffs also allege defendants are liable to them under Louisiana state law for intentional infliction of emotional distress.

In order to prevail in a cause of action for intentional infliction of emotional distress under Louisiana law, a plaintiff must prove (1) that the conduct of the defendant was extreme and outrageous, (2) that the emotional distress suffered by the plaintiff was severe, and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct. Sparks v. Donovan, 2004-388 (La. App. 3d Cir. 10/14/04), 884 So.2d 1276, and cases cited therein. The conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. The extreme and outrageous character of the conduct may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests. The distress suffered must be such that no reasonable

45

person could be expected to endure it. Liability arises only where the mental suffering or anguish is extreme. Finally, liability can arise only where the actor desires to inflict severe emotional distress or where he knows that such duress is certain or substantially certain to result from his conduct. <u>White v. Monsanto Co.</u>, 585 So.2d 1205, 1209-1210 (La. 1991).

Clearly, if defendants intended to convict the plaintiffs for the murders, regardless of their guilt or innocence, in order to satisfy the public, spare the sheriff embarrassment, or for any other reason, such conduct on the part of the defendants would be an extreme and outrageous disregard for plaintiffs' constitutional rights. Defendants would have known that such conduct would certainly result in plaintiffs' severe emotional distress. There can be no doubt that extreme distress is certain to result from a false conviction for first degree murder.

As set forth at length above, since plaintiffs have not made any substantive allegations against Holdman and Averitt which would support this claim, defendants' motion for summary judgment should be granted in favor of Holdman. However, since there are genuine issues of material fact as to whether Forbess withheld exculpatory and impeachment evidence, coerced testimony from witnesses, and fabricated evidence in order to bring about plaintiffs' convictions regardless of their guilt or innocence, there are genuine issues of material fact as to whether he intentionally inflicted emotional

46

distress on plaintiffs which preclude a summary judgment on this issue.

## Conclusion

Based on the foregoing discussion, IT IS RECOMMENDED that defendants' motion for summary judgment in favor of Sheriff Buckley in his official capacity be DENIED.

IT IS FURTHER RECOMMENDED that defendants' motion for summary judgment be GRANTED in favor of Averitt in his official capacity on the Monell claims.

IT IS FURTHER RECOMMENDED that defendants' motion for summary judgment and qualified immunity be DENIED on the issues of false arrest/false imprisonment as to Averitt, Buckley and Forbess, and GRANTED as to Holdman.

IT IS FURTHER RECOMMENDED that defendants' motion for summary judgment be GRANTED as to all defendants on the Section 1983 malicious prosecution claims.

IT IS FURTHER RECOMMENDED that defendants' motion for summary judgment be GRANTED as to all defendants on the Section 1985 and Section 1986 conspiracy claims.

IT IS FURTHER RECOMMENDED that defendants' motion for summary judgment be DENIED as to the state law respondeat superior claims against Sheriff Averitt and Sheriff Buckley in their official capacities and GRANTED as to those claims against Sheriff Averitt in his individual capacity.

IT IS FURTHER RECOMMENDED that defendants' motion for summary

47

judgment be GRANTED as to all defendants on the state law claim of malicious prosecution.

IT IS FURTHER RECOMMENDED that defendants' motion for summary judgment be GRANTED on the state law claims of false arrest/imprisonment as to Holdman and Averitt in his individual capacity, and DENIED as to Forbess, Buckley, and Averitt in his official capacity.

IT IS FURTHER RECOMMENDED that defendants' motion for summary judgment be GRANTED in favor of Averitt in his individual capacity and Holdman, and DENIED as to Averitt in his official capacity, Buckley in his official capacity, and Forbess on the issue of intentional infliction of emotional distress.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), the parties have **ten (10) business days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **ten (10) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the district judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN TEN (10) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL**

48

BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM
ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND
LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.

    THUS DONE AND SIGNED at Alexandria, Louisiana, on this _____
day of October, 2007.

 

                        _____
                            JAMES D. KIRK
               UNITED STATES MAGISTRATE JUDGE